DAVIDE GOLIA, SBN 118464
LOUIS J. BLUM, SBN 220941
AJAY C. SHAH, SBN 261741

**MARKS, GOLIA & FINCH, LLP**
ATTORNEYS AT LAW
8620 SPECTRUM CENTER BOULEVARD – SUITE 900
SAN DIEGO, CALIFORNIA 92123-1454
TELEPHONE: (858) 737-3100
FACSIMILE: (858) 737-3101

Attorneys for Plaintiff RQ Construction, Inc.

```
FILED

DEC 4 - 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                         DEPUTY
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO DIVISION

RQ CONSTRUCTION, INC.,
a California corporation,

       Plaintiffs,

v.

ECOLITE CONCRETE U.S.A., INC.,
a Nevada corporation;
ECOLITE INTERNATIONAL, INC.,
a Nevada corporation;
BRIAN SMITH, an individual; and
DOES 1 through 90,

       Defendants.

CASE NO. 09 CV 2728 BEN WVG

COMPLAINT FOR:

(1) FRAUD UNDER RULE 10B-5;
(2) JOINT AND SEVERAL LIABILITY CONTROL PERSONS: TITLE 15 U.S.C. § 78t;
(3) FAILURE TO REGISTER: TITLE 15 U.S.C. §§ 77e, l;
(4) FRAUD IN A PUBLIC OFFERING: TITLE 15 U.S.C. § 77l;
(5) CONTROL PERSON LIABILITY: TITLE 15 U.S.C. § 77o;
(6) COMMON-LAW FRAUD;
(7) NEGLIGENT MISREPRESENTATION;
(8) FALSE OR MISLEADING STATEMENTS: CAL. CORP. CODE §§ 25401, 25501; AND
(9) SALE IN VIOLATION OF QUALIFICATION REQUIREMENTS: CAL. CORP. CODE § 25110.

**DEMAND FOR JURY TRIAL**

Assigned to:
Hon. _____, Dept. _____

/ / / / /

/ / / / /

/ / / / /

COMPLAINT

## GENERAL ALLEGATIONS

1.     This action is brought pursuant to and jurisdiction is conferred by Title 17, Code of Federal Regulations, section 240.10b-5 ("Rule 10b-5"), Title 15, United States Code sections 77a et seq. (the "33 Act"), and Title 15, United States Code, sections 78a et seq. (the "34 Act").  The Court has jurisdiction over state law claims pursuant to the Court's supplemental jurisdiction, Title 28, United States Code, section 1367.

2.     Venue in this Court is proper as a substantial part of the transactions which implicate Rule 10b-5, the 33 Act, and the 34 Act were performed within this judicial district.

3.     Plaintiff RQ Construction, Inc. ("RQ"), is, and at all relevant times was, a California corporation authorized and licensed to do business and doing business in the State of California.

4.     Defendant Ecolite Concrete U.S.A., Inc. ("ECUSA"), is, and at all relevant times was, a Nevada corporation authorized and licensed to do business and doing business in the State of California.

5.     RQ is informed and believes defendant Brian Smith ("Smith") is, and at all relevant times was, a resident of San Diego County, California.  At all relevant times Brian Smith was a director and the CEO of ECUSA.

6.     Defendant Ecolite International, Inc. ("International"), is, and at all relevant times was, a Nevada corporation authorized and licensed to do business and doing business in the State of California.

7.     International is the majority shareholder of ECUSA.  Smith has controlling interest in International and is, and at all relevant times was, its CEO.

8.     Defendants DOES 1 through 90 are sued under fictitious names.  RQ does not know the true names and capacities of DOES 1 through 90.  RQ is informed and believes that DOES 1 through 90 are in some manner responsible for the events and occurrences described here.  When the true names and capacities of DOES 1 through 90 are ascertained, RQ will amend this complaint by inserting their true names and capacities.

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

2

COMPLAINT

9.     RQ is informed and believes that each of the defendants named as DOES 46 through 90 are and were the agents, servants, employees and/or alter egos of one or more of the other named defendants, and are in some manner responsible for the events and occurrences described here.

<u>Sales of ECUSA Stock to RQ</u>

10.     RQ is informed and believes ECUSA has exclusive rights to a product called Ecolite, a prefabricated steel-stud and concrete wall system.

11.     In late 2006, ECUSA and RQ negotiated for RQ to invest in ECUSA.

12.     Negotiations occurred primarily between George H. Rogers, III ("Rogers"), President and CEO of RQ, and Smith, then CEO and director of ECUSA.  Smith represented to Rogers that all shares of ECUSA were validly issued and that ECUSA did not have any litigation exposure.

13.     On or about November 7, 2006, after negotiations between Smith and Rogers, ECUSA and RQ entered into a Memorandum of Understanding (the "First MOU").  The First MOU stated, among other things, that ECUSA would issue RQ warrants to buy ten percent of the equity of ECUSA.

14.     In the First MOU, ECUSA and Smith represented the value of ECUSA was $12,000,000.00.  The First MOU states:  "At the current valuation of $1.00 per share that Ecolite has been selling equity, this will equate to 1.2 million shares, and likewise, a valuation of $1.2 million."  A true and correct copy of the First MOU is attached as Exhibit "1," and incorporated by reference as though set forth in full at this point.

15.     RQ exercised its warrants on multiple occasions to purchase shares of ECUSA stock for $1.00 per share.

16.     In late 2007 and early 2008, RQ and ECUSA began negotiations for an additional investment by RQ in ECUSA through discussions between Smith and Rogers.

/ / / / /

/ / / / /

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

3

COMPLAINT

17.     On February 13, 2008, as a result of the negotiations between Smith and

Rogers, RQ and ECUSA entered into another Memorandum of Understanding (the "Second

MOU"), under which RQ obligated itself to purchase up to 2 million shares of Common Stock

from ECUSA at the price of $1.00 per share, for an aggregate purchase price of up to

$2,000,000.00.  RQ was to be obligated to purchase the shares from ECUSA at no more than

$200,000.00 a month, if and only if requested by ECUSA.  Again, during these negotiations

Smith represented to Rogers that all previous shares were validly issued and that ECUSA did

not have any litigation exposure.  A true and correct copy of the Second MOU is attached as

Exhibit "2," and incorporated by reference as though set forth in full at this point.

18.     After negotiations in May and June of 2008, between Smith and Rogers, the

Second MOU was amended by a further Memorandum of Understanding, in or about June

2008 (the "Third MOU"), to increase to 3 million the aggregate number of shares of Common

Stock RQ was obligated to purchase at $1.00 per share.  Parties to the Third MOU are RQ,

ECUSA, International, with Smith signing on its behalf, and Smith in his individual capacity.

Again, RQ was only obligated to purchase shares up to $200,000.00 a month and only when

requested to do so by ECUSA.  If ECUSA did not request money, RQ was not obligated to

purchase shares.  Again, in these negotiations, Smith represented that all previous shares had

been validly issued and that ECUSA did not have any litigation exposure.  A true and correct

copy of the Third MOU is attached as Exhibit "3," and incorporated by reference as though set

forth in full at this point.

19.     Consistent with commitments in the First MOU, Second MOU, and Third

MOU, RQ purchased numerous shares of ECUSA stock.

20.     On July 28, 2008, RQ and ECUSA entered into a Put Option Agreement to

confirm the obligation RQ established in the Second and Third MOUs to purchase up to 3

million shares in installments of not more than $200,000.00 per month at the option of

ECUSA.  The Put Option Agreement also confirmed that the prior purchases under the Second

and Third MOUs were to be subject to the Put Option Agreement and would credit against the

4

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

1   3 million shares aggregate.  The Put Option Agreement provided for an award of attorneys'

2   fees, reasonable expenses, and costs to the prevailing party in any dispute between RQ and

3   ECUSA arising from or related to the Agreement.  A true and correct copy of the Put Option

4   Agreement is attached as Exhibit "4," and incorporated by reference as though set forth in full

5   at this point.

6       21.    Also on July 28, 2008, RQ's wholly owned LLC, RQ Manufacturing, LLC,

7   entered an agreement with ECUSA to purchase ECUSA's membership interest in Ecolite Las

8   Vegas, LLC (the "Purchase Agreement").  A true and correct copy of the Purchase Agreement

9   is attached as Exhibit "5," and incorporated by reference as though set forth in full at this point.

10      22.    The formation of RQ Manufacturing, LLC, and the Purchase Agreement were

11  in furtherance of and to conclude the commitments established in the Third MOU.

12      23.    The Purchase Agreement contains various warranties, including a representation

13  and warranty by ECUSA that it did not have litigation exposure.  The warranties expressly

14  extend to various related agreements, including the Put Option Agreement.

15      24.    In soliciting each commitment by RQ, Smith made representations to Rogers,

16  including but not limited to, the fact ECUSA was without litigation exposure and all shares of

17  ECUSA stock had been validly issued.

18      25.    In reliance on the representations of ECUSA, International, Smith, and pursuant

19  to the various agreements, RQ entered and performed per the three MOUs, including its

20  purchase of numerous shares of stock for $1.00 per share.

21      26.    RQ is informed and believes that the oral representations of Smith with respect

22  to validly issued shares and litigation exposures, and the written warranties to that effect

23  contained in the Purchase Agreement, were false and that Smith, International, and ECUSA

24  were aware of the falsity.

25  / / / / /

26  / / / / /

27  / / / / /

28

MARKS, GOLIA & FINCH, LLP
8620 Spectrum Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

<u>Sales Of ECUSA Stock To Eye See Partners, LLC</u>

27.    RQ is informed and believes that, prior to any purchases of shares by RQ, ECUSA had sold shares to Eye See Partners, LLC ("Eye See"), an entity formed specifically for the purpose of acquiring and holding ECUSA shares.

28.    RQ is informed and believes Eye See has approximately 80 members, who are residents of various states, none of whom qualified as accredited investors pursuant to Federal or California law.

29.    RQ is informed and believes Smith invited the members of Eye See on a cruise where he solicited their investment in ECUSA.

30.    RQ is informed and believes an aggregate of 596,377 shares were sold for $518,000.00 to Eye See.

31.    RQ is informed and believes ECUSA did not file a registration statement with the Securities and Exchange Commission for these transactions and it did not apply for a qualification permit with the California Corporations Commissioner.

32.    RQ is informed and believes that within the six months before the first sale, and six months following the last sale to Eye See, ECUSA sold additional securities to other persons for net proceeds of $108,333.00 and $650,000.00, respectively.  RQ is informed and believes ECUSA has sold additional securities from the subsequent sale to present at intervals not exceeding six months.

33.    RQ is informed and believes ECUSA, through Smith, was intimately involved in soliciting the Eye See members.

34.    RQ is informed and believes that stock certificates were never actually provided to Eye See.  RQ is informed and believes that individual members of Eye See have been requesting issuance of stock certificates directly to them.  RQ is informed and believes that ECUSA has refused to issues stock certificates directly to the individual members of Eye See.

/ / / / /

/ / / / /

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

6

COMPLAINT

35.  At no time during negotiation of the three MOUs did ECUSA advise RQ of the sales to Eye See, the failure to issue stock certificates that the Eye See members had been requesting the issuance of stock certificates individually, or that ECUSA was declining to issue such certificates.

36.  RQ did not learn of the Eye See sales until in or about June or July 2009. Before that date, RQ was never alerted to the possibility of rescission or fraud claims by Eye See members, nor was RQ alerted to the potential for liability of the ECUSA officers and directors in willfully proceeding with unregistered and nonexempt offerings to Eye See.

<u>Claims By Wilhelm Against Smith</u>

37.  RQ is informed and believes Jon Wilhelm ("Wilhelm") is an investor in ECUSA's precursor, Ecolite Concrete Services, and shareholder in ECUSA's affiliated company, International.

38.  RQ is informed and believes Wilhelm made and continues to make serious allegations that Smith defrauded Wilhelm in soliciting investment in Ecolite Concrete Services, a sole proprietorship that Smith misrepresented as a corporation.  RQ is informed and believes Wilhelm alleges Smith further defrauded him by, after Wilhelm's investment, spinning Ecolite Concrete Services off into two separate corporations, International and ECUSA.  RQ is informed and believes Wilhelm was issued shares of International making him a six percent shareholder.  RQ is informed and believes Wilhelm was not issued equivalent shares in ECUSA and has never been issued shares in ECUSA.

39.  RQ is informed and believes Wilhelm alleges Ecolite Concrete Services was a sole proprietorship at the time of his six percent investment in the company.  Consequently, Wilhelm alleges he gained a partnership interest in Ecolite Concrete Services.  Because Ecolite Concrete Services subsequently spun off into International and ECUSA, Wilhelm alleges he is entitled to a six percent interest in International and a six percent interest in ECUSA.  Issuance of shares to Wilhelm to equal a six percent interest would substantially dilute ECUSA's shares.

/ / / / /

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

40.     RQ is informed and believes Wilhelm also claims Smith breached his fiduciary duties as a director and officer of International, including unlawfully diluting the shares of International in ECUSA, looting the assets of International by transferring them to ECUSA, wrongfully transferring some or all the intellectual property rights of International to ECUSA, and not compensating Wilhelm for contributions to the intellectual property held by International and licensed to ECUSA.

41.     RQ is informed and believes that the basis for and the fact of Wilhelm's claims were known to Smith, International, and ECUSA at the time the MOUs were being negotiated, and that Wilhelm is currently threatening litigation against Smith, International, and ECUSA due to Smith's actions.

42.     At no time did ECUSA, International, or Smith advise Rogers or RQ of Wilhelm's claims or threat of litigation.

### Claims By Shields Against ECUSA And Smith

43.     RQ is informed and believes David Shields and Evelyn Shields (collectively the "Shields") are investors in Ecolite Concrete Services.

44.     RQ is informed and believes the Shields made and continue to make serious allegations against Smith for misrepresenting, at the time of their investment, the organizational status of Ecolite Concrete Services.

45.     RQ is informed and believes Smith stated Ecolite Concrete Services was a corporation, when in fact it was a sole proprietorship. As a consequence of this misrepresentation the Shields allege they gained a partnership interest in Ecolite Concrete Services. Because Ecolite Concrete Services subsequently spun off into International and ECUSA, the Shields allege they are also entitled to an interest in ECUSA.

46.     If the Shields are issued shares, this would act to substantially dilute ECUSA's shares.

/ / / / /

/ / / / /

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

8

COMPLAINT

47.     RQ is informed and believes that the basis for and risk of the Shields claims were known to and appreciated by ECUSA, International, and Smith at the time the Third MOU was being negotiated.  RQ is informed and believes the Shields are threatening litigation against Smith, International, and ECUSA due to Smith's actions.

48.     At no time did ECUSA, International, or Smith advise Rogers or RQ of the transactions with the Shields, the risk of litigation by the Shields, or the Shields' threat of litigation.

                    Misrepresentations And Omissions By ECUSA, Smith, And International

49.     Prior to RQ's investment memorialized in the First MOU, ECUSA and Smith represented all shares were validly issued and ECUSA did not have litigation exposure.  In fact, ECUSA and Smith failed to disclose the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings.

50.     Prior to RQ's investment memorialized in the Second MOU, ECUSA and Smith represented all shares were validly issued and ECUSA did not have litigation exposure.  In fact, ECUSA and Smith failed to disclose the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings.

51.     Prior to RQ's investment memorialized in the Third MOU, ECUSA, International, and Smith represented all shares were validly issued and ECUSA did not have litigation exposure.  In fact, ECUSA, International, and Smith failed to disclose the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings.

52.     Prior to RQ's investment memorialized in the Put Option Agreement, ECUSA and Smith represented orally and in writing that all shares were validly issued and ECUSA did not have litigation exposure.  In fact, ECUSA, International, and Smith failed to disclose the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings.

/ / / / /

/ / / / /

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

9

COMPLAINT

53.     Pursuant to the Put Option Agreement, ECUSA regularly and fully drew on the $200,000.00 a month allotment. Each time ECUSA exercised its rights under the Put Option Agreement, it had an opportunity to make full disclosure as to problems with issuance of previous shares and exposure to litigation, but did not.

54.     In each transaction, ECUSA and Smith, and with respect to the third MOU and related agreement, International, had an affirmative duty to disclose the Eye See, Wilhelm, and Shields issues, as described above, and the consequent problems with prior issuance of shares and ECUSA's exposure to litigation. ECUSA, Smith, and International breached this duty by failing to make these material disclosures and by making express representations to the contrary.

55.     Had RQ known about the Eye See, Wilhelm, and Shields issues and the consequent problems with prior issuance of shares and exposure to litigation, RQ would not have purchased shares of ECUSA.

56.     RQ is informed and believes that it is obligated to disclose the Eye See, Wilhelm, and Shields issues to any potential purchaser of RQ's ECUSA shares. RQ is informed and believes that the disclosure obligation has effectively reduced the value of RQ's shares to zero. RQ is informed and believes the disclosure obligation and resulting devaluation of shares will persist regardless of whether Eye See, Wilhelm, or Shields bring formal litigation on their claims.

57.     RQ is informed and believes that, as a direct and proximate result of the Eye See, Wilhelm, and Shields issues, the value of RQ's ECUSA stock is significantly diminished to a value of zero or nearly zero dollars, and, to the extent there is any remaining value, stands to be further diminished and diluted.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

MARKS, GOLIA &
FINCH, LLP
8820 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

## FIRST CLAIM FOR RELIEF

(Fraud Under Rule 10b-5 – Against ECUSA, Smith,
International, and DOES 1 through 5 and 46 through 50)

58.     RQ realleges and incorporates by reference paragraphs 1 through 57, above, as though set forth in full at this point.

59.     RQ is an actual purchaser of shares of ECUSA stock.

60.     ECUSA, Smith, and DOES 1 through 5 and 46 through 50 misrepresented the value of ECUSA to be $12,000,000.00 in the First MOU.  The positive statement of value was false because it was unqualified by a disclosure of the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings.  It misrepresented the potential exposure to litigation and that all shares of ECUSA had been validly issued.

61.     ECUSA, Smith, International, and DOES 1 through 5 and 46 through 50 also made express representations as to the lack of litigation exposure and valid issuance of all shares.  The representations were oral and in the Purchase Agreement.

62.     The misrepresentations were made in connection with RQ's purchases of ECUSA stock.

63.     The misrepresentations are material because they effect the value of, viability of, and risk associated with investment in ECUSA.

64.     The misrepresentations caused and had a strong propensity to affect investment decisions to buy ECUSA stock.

65.     RQ relied on the misrepresentations made by ECUSA, Smith, International, and DOES 1 through 5 and 46 through 50 in deciding to buy ECUSA stock.

66.     ECUSA, Smith, International, and DOES 1 through 5 and 46 through 50 intended to deceive, manipulate, or defraud RQ into buying ECUSA stock.

67.     RQ spent millions of dollars purchasing shares of ECUSA stock that had a book value closer to zero.

/ / / / /

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

11

68.     ECUSA, Smith, International, and DOES 1 through 5 and 46 through 50 used the means of interstate commerce to communicate their misrepresentation.

69.     As a proximate result of the misrepresentations by ECUSA, Smith, International, and DOES 1 through 5 and 46 through 50, RQ has been damaged in an amount to be proven at trial.

<div align="center">SECOND CLAIM FOR RELIEF</div>

<div align="center">(Joint And Several Liability For Control Persons:<br>Title 15 U.S.C. § 78t – Against Smith and DOES 6 through 10 and 51 through 55)</div>

70.     RQ realleges and incorporates by reference paragraphs 1 through 69, above, as though set forth in full at this point.

71.     RQ is an actual purchaser of shares of ECUSA stock.

72.     Smith and DOES 6 through 10 and 51 through 55 are liable for misrepresentations as described above in RQ's First Claim for Relief.

73.     Smith has control person liability due to his position as CEO of ECUSA and of International, because of his voting power on the Board of Directors of ECUSA, his voting power as a 25 percent shareholder of ECUSA, and his controlling interest in majority shareholder, International.

74.     Smith directly participated in the solicitations, negotiations and drafting of the agreements in which he made oral and written misrepresentations.

75.     As a proximate result of the misrepresentations by ECUSA, Smith, International, and DOES 6 through 10 and 51 through 55, RQ has been damaged in an amount to be proven at trial.

<div align="center">THIRD CLAIM FOR RELIEF</div>

<div align="center">(Failure To Register:  Title 15 U.S.C. §§ 77e, l –<br>Against ECUSA, Smith, and DOES 11 through 15 and 56 through 60)</div>

76.     RQ realleges and incorporates by reference paragraphs 1 through 75, above, as though set forth in full at this point.

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

77.   RQ purchased unregistered and non-exempt ECUSA securities.

78.   Eye See is an unaccredited investor.  The purchase of ECUSA stock by RQ is integrated with the sale of ECUSA stock to Eye See.  The offerings involved the same class of shares and the same consideration.  The offerings were part of a continuous offering process and were made at about the same time.  The share purchases of Eye See and RQ are part of the "1st Private Round," and part of the same plan of financing.  Finally, the sales were made for the same general purpose of funding ECUSA's general operations as ECUSA has been involved in general start up activity since the licensing of the Ecolite product.

79.   The sale of ECUSA stock to RQ and Eye See was accomplished by means of interstate commerce.

80.   As a proximate result of the sale of unregistered securities by ECUSA, Smith, and DOES 11 through 15 and 56 through 60, RQ has been damaged in an amount to be proven at trial.

<center>FOURTH CLAIM FOR RELIEF</center>

<center>(Fraud In A Public Offering:  Title 15 U.S.C. § 77l –<br/>Against ECUSA, Smith, and DOES 16 through 20 and 61 through 65)</center>

81.   RQ realleges and incorporates by reference paragraphs 1 through 80, above, as though set forth in full at this point.

82.   As described above, the purchase of ECUSA stock by RQ is integrated with the sale of ECUSA stock to Eye See.  The offerings involved the same class of shares and the same consideration.  The offerings were part of a continuous offering process and were made at about the same time.  The share purchases of Eye See and RQ are part of the "1st Private Round," and part of the same plan of financing.  Finally, the sales were made for the same general purpose of funding ECUSA's general operations as ECUSA has been involved in general start up activity since the licensing of the Ecolite product.

83.   ECUSA, Smith, and DOES 16 through 20 and 61 through 65 offered to sell and sold ECUSA stock to RQ.

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

84. The sale of ECUSA stock to RQ was accomplished by means of interstate commerce.

85. The sale of ECUSA stock was made through the First MOU, Second MOU, Third MOU, and Put Option Agreement. Those agreements were secured by oral assurances as to value, that all previous shares had been validly issued, and that ECUSA did not have litigation exposure. As to the Third MOU, ECUSA, and Smith warranted in writing that all shares were validly issued and that ECUSA did into have litigation exposure.

86. The written offers included an untrue statement of a material fact that the value of ECUSA was $12,000,000.00. The positive statement of value was unqualified by a disclosure of the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings. As to the Third MOU, the written offer also included an untrue statement of material fact regarding litigation exposure.

87. RQ was unaware of the falsity of these representations when they purchased the ECUSA stock.

88. The sale of ECUSA stock to RQ and Eye See was accomplished by means of interstate commerce.

89. As a proximate result of the misrepresentations by ECUSA and DOES 16 through 20 and 61 through 65, RQ has been damaged in an amount to be proven at trial.

FIFTH CLAIM FOR RELIEF

(Control Person Liability: Title 15 U.S.C. § 77o –
Against Smith and DOES 21 through 25 and 66 through 70)

90. RQ realleges and incorporates by reference paragraphs 1 through 89, above, as though set forth in full at this point.

91. RQ is an actual purchaser of shares of ECUSA stock.

92. Smith and DOES 21 through 25 and 66 through 70 are liable for misrepresentations as described above in RQ's Fourth Claim for Relief.

/ / / / /

MARKS, GOLIA & FINCH, LLP
8620 Spectrum Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

93.     Smith has control person liability due to his position as CEO, because of his

voting power on the Board of Directors of ECUSA, his voting power as a 25 percent

shareholder of ECUSA, and his controlling state in majority shareholder, International.

94.     Smith directly participated in the negotiations and drafting of the agreements in

which he made oral and written misrepresentations.

95.     As a proximate result of the actions by Smith and DOES 21 through 25 and 66

through 70, RQ has been damaged in an amount to be proven at trial.

<div align="center">SIXTH CLAIM FOR RELIEF</div>

<div align="center">(Common-Law Fraud – Against ECUSA, Smith,<br>International, and DOES 26 through 30 and 71 through 75)</div>

96.     RQ realleges and incorporates by reference paragraphs 1 through 95, above, as

though set forth in full at this point.

97.     ECUSA, Smith, and DOES 26 through 30 and 71 through 75 misrepresented the

value of ECUSA to be $12,000,000.00 in the First MOU.  The positive statement of value was

false because it was unqualified by a disclosure of the Eye See members' claims, the Wilhelm

claims, the Shields claims, or the price of prior offerings.  It misrepresented the potential

exposure to litigation and that all shares of ECUSA had been validly issued.  ECUSA, Smith,

and DOES 26 through 30 and 71 through 75 also made express representations as to the lack of

litigation exposure and valid issuance of all shares.

98.     ECUSA, Smith, and DOES 26 through 30 and 71 through 75 failed to disclose

ECUSA's litigation exposure prior to RQ's purchase of ECUSA stock per the First MOU, and

Second MOU..

99.     ECUSA, International, Smith, and DOES 26 through 30 and 71 through 75

failed to disclose ECUSA's litigation exposure or the consequent reduction of value resulting

from the obligation to disclose the litigation exposure prior to RQ's purchase of ECUSA stock

per the Third MOU.

/ / / / /

MARKS, GOLIA &<br>FINCH, LLP<br>8620 Spectrum<br>Center Boulevard<br>Suite 900<br>San Diego, CA 92123<br>(858) 737-3100

15

COMPLAINT

100.   ECUSA, Smith, International, and DOES 26 through 30 and 71 through 75, with malice and oppression, intended to deceive, manipulate, or defraud RQ into buying ECUSA stock.

101.   RQ justifiably relied on the misrepresentation of ECUSA, Smith, and DOES 26 through 30 and 71 through 75 in their purchase of ECUSA stock.

102.   RQ spent millions of dollars purchasing shares of ECUSA stock that had a book value closer to zero.

103.   As a proximate result of the misrepresentations by ECUSA, Smith, and DOES 26 through 30 and 71 through 75, RQ has been damaged in an amount to be proven at trial.

<u>SEVENTH CLAIM FOR RELIEF</u>

(Negligent Misrepresentation – Against ECUSA,
Smith, International, and DOES 31 through 35 and 76 through 80)

104.   RQ realleges and incorporates by reference paragraphs 1 through 103, above, as though set forth in full at this point.

105.   ECUSA, Smith, and DOES 31 through 35 and 76 through 80 misrepresented the value of ECUSA to be $12,000,000.00 in the First MOU.  The positive statement of value was false because it was unqualified by a disclosure of the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings.  It misrepresented the potential exposure to litigation and that all shares of ECUSA had been validly issued.  ECUSA, Smith, and DOES 31 through 35 and 76 through 80 also made express representations as to the lack of litigation exposure and valid issuance of all shares.

106.   ECUSA, Smith, and DOES 31 through 35 and 76 through 80 failed to disclose ECUSA's litigation exposure prior to RQ's purchase of ECUSA stock per the First MOU and Second MOU.

107.   ECUSA, International, Smith, and DOES 31 through 35 and 76 through 80 failed to disclose ECUSA's litigation exposure prior to RQ's purchase of ECUSA stock per the Third MOU.

16

COMPLAINT

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

108.   ECUSA, Smith, International, and DOES 31 through 35 and 76 through 80 did not have a reasonable ground to believe the statements to be true.

109.   ECUSA, Smith, International, and DOES 31 through 35 and 76 through 80 intended to induce reliance on the statements.

110.   RQ justifiably relied on the misrepresentation of ECUSA, Smith, International, and DOES 31 through 35 and 76 through 80 in their purchase of ECUSA stock.

111.   RQ spent millions of dollars purchasing shares of ECUSA stock that had a book value closer to zero.

112.   As a proximate result of the misrepresentations by ECUSA, Smith, International, and DOES 31 through 35 and 76 through 80, RQ has been damaged in an amount to be proven at trial.

<u>EIGHTH CLAIM FOR RELIEF</u>

(False Or Misleading Statements:  Cal. Corp. Code, §§ 25401,
25501 – Against ECUSA and DOES 36 through 40 and 81 through 85)

113.   RQ realleges and incorporates by reference paragraphs 1 through 112, above, as though set forth in full at this point.

114.   ECUSA, Smith, and DOES 36 through 40 and 81 through 85 misrepresented the value of ECUSA to be $12,000,000.00 in the First MOU.  The positive statement of value was false because it was unqualified by a disclosure of the Eye See members' claims, the Wilhelm claims, the Shields claims, or the price of prior offerings.  It misrepresented the potential exposure to litigation and that all shares of ECUSA had been validly issued.  ECUSA, Smith, and DOES 31 through 35 and 76 through 80 also made express representations as to the lack of litigation exposure and valid issuance of all shares.

115.   The misrepresentations were material to and made in connection with the purchase of ECUSA stock by RQ.

116.   As a proximate result of the misrepresentations by ECUSA and DOES 36 through 40 and 81 through 85, RQ has been damaged in an amount to be proven at trial.

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

1                    NINTH CLAIM FOR RELIEF

2                (Sale In Violation Of Qualification Requirements:
       Cal. Corp. Code, § 25110 – Against ECUSA and DOES 41 through 45 and 86 through 90)

3

4           117.     RQ realleges and incorporates by reference paragraphs 1 through 116, above, as

5 though set forth in full at this point.

6           118.     RQ purchased unqualified and non-exempt ECUSA securities.

7           119.     The purchase of ECUSA stock by RQ is integrated with the sale of ECUSA

8 stock to Eye See. Both offerings involved the same class of shares and the same consideration.

9 The offerings were part of a continuous offering process and were made at about the same

10 time. The share purchases by Eye See and RQ are part of the "1st Private Round," and part of

11 the same plan of financing. Finally, the sales were made for the same general purpose of

12 funding ECUSA's general operations as ECUSA has been involved in general start up activity

13 since the licensing of the Ecolite product.

14           120.     The sale of stock to RQ was in violation of Corporations Code section 25110,

15 and as a proximate result, RQ was damaged in an amount to be proven at trial.

16           WHEREFORE, the RQ prays for judgment against ECUSA, Smith, International, and

17 DOES 1 through 90 as follows:

18 ON THE FIRST CLAIM FOR RELIEF:

19           1.      For restitution of all sums and consideration paid to ECUSA;

20           2.      For general, special and consequential damages in an amount not yet fully

21 ascertained and according to proof at trial;

22           3.      For interest on all sums at the maximum legal rates allowed by law from dates

23 according to proof; and

24           4.      For attorneys' fees and all costs and reasonable expenses of suit.

25 ON THE SECOND CLAIM FOR RELIEF:

26           1.      For restitution of all sums and consideration paid to ECUSA;

27 / / / / /

28

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

18

COMPLAINT

1         2.     For general, special and consequential damages in an amount not yet fully

2 ascertained and according to proof at trial; and

3         3.     For interest on all sums at the maximum legal rates allowed by law from dates

4 according to proof.

5 ON THE THIRD CLAIM FOR RELIEF:

6         1.     For restitution of all sums and consideration paid to ECUSA;

7         2.     For general, special and consequential damages in an amount not yet fully

8 ascertained and according to proof at trial;

9         3.     For interest on all sums at the maximum legal rates allowed by law from dates

10 according to proof; and

11         4.     For attorneys' fees and all costs and reasonable expenses of suit.

12 ON THE FOURTH CLAIM FOR RELIEF:

13         1.     For restitution of all sums and consideration paid to ECUSA;

14         2.     For general, special and consequential damages in an amount not yet fully

15 ascertained and according to proof at trial;

16         3.     For interest on all sums at the maximum legal rates allowed by law from dates

17 according to proof; and

18         4.     For attorneys' fees and all costs and reasonable expenses of suit.

19 ON THE FIFTH CLAIM FOR RELIEF:

20         1.     For restitution of all sums and consideration paid to ECUSA;

21         2.     For general, special and consequential damages in an amount not yet fully

22 ascertained and according to proof at trial;

23         3.     For interest on all sums at the maximum legal rates allowed by law from dates

24 according to proof; and

25         4.     For attorneys' fees and all costs and reasonable expenses of suit.

26 / / / / /

27 / / / / /

28

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

19

COMPLAINT

1    ON THE SIXTH CLAIM FOR RELIEF:

2         1.    For general, special and consequential damages in an amount not yet fully

3    ascertained and according to proof at trial;

4         2.    For interest on all sums at the maximum legal rates allowed by law from dates

5    according to proof;

6         3.    For punitive damages; and

7         4.    For attorneys' fees and all costs and reasonable expenses of suit.

8    ON THE SEVENTH CLAIM FOR RELIEF:

9         1.    For general, special and consequential damages in an amount not yet fully

10   ascertained and according to proof at trial;

11        2.    For interest on all sums at the maximum legal rates allowed by law from dates

12   according to proof; and

13        3.    For attorneys' fees and all costs and reasonable expenses of suit.

14   ON THE EIGHTH CLAIM FOR RELIEF:

15        1.    For restitution of all sums and consideration paid to ECUSA;

16        2.    For general, special and consequential damages in an amount not yet fully

17   ascertained and according to proof at trial;

18        3.    For interest on all sums at the maximum legal rates allowed by law from dates

19   according to proof; and

20        4.    For attorneys' fees and all costs and reasonable expenses of suit.

21   ON THE NINTH CLAIM FOR RELIEF:

22        1.    For restitution of all sums and consideration paid to ECUSA;

23        2.    For general, special and consequential damages in an amount not yet fully

24   ascertained and according to proof at trial;

25        3.    For interest on all sums at the maximum legal rates allowed by law from dates

26   according to proof; and

27        4.    For attorneys' fees and all costs and reasonable expenses of suit.

28

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

1    ON ALL CAUSES OF ACTION:

2          1.      For costs of suit incurred; and

3          2.      For such other and further relief the Court deems just and proper.

4    DATED:  December 4, 2009                    Respectfully submitted,

5                                                MARKS, GOLIA & FINCH, LLP

6

7                                        By: _____
                                                DAVIDE GOLIA
8                                               LOUIS J. BLUM
                                                AJAY C. SHAH
9                                        Attorneys for Plaintiff RQ Construction, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

## DEMAND FOR JURY TRIAL

RQ Construction, Inc., hereby demands a trial by jury.

DATED:  December 4, 2009

Respectfully submitted,

MARKS, GOLIA & FINCH, LLP

By: _____
DAVIDE GOLIA
LOUIS J. BLUM
AJAY C. SHAH
Attorneys for Plaintiff RQ Construction, Inc.

971.016/ACS133.sxb

22

MARKS, GOLIA &
FINCH, LLP
8620 Spectrum
Center Boulevard
Suite 900
San Diego, CA 92123
(858) 737-3100

COMPLAINT

**EXHIBIT 1**

## Memorandum of Understanding

This memorandum is to state the fundamental terms, commitments and conditions by which Ecolite Concrete USA, Inc. (Ecolite) and RQ Construction, Inc. (RQ) will team for the common purpose of bringing value to and for the benefit of each respective firm.

1.  It is the belief that RQ will be awarded the Ft. Irwin, CA MOUT job (proof of concept) and RQ intends to enter into a contract with Ecolite once the MOUT job is awarded to RQ. The contract between RQ and Ecolite will be approximately $1,490,000. Further, RQ will release contract dollars to Ecolite in advance of delivery of concrete panels once controls are agreed upon to enable Ecolite's funding of the manufacturing of the panels.

2.  RQ will fund up to $200,000 for the R&D of the Ecolite concrete panel system for the purpose of meeting base BEAP, progressive collapse and AT/FP requirements for Federal projects. The actual costs expended by RQ will be accounted for on a quarterly basis, and will be offset against the purchase price of converting the warrants similar to the provisions of Para. 9 below.

3.  RQ will attempt to integrate the Ecolite wall panel system into all of its projects to accelerate Ecolite's portfolio of credible projects and additional substantiation of the technical benefits of the Ecolite wall system.

4.  RQ will coordinate and assist the building of an engineering group to provide structural engineering design for Ecolite wall system customers.

5.  RQ will make available certain services to Ecolite such as accounting and estimating services to take advantage of economies of scale. Ecolite will reimburse RQ for such services based upon an agreed upon hourly cost schedule.

6.  George Rogers will agree to serve on the Ecolite board of directors upon adequate personal liability protections.

7.  RQ Construction, Inc. (and/or its assignees) will be offered warrants to buy a 10% ownership interest in Ecolite Concrete USA, Inc. and have the option to maintain that percentage without dilution with the appropriate additional capital contributions. At the current valuation of $1.00 per share that Ecolite has been selling equity, this will equate to 1.2 million shares, and likewise, a valuation of $1.2 million. As compensation for the risk that RQ is taking on for using a new building technology and a shortened delivery schedule promised by Ecolite, the purchase price will be reduced by Ecolite's profit on the MOUT job, namely $300,000.

8. RQ will receive a 10% royalty of sales of Ecolite wall systems that will be utilized in any Federally contracted or funded, prevailing wage project, exclusive of school projects. Said royalties are subject to the provisions outlined in #9 below and will be written into licensees' contracts. This royalty will be for 48 months from the date of the first licensee after the initial Vista plant or 60 months from this agreement, whichever is first.

9. RQ will use the receipts of the first $900,000 that it is due from royalty income from Federal, prevailing wage projects (non-school related) that use the Ecolite wall panel system for the purpose of buying the warrants in Para 7. Additionally, on all Ecolite wall panel systems that RQ purchases and installs, it will pay Ecolite 10% of the panel purchase price. Said payment will also be used to purchase the warrants previously referred to on a dollar-for-dollar basis.

10. In the event that the royalty stream is insufficient to pay for the warrants within 36 months from the date of this agreement, RQ will have the option to purchase the remaining warrants for cash or forfeit any unexercised warrants at that date.

11. RQ has a 1st right of refusal for licenses for the Ecolite wall system in the cities of Sacramento, CA; Victorville, CA; and Phoenix, AZ.

12. For the first 24 months, RQ will be the "sole beneficiary" of the Ecolite wall system on projects that it is competing for. If RQ is not competing for a project, Ecolite will be free to provide the wall system to whomever it chooses, and RQ will provide its best efforts to help make these sales.

Accepted,                                     Accepted,
November 7, 2006                              November 7, 2006


George H. Rogers, III, President & CEO        Brian Smith, CEO
RQ Construction. Inc.                         Ecolite Concrete USA, Inc.

*[signature]* CEO                             *[signature]*

February 13, 2008

MEMORANDUM OF UNDERSTANDING

This Memorandum (MOU) is to state the fundamental terms, commitments and conditions by which Ecolite Concrete USA, Inc. (Ecolite) and RQ Construction, Inc. (RQ), and EcoWall, LLC (EcoWall) will team for the common purpose of bringing value to and for the benefit of each respective firm. The parties shall amend any existing agreements between them that are modified by this MOU, and shall prepare as necessary any new separate agreement needed to formalize the terms of this MOU. The parties, however, shall operate under the terms of this MOU from the date it is signed until the date the amendments and/or new formal agreements are executed.

- RQ shall provide Ecolite access to a Fund upon which Ecolite may draw up to $2 million. Ecolite shall send RQ a written draw request containing the amount requested. RQ will send to Ecolite within five (5) business days a check in the amount so requested. In turn, Ecolite will deliver to RQ within 10 business days of Ecolite's receipt of the funds per the draw request 1 share of Ecolite stock for each dollar Ecolite received. Ecolite may draw from the Fund for twelve (12) months from the date of signing this MOU at which time the RQ funding obligation shall cease unless otherwise extended in writing. Within ten (10) business days of 1) the expiration of the 12 month period or 2) RQ's receipt of a notice from Ecolite that Ecolite shall cease drawing from the Fund, whichever occurs first, Ecolite shall issue to RQ Warrants to be exercised within twelve (12) months of their issuance. The number of Warrants shall be equal to the amount of money not drawn by Ecolite from the Fund. Accordingly, for each dollar Ecolite does not draw from the Fund, RQ shall receive 1 Warrant to purchase 1 share at $1.
- The EcoWall deposit under the EcoWall/Ecolite distributor agreement shall be reduced to $1,430,000 from $3.4 million. Accordingly, EcoWall shall deposit toward the purchase of product with Ecolite Las Vegas, LLC $580,000 within ten (10) business days of the signing of this MOU.
- RQ/EcoWall will be named Managing Member of Ecolite Las Vegas, LLC in perpetuity.
- RQ/EcoWall will be responsible to meet MV funding obligations going forward and may choose to do so, in its sole discretion through loans, capital contributions and/or a combination thereof. Capital Contributions shall be accounted for per the existing Ecolite Las Vegas, LLC Operating Agreement.
- Ecolite remains responsible for plant establishment and operations (subject to RQ/EcoWall oversight).
- It is agreed and understood that $400k+ will be spent by MV immediately to purchase equipment from Barstow and that those $ to Barstow will be spent to eliminate Ecolite Manufacturing's debt.
- It is also agreed and understood that effective immediately the process of financing/refinancing the 1st phase of MV equipment will begin (led by

Ecolite and guaranteed by RQ). SBA will be retired, title and equipment will change to MV, and S above SBA payoff for Barstow equipment will be recaptured by MV for operations.

- RQ shall be permitted to purchase product from MV at "cost" (as defined by Pricing Exhibit "Direct + Indirect" in the original Distributor Agreement of 10/2007) for RQ led jobs which are awarded to RQ within twelve (12) months from the effective date of the MOU. After the expiration of the twelve (12) month period, the price for product to RQ shall be at the market price set by MV for RQ; provided however, that if MV owes RQ/Ecowall an obligation to repay loans/capital contributions advanced by RQ/Ecowall pursuant to bullet point 4 above, then RQ/EcoWall shall pay MV "cost" for the product in cash and then shall set off from the obligation owed by MV to RQ/EcoWall the difference between the total market price charged RQ for the product less the RQ cash payment.

- Ecolite reserves the right to establish new Ecolite manufacturing plants within any of the EcoWall territories as long as the product is shipped to a non-EcoWall territory.

- EcoWall will receive an additional 2-year extension on the non-compete for their "first right" territories (bringing them to 4 years (48 months) total). The start date for this period begins when Ecolite receives an ICC # for its current submittal. If EcoWall sells a minimum of 1,730,000 sq ft of Ecolite Walls during any rolling 12 month period while the non compete is in effect, EcoWall's "first right" territories will "convert" to exclusive territories going forward. At such time, the EcoWall distributorship minimum annual guarantee will increase to 1,730,000 sq ft per year. These "converted" territories will be treated the same as EcoWall's existing exclusive territories in all respects. If EcoWall fails to meet the 1,730,000 sq ft goal by the end of the 48 months, all "first right" territories will revert back to Ecolite USA.


_____          2-14-08
RQ Construction                          Date
George Rogers, CEO

_____          2-14-08
EcoWall, LLC                             Date
The Avanti Group, LLC, Manager

_____          2/14/08
Ecolite Concrete USA, Inc.               Date
Brian Smith, CEO

**EXHIBIT 3**

## Memorandum of Understanding

THIS MEMORANDUM OF UNDERSTANDING ("**MOU**") is made this ___ day of June, 2008 (the "**Effective Date**") by and among Ecolite Concrete, U.S.A., Inc., a Nevada corporation ("**ECUSA**"), RQ Construction, Inc., a California corporation ("**RQ**"), Ecolite Las Vegas, LLC, a Nevada limited liability company (the "**LLC**"), EcoWall, LLC, a Nevada limited liability company ("**EcoWall**") and Brian Smith, an individual. The parties shall use commercially reasonable efforts to promptly amend any existing agreements amongst them that are altered or amended by this MOU, and shall enter into new definitive agreements as required to reflect the terms and provisions of this MOU. Notwithstanding the foregoing and subject to the ratification of this MOU by the respective Boards of Directors of RQ and ECUSA, the parties hereto shall be bound by and shall operate under the terms and provisions of this MOU until amendments and/or definitive agreements memorializing such terms and provisions become effective. To the extent that the terms and provisions of this MOU are subject to interpretation and/or further negotiation, the parties hereto shall interpret the terms of this MOU in good faith and in such a manner so as to best effectuate the understanding and intent of the parties in entering in to this MOU.

NOW THEREFORE, BE IT RESOLVED, For good and sufficient consideration, the receipt of which is acknowledged by all of the parties hereto, the parties agree as follows:

1.    <u>LLC Matters</u>. ECUSA and EcoWall shall enter into a membership interest acquisition agreement pursuant to which ECUSA and EcoWall shall sell and RQ, through an LLC or some other ownership form it may in its sole discretion choose, shall purchase all of ECUSA's and EcoWall's outstanding membership interests of the LLC and/or the LLC as a whole (the "**Interests**"), such that after such sale and purchase, RQ shall own all of the issued and outstanding Interests of the LLC. ECUSA shall disclose to RQ within seven days of the signing of this MOU all LLC financial obligations, commitments and discussions or negotiations now existing that might lead to a financial obligation or commitment of LLC. Moreover, ECUSA shall include in the membership acquisition document representations and warranties that it has made full disclosure as to the above listed items. Upon consummation of the purchase and sale of the Interests, the parties hereto agree that (i) ECUSA shall cease to be the manager of the LLC; (ii) ECUSA shall cease to have any liability for the debts and obligations of the LLC; (iii) RQ shall have sole responsibility (as between RQ on the one hand, and EcoWall and ECUSA on the other hand) for the financial obligations of the LLC, including all financial obligations (including capital equipment expenses) related to the LLC's manufacturing plant located in Moreno Valley, California (the "**Plant**"); <u>provided</u>, <u>however</u>, that such financial obligations shall not be deemed to include any Product R&D materials costs to be covered by ECUSA as provided below.

1

2.    Royalties. ECUSA and the LLC shall enter into a new sub-license agreement pursuant to which the LLC shall pay ECUSA a royalty of seven percent (7%) of the LLC's Gross Product sales, based on price per square foot, for all Products manufactured by the LLC (whether out of the Initial Plant or any other manufacturing facilities (collectively, the "*Plants*"). For purposes of this MOU, "*Gross Product Sales*" and "*Products*" mean as follows: "*Gross Product Sales*" means the price paid by the customer for the Products sold less commissions and sales taxes attributable to the sale. "*Products*" means custom steel and concrete frame wall products, associated hardware and existing and future building material products originated by ECUSA and/or ECI to be a part of the ECUSA and ECI family of Products; provided, however, that Products shall not include the manufacturer by LLC of conventional building elements such as a conventional frame for a wall or window or other building material product lines that are unrelated to and do not compete with the ECUSA/ECI family of Products.

3.    Distribution Agreement. That certain Distribution Agreement, dated as of October 17, 2007 (the "*Prior Agreement*") by and among ECUSA, the LLC, EcoWall and, for limited purposes, Ecolite International, Inc., a Nevada corporation ("*ECI*"), shall be terminated and shall cease to be of force or effect (and no provisions of the Prior Agreement shall survive termination thereof, even if explicitly provided to the contrary therein). In its stead, ECUSA, the LLC, EcoWall and, to the extent appropriate, ECI, shall enter into an exclusive territory license agreement (the "*License Agreement*") that amongst other things, shall provide for the following:

(i)     grant of an exclusive license within the Territory (as defined below) from ECUSA to EcoWall allowing EcoWall to (amongst other things) purchase, market, offer to sell and sell the Products;

(ii)    expansion of the territory covered by the exclusive license grant so that it covers (i) the State of Nevada, (ii) Imperial County, Kern County, Los Angeles County, Orange County, Riverside County, Sacramento County, San Bernardino County, San Diego County, San Luis Obispo County and Ventura County, California, and (iii) Maricopa County, Arizona (collectively, the "*Territory*"); and

(iii)   appropriate provisions designed to protect EcoWall's continued ability to exercise its rights under the exclusive license granted pursuant to the contemplated Restated Agreement should Ecolite become bankrupt or insolvent.

(iv)    EcoWall shall have the right to market, price and advertise the Products independently of ECUSA and ECI so long as such marketing, pricing and advertising is consistent with ECUSA and ECI product information.

4.    Management Changes. James Lawrence shall be appointed as acting Chief Executive Officer of ECUSA and Matthew Hayes shall be appointed as acting President of ECUSA. Brian Smith shall resign as acting President and CEO of ECUSA and shall be appointed as Chairman of the Board of ECUSA. The performance of Messrs. Lawrence and Hayes shall be evaluated by the Board of Directors of ECUSA after six (6) months (subject to the discretion of the Board of Directors of ECUSA to make such

2

decisions or evaluations as required in the discharge of their fiduciary duties as directors of ECUSA).

5.     Research & Development (R&D).  Each of Ecolite and RQ shall appoint one individual to serve as its representative to oversee and facilitate Product R&D (with a focus on ICC and Product improvements). This Product R&D shall take place at the Initial Plant, and the materials costs associated with such Product R&D shall be borne by ECUSA. The two individuals performing the Product R&D oversight shall report regularly to a combined committee of RQ and ECUSA executives. All Product improvements and new Product developments shall be owned by ECUSA, but ECUSA agrees that the RQ sub-license agreement contemplated in Item 2 above shall include provisions to the effect that RQ shall never pay more than 7% royalty on the Product sales regardless of the improvements incorporated into the Products and RQ is entitled to receive the improvements at no cost.

6.     Access to Funds.  ECUSA and RQ shall enter into a form of put option agreement (the "*Put Agreement*") memorializing the terms of the put option in favor of ECUSA set forth in that certain Memorandum of Understanding between ECUSA and RQ dated as of February 13, 2008. The Put Agreement shall (i) provide for an aggregate draw down amount over the term of the put option (as measured from February 13, 2008) of $3,000,000 ($1,050,000 of which has already been drawn down by ECUSA, thus leaving $1,950,000 available as of the date of this MOU) (ii) limit the amount that may be drawn down by ECUSA to $200,000 per month (provided, that RQ may at its sole discretion allow amounts in excess of this $200,000 monthly cap to be drawn down upon request by Ecolite),(iii) be subject to suspension at any time by RQ should RQ withdraw its endorsement of the then acting Chief Executive Officer of ECUSA; provided, however, that should ECUSA's Board of Directors designate a replacement CEO reasonably satisfactory to RQ within 90 days of suspension of the Put Agreement, then such Put Agreement shall automatically resume in full force and effect; provided, further, that should ECUSA fail to designate a CEO reasonably satisfactory to RQ within 90 days of suspension of the Put Agreement, RQ shall be entitled to terminate the Put Agreement at any point thereafter.

7.     Election of Directors.  ECUSA, RQ, ECI and Brian Smith shall enter into a voting agreement (and ECUSA shall use reasonable efforts to cause other ECUSA stockholders to enter into such voting agreement) pursuant to which the parties to such voting agreement shall vote all shares of ECUSA voting capital stock now or hereafter held by them to elect the following individuals to ECUSA's Board of Directors: (i) two (2) individuals designated by RQ, (ii) three (3) individuals designated by Brian Smith, and (iii) the then-serving CEO of ECUSA.

8.     Miscellaneous.  This MOU may only be terminated or amended by a written document signed by all the parties hereto (or their successors, where applicable). This MOU shall be governed in accordance with California law, without regard to its conflicts

of law principles. This MOU (to the extent binding) shall supersede and replace all prior understandings and agreements between the parties with respect to the subject matters hereof. This MOU may be executed in multiple counterparts, each of which shall constitute an original and all of which together shall constitute one instrument.

IN WITNESS THEREOF, this Memorandum of Understanding has been executed effective as of the date first written above.

Ecolite Concrete U.S.A., Inc.,
a Nevada corporation

By: _____

Name: BRIAN SMITH

Title: CHAIRMAN

EcoWall, LLC,
a Nevada limited liability company

By: _____

Name: GEORGE H. ROGERS, III

Title: Manager

Ecolite International, Inc.,
a Nevada corporation

By: _____

Name: Brian Smith

Title: CEO.

Ecolite Las Vegas, LLC,
a Nevada limited liability company

By: _____

Name: BRIAN SMITH

Title: MEMBER

By: _____
          Brian Smith

RQ Construction, Inc.,
a CALIFORNIA corporation

By: _____

Name: GEORGE H. ROGERS, III

Title: CEO

ACTIVE 4356635v.1

4

Execution Version

# PUT OPTION AGREEMENT

This PUT OPTION AGREEMENT (this "**Agreement**") is effective as of July 28, 2008 and is entered into by ECOLITE CONCRETE U.S.A., INC., a Nevada corporation ("**Seller**") and RQ CONSTRUCTION, INC., a California corporation ("**Buyer**") with reference to the following recitals.

## RECITALS

A.   As of the date of this Agreement, (i) the authorized capital of Seller consists of (a) 20,000,000 shares of common stock, par value $0.001 per share (the "**Common Stock**"), of which 14,073,043 shares are duly issued and outstanding, and (b) 10,000,000 shares of preferred stock, par value $0.001 per share (the "**Preferred Stock**"), of which no shares are issued or outstanding, and (ii) up to 2,341,916 shares of Common Stock are issuable upon exercise of outstanding warrants to purchase Common Stock (the "**Warrants**"), all of which Warrants are duly issued and outstanding.

B.   As of the date of this Agreement, Buyer owns, directly and beneficially (i) 2,650,000 shares of Common Stock and (ii) Warrants exercisable for up to 400,000 shares of Common Stock.

C.   Seller and Buyer entered into a Memorandum of Understanding on or about February 13, 2008 (the "**MOU**") pursuant to which Buyer agreed to make certain financial accommodations to Seller, ECOLITE LAS VEGAS, LLC, a Nevada limited liability company ("**Manufacturing Sub**"), and ECOWALL, LLC, a Nevada limited liability company ("**Distributor**"), in exchange for certain consideration described therein. Among the financial accommodations extended to Seller was an agreement by which Buyer would hold itself out as available to purchase from Seller up to 2,000,000 shares of Common Stock at the price of $1.00 per share, for an aggregate purchase price of up to $2,000,000. This Agreement is entered into by Seller and Buyer pursuant to the undertakings contained in the MOU, as amended by that certain further Memorandum of Understanding dated June 13, 2008 by and among Buyer, Seller, Manufacturing Sub, Distributor and Brian Smith (the "**Subsequent MOU**" and together with the MOU, the "**MOUs**") which, among other things, increased to 3,000,000 the aggregate number of shares of Common Stock subject to the foregoing financial accommodation.

D.   Pursuant to the MOUs, and prior to the date of this Agreement, Buyer had paid to Seller the aggregate amount of $1,450,000.00 and Seller had sold to Buyer in consideration therefore an aggregate of 1,450,000 shares of the Common Stock with the understanding of each of them that such purchase and sale transactions should be governed by this Agreement and that the $1,450,000.00 should be deemed as a payment of Purchase Price as herein defined and the 1,450,000 shares of Common Stock should be deemed "Shares" as herein defined.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, Seller, and Buyer agree as follows:

1.    **Grant of Option.**

(a)    <u>Put Option</u>. Buyer hereby grants a put option ("Put Option") to Seller, subject to the terms set forth below, exercisable at any time following July 18, 2008 (the "Effective Date") but before 11:59 p.m., Los Angeles, California, time, on April 18, 2009, as such date may be adjusted pursuant to Section 2(a)(ii) hereof (hereinafter referred to as the "Expiration Date"), to require Buyer to purchase from Seller up to Three Million (3,000,000) shares of Common Stock (the "Shares"), as adjusted hereunder. As described in Recital D above, the Put Option has already been exercised by Seller to sell to Buyer, and Buyer has purchased as of the date of this Agreement, 1,450,000 Shares such that subsequent to the date of this Agreement there are 1,550,000 Shares remaining subject to the Put Option.

(b)    <u>Warrants</u>. As used herein, a "Terminating Event" shall mean any of the following: (1) delivery by Seller of written notice to Buyer that Seller elects to terminate the Put Option, (2) as of the Expiration Date Seller has not exercised the Put Option in full to sell all of the Shares pursuant Sections 2 and 3 below, and (3) the board of directors of Seller does not, within ninety (90) days of the delivery of a CEO Notice (defined in Section 2(a)(ii) below), appoint a person reasonably satisfactory to Buyer to replace the chief executive officer of the Company who was the subject of the CEO Notice. Upon a Terminating Event, (i) the Put Option shall be terminated and of no further effect and Buyer shall not be obligated to purchase from Seller any of the Shares as to which the Put Option had not been previously exercised and (ii) within ten (10) business days of the occurrence the Terminating Event Seller shall issue to Buyer a warrant in the form attached hereto as Exhibit B to purchase a number of shares of Common Stock equal to the number of Shares as to which the Put Option had not been exercised as of the Terminating Event at an exercise price of $1.00 per share exercisable through and including the first anniversary of the Terminating Event, such number of shares and exercise price to be subject to adjustment as provided in Section 4 below.

2.    **Exercise.**    The Put Option under this Agreement may be exercised at any time or from time to time on any business day following the Effective Date and before the Expiration Date upon tender by Seller to Buyer of a duly executed Exercise Form, in the form attached hereto as Exhibit A, stating therein the number of Shares to be purchased by Buyer against payment therefor in lawful money of the United States at the price of One Dollar ($1.00) per Share, subject to adjustment as hereinafter provided (hereinafter referred to as the "**Purchase Price**"). The number and character of such Shares are subject to adjustment as provided below.

(a)    <u>Limitations on Exercise</u>. The exercise of the Put Option shall be subject in all instances to the following limitations:

(i)    The Put Option may not be exercised within any period of thirty (30) days for a number of Shares for which the aggregate Purchase Price shall be greater than $200,000.00, unless Buyer in its sole and absolute discretion shall consent to a greater aggregate

Purchase Price for such thirty (30) day period. The foregoing $200,000.00 limitation is not itself subject to the adjustment provisions herein.

          (ii)    In the event Buyer, in its sole and absolute discretion, may lack confidence in the then-sitting chief executive officer of Seller and communicate the same in writing to Seller (a "CEO Notice"), then except as provided to the contrary below in this Section 2(a)(ii) Seller shall have no further right to exercise the Put Option and any and all subsequent attempts to exercise the Put Option shall be barred. A CEO Notice delivered to Seller not later than five (5) business days after receipt by Buyer of an Exercise Form shall be effective to bar Seller's exercise of the Put Option described in such Exercise Form and any and all subsequent attempts to exercise the Put Option. If the board of directors of Seller shall, within ninety (90) days of the delivery of the CEO Notice, appoint a person reasonably satisfactory to Buyer to replace the chief executive officer who was the subject of a CEO Notice, then Seller's right to exercise the Put Option shall be automatically restored and Seller shall have the right to deliver to Buyer an Exercise Form subject to Section 2(a)(i) (it being understood that the $200,000.00 limitation of Section 2(a)(i) shall not aggregate during the period that a CEO Notice is in effect; provided, however, that the Expiration Date will be extended for a period of time equal to the period of time in which Seller's Put Option was suspended pursuant to this Section 2(a)(ii)).

          3.    **Closing.**    As soon as practicable after each exercise of this Put Option, but not later than five (5) business days thereafter, the Seller and Buyer shall complete the transactions contemplated by the exercise of this Put Option by the following: (i) the Buyer shall deliver to Seller an amount equal to the Purchase Price multiplied by the number of Shares being sold and purchased upon such exercise in cash or bank check or by confirmed wire transfer of immediately available Federal Funds to an account designated by Seller, such method of payment to be elected by Buyer, (ii) Seller shall prepare and deliver to Buyer certificates representing the Shares so sold registered in the name of Buyer and (iii) Buyer shall pay the amount of any and all taxes which may be imposed in respect of any issue or delivery of stock certificates under this Section 3. All Shares purchased upon each exercise of this Put Option shall be validly issued, fully paid and non-assessable shares of Common Stock of the Seller.

          4.    **Antidilution and Other Adjustments.**

          (a)    <u>Dividends, Distributions and Mergers.</u>

          (1)    If at any time prior to each exercise of this Put Option the Seller shall (i) declare a dividend or make a distribution on the Common Stock payable in shares of its capital stock (whether shares of Common Stock or of capital stock of any other class); (ii) subdivide, reclassify or recapitalize its outstanding Common Stock into a greater number of shares; (iii) combine, reclassify or recapitalize its outstanding Common Stock into a smaller number of shares; or (iv) issue any shares of its capital stock by reclassification of its Common Stock (including any such reclassification in connection with a consolidation or a merger in which the Seller is the continuing corporation), the number of Shares issuable upon each subsequent exercise of this Put Option at the time of the record date of such dividend, distribution, subdivision, combination, reclassification or recapitalization shall be adjusted so that Buyer shall be required to purchase the aggregate number and kind of shares which, if this Put Option had been exercised immediately prior to such event, Buyer would have purchased

580811.1                          3

4300077v.6

upon such exercise by virtue of such dividend, distribution, subdivision, combination, reclassification or recapitalization. Any adjustment required by this subsection 4(a)(1) shall be made successively immediately after the record date, in the case of a dividend or distribution, or the effective date, in the case of a subdivision, combination, reclassification or recapitalization, to allow the purchase of such aggregate number and kind of shares.

(2)     If any time prior to each exercise of this Put Option the Seller shall fix a record date for the issuance or making of a distribution to all holders of the Common Stock (including any such distribution to be made in connection with a consolidation or merger in which the Seller is to be the continuing corporation) of evidences of its indebtedness, any other securities of the Seller or any cash, property or other assets (excluding a combination, reclassification or recapitalization referred to in Section 4(a)(1), regular cash dividends or cash distributions paid out of net profits legally available therefor and in the ordinary course of business, or subscription rights, options or warrants for Common Stock) (any such nonexcluded event being herein called a "Special Dividend"), the Purchase Price shall be decreased immediately after the record date for such Special Dividend to a price determined by multiplying the Purchase Price then in effect by a fraction, the numerator of which shall be the then current market price of the Common Stock (as established by the Board of Directors of the Seller, in the exercise of its absolute discretion) on such record date less the fair market value (as determined by the Seller's Board of Directors in the exercise of its absolute discretion) of the evidences of indebtedness, securities or property, or other assets issued or distributed in such Special Dividend applicable to one share of Common Stock or of such subscription rights or warrants applicable to one share of Common Stock and the denominator of which shall be such then current market price per share of Common Stock (as so determined). Any adjustments required by this subsection 4(a)(2) shall be made successively whenever such a record date is fixed and in the event that such distribution is not so made, the Purchase Price shall again be adjusted to be the Purchase Price that was in effect immediately prior to such record date. Whenever the Purchase Price payable upon each exercise of the Put Option is adjusted pursuant to this subsection 4(a)(2), the shares of Common Stock as to which this Put Option may be exercised shall simultaneously be adjusted by multiplying the number of such shares initially payable upon exercise of this Put Option by the Purchase Price in effect on the date thereof and dividing the product so obtained by the Purchase Price, as adjusted.

(3)     If at any time prior to each exercise of this Put Option the Seller shall make a distribution to all holders of the Common Stock of stock of a subsidiary or securities convertible into or exercisable for such stock, then in lieu of an adjustment in the Purchase Price or the number of shares of Common Stock purchasable upon the exercise of this Put Option, Buyer, upon the exercise hereof at any time after such distribution, shall be required to purchase from Seller, such subsidiary or both, as the Seller shall determine, the stock or other securities which the Buyer would have been required to purchase form Seller if Seller had exercised this Put Option immediately prior thereto, all subject to further adjustment as provided in this Section 4; provided, however, that no adjustment in respect of dividends or interest on such stock or other securities shall be made during the term of this Put Option or upon its exercise.

(4)     In case of any merger or consolidation of the Seller with or into another entity in which the Seller is not the surviving entity, the Put Option shall relate to

580811.1                                      4

4300077v.6

the number and kind of shares, evidences of indebtedness or other certificated security of the resulting entity (or subsidiary or parent of such resulting entity) to which a holder of the Shares would be entitled upon such merger or consolidation, but shall not relate to any other consideration received in connection with such merger or consolidation including, without limitation, cash or property in kind that is not shares, evidences of indebtedness or other certificated security of the resulting entity (or subsidiary or parent of such resulting entity).

(b)    No Adjustment for Dividends.   Except as provided in this Section 4, no adjustment in respect of any cash dividends shall be made during the term of this Put Option or upon each exercise of this Put Option.

(c)    Form of Put Option after Adjustments.   The form of this Put Option need not be changed because of any adjustments in the Purchase Price or the number or kind of the shares of Common Stock subject to this Put Option.

5.    **Restrictions on Transfer.**   Except as provided in Sections 6 and 7 below, neither party to this Agreement may assign any right hereunder nor delegate any obligation without the prior written consent of the other party, which consent may be withheld or granted in such other party's absolute discretion.   Buyer shall not sell, assign or otherwise transfer any Shares except in accordance with the provisions of Sections 6 and 7 hereof.

6.    **Investment Representations.**

(a)    Buyer agrees that upon the signing and delivery of this Agreement, and upon the exercise of the Put Option, it will acquire the Shares for investment and not with a view to public distribution thereof.   Buyer represents and warrants that it can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Shares.   Buyer understands that the Shares have not been registered under the Securities Act of 1933, as amended (the "Act"), by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Buyer's investment intent as expressed herein. Buyer further acknowledges and understands that the Shares must be held indefinitely unless the Shares are subsequently registered under the Act or an exemption from such registration is available.   Buyer further acknowledges and understands that the Seller is under no obligation to register the Shares.   Buyer understands that the certificate evidencing the Shares will be imprinted with a legend that prohibits the transfer of the Shares unless the Shares are registered or such registration is not required in the opinion of counsel for the Seller.   Buyer is familiar with the provisions of Rule 144 under the Act, as in effect from time to time, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.   Buyer understands that at the time Buyer wishes to sell the Shares there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Seller may not be satisfying the current public information requirements of Rule 144, and that, in such event, Buyer would be precluded from selling the Shares under Rule 144 even if the minimum holding period requirement had been satisfied. Buyer represents and warrants that it is an "accredited investor" as defined in Rule 501 promulgated under the Act.

580811.1                                     5

4300077v.6

(b)     Buyer further agrees not to make any disposition of all or any portion of the Shares unless and until the transferee has agreed in writing for the benefit of the Seller to be bound by the terms and provisions of this Agreement, and: (i) there is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or, (ii) (y) Buyer shall have notified the Seller of the proposed disposition and shall have furnished the Seller with a detailed statement of the circumstances surrounding the proposed disposition, and (z) if requested by the Seller, Buyer shall have furnished the Seller with an opinion of counsel, reasonably satisfactory to the Seller that such disposition will not require registration of such shares under the Act. Notwithstanding the foregoing, no such registration statement or opinion of counsel shall be necessary for a transfer by Buyer to RQHI (as defined below), if RQHI agrees in writing to be subject to the terms hereof to the same extent as if it was the original Buyer hereunder.

7.     **Transfer of Shares to RQ Holdings I, LLC.**  Notwithstanding Sections 5 and 6 above (except for the last sentence of Section 6(b) above), the Shares purchased by Buyer upon each exercise of the Put Option may be transferred to RQ Holdings I, LLC, a California limited liability company ("RQHI"). Buyer represents and warrants that (i) it owns all of the membership interests in RQHI, and (ii) upon the transfer of any of the Shares to RQHI, RQHI shall hold the Shares for investment and not with a view to public distribution thereof.

8.     **Change; Waiver.**     This Agreement and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

9.     **Headings.**     The headings in this Agreement are for purposes of convenience in reference only, and shall not be deemed to constitute a part hereof.

10.     **Attorney's Fees.**  In the event of any controversy, claim, or dispute between the parties hereto, arising out of or relating to this Agreement, or the breach thereof, the prevailing party shall be entitled to recover from the other party reasonable expenses, attorneys' fees and costs. Attorneys' fees incurred in enforcing any judgment are recoverable as a separate item, and this provision for post-judgment attorneys' fees shall survive any judgment and shall not be deemed merged into the judgment.

11.     **Law Governing.**     This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of California without regard to the conflict of laws provisions thereof.

***[Signature page follows.]***

580811.1

6

4300077v.6

IN WITNESS WHEREOF, the undersigned have signed and delivered this Agreement as of the date first written above at ~~Los Angeles~~, California.
CARLSBAD,

**SELLER:**

ECOLITE CONCRETE U.S.A., INC., a Nevada corporation

By:_____
   Name: James Lawrence
   Title: Chief Executive Officer

**BUYER:**

RQ CONSTRUCTION, INC., a California corporation

By:_____
   George H. Rogers III,
   President and Chief Executive Officer

## EXHIBIT A

### EXERCISE FORM

(To be executed only upon exercise of Put Option)

ECOLITE CONCRETE U.S.A., INC., a Nevada corporation, the owner of the Put Option defined in and pursuant to that certain Put Option Agreement dated as of July 28, 2008 (the "Agreement"), among ECOLITE CONCRETE U.S.A., INC., a Nevada corporation as "Seller," and RQ CONSTRUCTION, INC., a California corporation as "Buyer", irrevocably exercises the Put Option with respect to _____ shares of the Common Stock of Seller and agrees to tender the certificate or certificates representing such shares against the Purchase Price as defined in the Agreement multiplied by the number of shares as to which the Put Option is exercised hereby (the "Exercise Price") and herewith makes demand for the Exercise Price, all on the terms and conditions specified in the Agreement.

Subject to the election of the Buyer pursuant to the Agreement, the Exercise Price shall be paid in cash or bank check or by confirmed wire transfer of immediately available Federal Funds to the following account:

Bank:_____

Bank Address:_____

ABA Number:_____

Account Name:_____

Account Number:_____

All terms used in his Exercise Form and defined in the Agreement shall have the meanings ascribed in the Agreement.

Dated: _____.

ECOLITE CONCRETE U.S.A., INC., a Nevada corporation

By:_____

Name:_____

Title:_____

## **EXHIBIT B**

**FORM OF WARRANT**
**(Attached)**

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.

<div align="center">

**WARRANT**
**To Purchase Common Stock of**
**Ecolite Concrete USA, Inc.**

Date of Issuance: January ____, 2008

</div>

The following is a statement of the rights of the holder of this Warrant and the conditions to which this Warrant is subject, and to which the holder hereof, by the acceptance of this Warrant, agrees:

For value received, Ecolite Concrete USA, Inc., a Nevada corporation (the "Company"), hereby grants to the [*insert name of warrant holder*], a [*insert individual, or type of entity and state of organization*] (the "Holder"), the right to purchase from the Company at the Exercise Price (as defined below) [*insert number of shares*] shares (the "Issuable Shares") of common stock, par value $0.01 per share, of the Company (the "Common Stock") at a price per Issuable Share equal to one dollar ($1.00). Such exercise price, as adjusted from time to time in accordance with the terms of this Warrant, is referred to herein as the "Exercise Price". This Warrant may be exercised at any time prior to the five-year anniversary of its issuance (the "Expiration Date").

This Warrant is issued in connection with that certain Common Stock Purchase Agreement dated as of the date hereof, by and between the Company and Holder.

1.    <u>Warrant Not Registered</u>.

The Holder of this Warrant acknowledges that neither this Warrant nor the Issuable Shares have been registered under the Act, and agrees not to sell, pledge, distribute, offer for sale, transfer or otherwise dispose of this Warrant or any Issuable Shares in the absence of (i) an effective registration statement under the Act as to this Warrant or such Issuable Shares and registration or qualification of this Warrant or such Issuable Shares under any applicable U.S. federal or state securities law then in effect or (ii) an opinion of counsel, satisfactory to the Company, that such

registration and qualification are not required. Each certificate or other instrument evidencing the Issuable Shares shall bear a legend substantially to the foregoing effect.

2.     Exercise of Warrant.

2.1     The Warrant may be exercised at any time prior to the Expiration Date upon (i) surrender to the Company at the main office of the Company (or such other office or agency of the Company as it may designate in writing to the Holder at the address of the Holder appearing on the books of the Company) of the warrant certificates, together with the Notice of Exercise annexed hereto properly completed and executed by the Holder and (ii) payment to the Company of the Exercise Price for each Issuable Share or other securities issuable upon exercise of such Warrant. The Exercise Price may be paid in cash or by certified or official bank check or by wire transfer to an account designated by the Company for such purpose.

2.2     Certificates or other documentation evidencing the Issuable Shares purchased hereunder shall be delivered to the Holder within a reasonable period of time after the later of (i) the date on which this Warrant is exercised, or (ii) the date on which the Exercise Price is fully paid, but in no event shall they be delivered later than 15 days following such date.

2.3     The Company covenants and agrees that all Issuable Shares which may be issued upon the exercise of this Warrant will be duly authorized, validly issued, fully paid and nonassessable and free from all taxes, liens, encumbrances, and charges in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

2.4     The Company further covenants and agrees that, during the period within which the rights evidenced by this Warrant may be exercised, the Company will at all times during such period have authorized and reserved, for the purpose of issue or transfer upon exercise of the rights evidenced by this Warrant, a sufficient number of authorized but unissued Common Stock, or other securities and property, when and as required to provide for the exercise of the rights evidenced by this Warrant. The Company will take all such action as may be necessary to assure that such Common Stock may be issued as provided herein without violation of any applicable law or regulation, or of any requirements of any securities exchange upon which the securities of the Company may be listed; provided, however, that the Company shall not be required to effect a registration under federal or state securities laws with respect to such exercise.

2.5     Upon any partial exercise or conversion, the Company will issue to the Holder a new Warrant for the number of shares of Common Stock as to which this Warrant was not exercised or converted.

3.     Adjustment of Exercise Price.

3.1     The Exercise Price and the number of Issuable Shares are subject to adjustment in accordance with this Section 3 from time to time upon the occurrence of certain events described in this Section 3.

3.2    In the event the Company shall, at any time or from time to time after the date hereof, issue any Common Stock as a stock dividend to the holders of Common Stock, or subdivide or combine the outstanding Common Stock into a greater or lesser number of shares, or effectuate a similar sale, issuance, subdivision or combination in which no consideration is payable by the holders of Common Stock (any such sale, issuance, subdivision or combination being herein called a "Share Change"), then, and thereafter upon each further Share Change, the Exercise Price shall be adjusted in inverse proportion to the fraction determined by dividing the number of shares of Stock outstanding after such event (on a fully diluted basis) by the number of shares of Common Stock outstanding before such event (on a fully diluted basis) (the "Adjustment Ratio") and the number of Issuable Shares shall be adjusted in direct proportion to the Adjustment Ratio.

3.3    (a)  If the Company shall be party to a Sale or Merger (as defined below), or engage in any similar transaction, then, in each case, in lieu of the Common Stock issuable upon the exercise of the Warrant immediately prior to such transaction, upon the consummation of such transaction at the option of the Holder, either (A) the Warrant shall terminate, or (B) the Holder shall receive the stock and/or other securities and/or property (including cash) to which the Holder would have been entitled (less the then effective Exercise Price) upon such Sale or Merger or similar transaction had the Holder exercised the Warrant fully immediately prior thereto, all subject to the adjustments provided herein or substantially similar adjustments.

(b)  A "Sale or Merger" shall mean any of the following: (i) the merger or consolidation of the Company into or with another entity in which the holders of the voting equity of the Company immediately preceding such merger or consolidation shall own less than fifty percent (50%) of the voting securities of the surviving entity; (ii) the sale, transfer or lease, whether in a single transaction or pursuant to a series of related transactions or plan, of all or substantially all the assets of the Company, which assets shall include for these purposes fifty percent (50%) or more of the outstanding voting equity securities of any subsidiaries of the Company, the assets of which constitute all or substantially all the assets of the Company and its subsidiaries taken as a whole; (iii) the sale, transfer or lease, whether in a single transaction or pursuant to a series of related transactions, of all or substantially all the assets of the subsidiaries of the Company, the assets of which constitute all or substantially all of the assets of the Company and such subsidiaries taken as a whole, (iv) a sale or transfer, whether in a single transaction or series of related transactions, of fifty percent (50%) or more of the Company's outstanding voting securities (other than in an equity financing transaction), or (v) a public offering of the securities of the Company.

4.    No Fractional Common Stock.

The Company shall not be required to issue any fractional shares in connection with any exercise of this Warrant.  The Company may pay to the Holder, in lieu of issuing any fractional share, a sum in cash equal to such fraction multiplied by the then effective Exercise Price.

5.    Charges, Taxes and Expenses.

Issuance of certificates or other documentation evidencing the Issuable Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of

the issuance of such certificate, all of which taxes and expenses shall be paid by the Company, and such certificates shall be issued in the name of the Holder or in such name or names as may be directed by the Holder; provided, however, that in the event certificates or other documentation evidencing the Common Stock are to be issued in a name other than the name of the Holder, this Warrant, when surrendered for exercise, shall be accompanied by the Assignment Form attached hereto duly executed by the Holder; and provided, further, that upon any transfer involved in the issuance or delivery of any certificates or other documentation evidencing the Issuable Shares the Company may require reimbursement for any tax imposed in connection with such transfer.

6.    No Rights as Shareholder.

This Warrant does not entitle the Holder to any voting rights or other rights as a shareholder of the Company prior to the exercise hereof.

7.    Exchange and Registry of Warrant.

This Warrant is exchangeable, upon the surrender hereof by the Holder at the above-mentioned office or agency of the Company, for a new Warrant of like tenor and dated as of such exchange. The Company shall maintain at such office or agency a registry showing the name and address of the Holder. This Warrant may be surrendered for exchange, transfer or exercise, in accordance with its terms, at such office or agency of the Company, and the Company shall be entitled to rely in all respects, prior to written notice to the contrary, upon such registry.

8.    Loss, Theft, Destruction or Mutilation of Warrant.

Upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it, and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of such Warrant, if mutilated, the Company will make and deliver a new Warrant of like tenor and dated as of such cancellation, in lieu of this Warrant. The foregoing notwithstanding, with respect to the initial Holder of this Warrant, the Company in lieu of its rights set forth in the preceding sentence, shall only require an affidavit of loss and indemnity agreement from such Holder and such Holder shall not be obligated to provide any security therefore or to pay any fees or expenses in connection therewith.

9.    Saturdays, Sundays, Holidays, etc.

If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday, Sunday, legal holiday or other day on which banks are required to be closed in New York, New York, then such action may be taken or such right may be exercised on the next succeeding day that is not a Saturday, Sunday, legal holiday or other day on which banks are required to be closed in San Diego, CA.

10.   Miscellaneous.

10.1   Law Governing.   This Warrant shall be binding upon any successors or assigns of the Company. This Warrant shall constitute a contract under the laws of the State of Nevada and for all purposes shall be construed in accordance with and governed by the laws of said state without regard to conflict of law principals.

10.2   Transferability; Subsequent Agreement.   Without the prior written consent of the Company, the Warrant shall not be assigned, pledged or hypothecated in any way (whether by operation of law or otherwise) and shall not be subject to execution, attachment or similar process. Any attempted transfer, assignment, pledge, hypothecation or other disposition of the Warrant or of any rights granted hereunder contrary to the provisions of this Section 10.2, or the levy of any attachment or similar process upon the Warrant or such rights, shall be null and void. In addition, Holder hereby covenants and agrees that, at the request of the Company, Holder shall enter into any shareholder agreement, investor rights agreement, voting agreement or similar agreement to which at least a majority of the Company's outstanding capital stock is or is to become party.

10.3   Acquisition for Investment.   Unless a current registration statement under the Securities Act of 1933, as amended, is in effect with respect to the securities purchasable upon exercise of this Warrant, the Holder hereof, by accepting this Warrant, covenants and agrees that, at the time of exercise hereof, and at the time of any proposed transfer of securities acquired upon exercise hereof, such Holder will deliver to the Company a written statement that the securities acquired by the Holder upon exercise hereof are for the account of the Holder for investment and are not acquired with a view to, or for sale in connection with, any distribution thereof (or any portion thereof) and with no present intention (at any such time) of offering and distributing such securities or any portion thereof. The certificates evidencing the securities purchasable upon exercise of this Warrant, if such securities are not subject to a current registration statement, shall bear a legend to the effect that such securities have not been so registered and may not be transferred except pursuant to an effective registration statement under the Securities Act of 1933, as amended, or an opinion of counsel satisfactory to the Company, in its good faith discretion, that such registration is not required. The Holder will comply with all applicable provisions of state and federal securities laws and acknowledges that the securities acquired upon the exercise of this Warrant may have restrictions upon its resale imposed by state and federal securities laws.

10.4   Notices.   All notices, reports and other communications required or permitted hereunder shall be in writing and may be delivered in person, by email (receipt of transmission confirmed), by telecopy with written confirmation, overnight delivery service or U.S. mail, in which event it may be mailed by first-class, certified or registered, postage prepaid, addressed to the Holder at its address as shown on the books of the Company or to the Company, at the address listed below:

> Ecolite Concrete USA, Inc.
> 2091 Las Palmas, Cr., Ste E    .
> Carlsbad, CA 92011
> Attention: Brian Smith
> Facsimile:  (760) 904-9038

Email: Brian@EcoliteConcrete.com

10.5  <u>Severability</u>.  It is the desire and intent of the parties that the provisions of this Warrant be enforced to the fullest extent permissible under the law and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, in the event that any provision of this Warrant would be held in any jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Warrant or affecting the validity or enforceability of such provision in any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Warrant as of the Date of Issuance stated above.

**ECOLITE CONCRETE USA, INC.**

By:_____
        Brian Smith, CEO

## ASSIGNMENT FORM

(To assign the foregoing Warrant, execute this form and supply the required information.
Do not use this form to purchase shares.)

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto:

_____

whose address is _____,

<p style="text-align:center">(Please Print)</p>

and whose Social Security or other Taxpayer Identification Number is:_____

the foregoing Warrant and all rights thereunder, hereby constituting and appointing

_____   to   transfer   said   Warrant   on   the   books   of

_____ with full power of substitution in the premises.

Dated: _____, 200__.

Holder's Signature:_____

Holder's Name:_____

Holder's Address: _____

_____

_____

<p style="text-align:center">(Please Print)</p>

Signature Guaranteed: _____

NOTE:  The signature to this Assignment Form must correspond with the name as it appears on the face of the Warrant, without alteration or enlargement or any change whatever, and must be guaranteed by a bank or trust company or by a member of the National Association of Securities Dealers, Inc.  Officers of corporations and those acting in a fiduciary or other representative capacity should file proper evidence of authority to assign the foregoing Warrant.

# NOTICE OF EXERCISE

To:    Ecolite Concrete USA, Inc.

The undersigned pursuant to the provisions set forth in the attached Warrant, hereby irrevocably elects to purchase _____ shares of the Common Stock, par value $0.01 per share (the "Common Stock") of Ecolite Concrete USA, Inc. covered by such Warrant and herewith makes payment of $_____, representing the full purchase price for such shares at the price per share provided for in such Warrant.

The Common Stock for which the Warrant may be exercised shall be known herein as the "Warrant Stock".

The undersigned is aware that the Warrant Stock has not been and will not be registered under the Securities Act of 1933, as amended (the "Securities Act") or any state securities laws. The undersigned understands that reliance by the Company on exemptions under the Securities Act is predicated in part upon the truth and accuracy of the statements of the undersigned in this Purchase Form.

The undersigned represents and warrants that (1) it has been furnished with all information which it deems necessary to evaluate the merits and risks of the purchase of the Warrant Stock, (2) it has had the opportunity to ask questions concerning the Warrant Stock and the Company and all questions posed have been answered to its satisfaction, (3) it has been given the opportunity to obtain any additional information it deems necessary to verify the accuracy of any information obtained concerning the Warrant Stock and the Company and (4) it has such knowledge and experience in financial and business matters that it is able to evaluate the merits and risks of purchasing the Warrant Stock and to make an informed investment decision relating thereto.

The undersigned hereby represents and warrant that it is purchasing the Warrant Stock for its own account for investment and not with a view to the sale or distribution of all or any part of the Warrant Stock.

The undersigned understands that because the Warrant Stock has not been registered under the Securities Act, it must continue to bear the economic risk of the investment for an indefinite period of time and the Warrant Stock cannot be sold unless it is subsequently registered under applicable federal and state securities laws or an exemption from such registration is available.

The undersigned agrees that it will in no event sell or distribute or otherwise dispose of all or any part of the Warrant Stock unless (1) there is an effective registration statement under the Securities Act and applicable state securities laws covering any such transaction involving the Warrant Stock, or (2) the Company receives an opinion satisfactory to the Company of the undersigned's legal counsel stating that such transaction is exempt from registration.  The undersigned consents to the placing of a legend on its certificate for the Warrant Stock stating that the Warrant Stock has not been registered and setting forth the restriction on transfer

contemplated hereby and to the placing of a stop transfer order on the books of the Company and with any transfer agents against the Warrant Stock until the Warrant Stock may be legally resold or distributed without restriction.

The undersigned has considered the federal and state income tax implications of the exercise of the Warrant and the purchase and subsequent sale of the Warrant Stock.

 

_____

Dated: _____

## INVESTOR SUITABILITY QUESTIONNAIRE
## FOR INDIVIDUAL INVESTORS

This Questionnaire is to be completed and executed by prospective investors in shares of the Common Stock (the "Securities") of Ecolite Concrete USA, Inc., a Nevada corporation (the "Company"), who are individuals (as opposed to a corporation, partnership, trust or some other form of entity or association).

The purpose of this Questionnaire is to enable the Company to determine whether or not it qualifies for an exemption from registration under federal and state securities laws. All information furnished in completing this Questionnaire will be treated confidentially. By signing this Questionnaire, however, you agree that the Company may present this Questionnaire to such parties as it deems appropriate if called upon to establish the availability under federal or state securities laws of an exemption from registration of the offering and sale of the Securities.

A response should be provided to each and every question. If the answer to any question below is "none" or "not applicable," please so indicate.

1.   **PERSONAL**

Full Name of Prospective Purchaser _____

Residence Address _____

Mailing Address _____

Residence Telephone _____

Date of Birth _____

Social Security Number _____

2.   **BUSINESS**

Occupation _____

Number of Years _____

Present Employer _____

Position/Title _____

Business Address _____

Business Telephone _____

3.   **RESIDENCE INFORMATION**

(a)   Set forth in the space provided below the state(s) in which you have maintained your principal residence during the past three years and the dates during which you resided in each state.

_____

_____

(b)   Do you maintain residence in any other state? If yes, in which state(s)?

_____

4.   **INCOME**

(a)   Do you reasonably expect your individual income from all sources during the year ending December 31, 200__ to be in excess of $200,000 or your joint income with your spouse from all sources during the year ending December 31, 200__, to be in excess of $300,000?

Yes _____ No _____      If not, please specify amount: $_____

(b)   What percentage of your income as shown above is anticipated to be derived from sources other than salary?

_____

(c)   Was your yearly individual income from all sources during each of the years ending December 31, 200__ and December 31, 200__ in excess of $200,000 or your joint income with your spouse from all sources during each of the years ending December 31, 200__ and December 31, 200__ in excess of $300,000?

Yes _____ No _____      If not, please specify amounts:  200__ _____  200__ _____

5.   **NET WORTH AND PROPOSED INVESTMENT**

(a)   Is your net worth as of this date, combined with the net worth of your spouse, in excess of $1,000,000?

Yes _____ No _____  If not, please specify amount: $_____

(b)   Aggregate dollar amount of your proposed investment. $_____

6.   **EDUCATION**

Please describe your educational background and degrees obtained, if any.



7.   **AFFILIATION**

If you have any pre-existing personal or business relationship with the Company or any of its officers, directors, or controlling persons, please describe the nature and duration of such relationship.

_____

_____

8.   **BUSINESS AND FINANCIAL EXPERIENCE**

(a)   Please describe in reasonable detail the nature and extent of your business, financial and investment experience which you believe gives you the capacity to evaluate the merits and risks of the proposed investment and the capacity to protect your interests.

_____

_____

(b)   Are you purchasing the securities offered for investment?

Yes _____ No _____    If not, please state reason for investment: _____

_____

(c)    Do you meet one of the categories below; that is, (i), (ii) or (iii)?

☐ Yes                    ☐ No

Please check all categories which apply to you:

☐     (i)    You, or your professional advisor, have the capacity to protect your own interests in connection with the transaction.

☐     (ii)    You are able to bear the economic risk of your investment in the transaction.

☐     (iii)   The investment does not exceed 10% of your net worth or joint net worth with your spouse.

9.    **FINANCIAL ADVISORS**

In evaluating this investment, will you use the services of any of the following advisors? (If so, please identify, providing address and telephone number.)

Accountant:_____

_____

Attorney:_____

_____

Others:_____

_____

_____

   The above information is true and correct in all material respects and the undersigned recognizes that the Company is relying on the truth and accuracy of such information in reliance on the exemption contained in Subsection 4(2) of the Securities Act of 1333, as amended, and/or Regulation D promulgated by the Securities and Exchange Commission, and similar exemptions under applicable state securities laws. The undersigned agrees to notify the Company promptly of any changes in the foregoing information which may occur prior to the investment.

Executed at _____, on _____, 2006.

_____
[Signature]

_____
[Print Name]

## INVESTOR SUITABILITY QUESTIONNAIRE
## FOR NON-INDIVIDUAL INVESTORS

This Questionnaire is to be completed and executed by each prospective investor in shares of the Common Stock (the "Securities") of Ecolite Concrete USA, Inc., a Nevada corporation (the "Company"), if such prospective investor is a corporation, partnership, trust or some other form of entity or association.

The purpose of this Questionnaire is to enable the Company to determine whether or not such prospective investor qualifies for an exemption from registration under federal and state securities laws. All information furnished in completing this Questionnaire will be treated confidentially. By signing this Questionnaire, however, you agree that the Company may present this Questionnaire to such parties as it deems appropriate if called upon to establish the availability under federal and state securities laws of an exemption from registration of the offering and sale of the Securities.

A response should be provided to each and every question (except for Part II, which may not be required to be completed by certain entities, as explained below in Part I, Question 2). If the answer to any question below is "none" or "not applicable", please so indicate.

## PART I

**1.      IDENTIFICATION**

Full Name of Prospective Purchaser _____

Address of Principal Place of Business _____

State of Formation or Incorporation _____

Date of Formation or Incorporation _____

Type of Business Entity (corporation, partnership, trust etc.) _____

Taxpayer Identification Number _____

**2.      FORMATION OF ENTITY**

Was entity formed for the purpose of this investment?

Yes _____  No _____      If no, give examples of prior business or investments:

_____

_____

If the answer to question 2 is yes, all stockholders, partners, beneficiaries, etc. of the entity must each answer Part II of this Questionnaire. Please make sufficient copies of Part II so that a form can be completed and executed by each such individual. If the answer to question 2 is no, Part II should not be completed.

**3.      PROPOSED INVESTMENT**

Please indicate the amount of your proposed investment: $_____
Please state net worth of entity at time of purchase of securities: $_____
Please state the percentage of entity's net worth represented by the purchase price: _____%

4.   **BUSINESS**

Please indicate which of the following accurately describes the nature of the business conducted by your company.

a.   Savings and Loan Association or Banking

b.   Insurance

c.   Investment Company registered under the Investment Company Act of 1940

d.   Business Development Company (as defined in the Investment Company Act of 1940)

e.   Small Business Investment Company licensed by the Small Business Administration

f.   Employee Benefit Plan whose total assets exceed $5,000,000

g.   Corporation, partnership or business trust whose total assets exceed $5,000,000

h.   ERISA plan whose plan fiduciaries are Savings and Loan Associations

i.   Other (please describe briefly)

_____

_____

5.   **INVESTMENT EXPERIENCE**

Please provide information detailing the business, financial and investment experience of the entity and investment manager of such entity, with particular emphasis on investments in companies such as the Company.

_____

6.   **PRE-EXISTING RELATIONSHIP**

Please provide information detailing any pre-existing personal or business relationship between the entity or any investment manager of the entity and the Company or any of its officers, directors or controlling persons.

_____

_____

_____

_____

7.   **CERTIFICATIONS**

By signing this Questionnaire, the undersigned certifies the following:

(a)   that the entity's purchase of the Securities will be solely for the entity's own account and not for the account of any other person; and

(b)   that the entity's name, address of principal place of business, place of formation and taxpayer identification number as set forth in this Questionnaire are true, correct and complete.

The above information is true and correct in all material respects and the undersigned recognizes that the Company is relying on the truth and accuracy of such information in reliance on the exemption contained in Subsection 4(2) of the Securities Act of 1933, as amended, and/or Regulation D promulgated by the Securities and Exchange Commission, and similar exemptions under applicable state securities laws. The undersigned agrees to notify the Company promptly of any changes in the foregoing information which may occur prior to the investment.

Executed at _____, on _____, 2007.

_____

[Print Name of Investor (Entity)]

_____

[Signature of Authorized Person]

_____

[Title]

**PART II**
**INDIVIDUAL MEMBERS OF INVESTING ENTITY**

1.   **PERSONAL**

Full Name of Prospective Purchaser _____

Residence Address _____

Mailing Address _____

Residence Telephone _____

Date of Birth _____

Social Security Number _____

2.   **BUSINESS**

Occupation _____

Number of Years _____

Present Employer _____

Position/Title _____

Business Address _____

Business Telephone _____

3.   **RESIDENCE INFORMATION**

(a)   Set forth in the space provided below the state(s) in which you have maintained your principal residence during the past three years and the dates during which you resided in each state.

_____

_____

(b)   Do you maintain residence in any other state? If yes, in which state(s)?

_____

4.   **INCOME**

(a)   Do you reasonably expect your individual income from all sources during the year ending December 31, 200__ to be in excess of $200,000 or your joint income with your spouse from all sources during the year ending December 31, 200__, to be in excess of $300,000?

Yes _____ No _____    If not, please specify amount: $_____

(b)   What percentage of your income as shown above is anticipated to be derived from sources other than salary?

_____

(c)   Was your yearly individual income from all sources during each of the years ending December 31, 200__ and December 31, 200__ in excess of $200,000 or your joint income with your spouse from all sources during each of the years ending December 31, 200__ and December 31, 200__ in excess of $300,000?

Yes _____ No _____     If not, please specify amounts: 200__ _____ 200__ _____

5.   **NET WORTH AND PROPOSED INVESTMENT**

(a)   Is your net worth as of this date, combined with the net worth of your spouse, in excess of $1,000,000?

Yes _____ No _____        If not, please specify amount: $_____

(b)   Aggregate dollar amount of your proposed investment.  $_____

6.   **EDUCATION**

Please describe your educational, background and degrees obtained, if any.

_____

_____

7.   **AFFILIATION**

If you have any pre-existing personal or business relationship with the Company or any of its officers, directors, or controlling persons, please describe the nature and duration of such relationship.

_____

_____

_____

8.   **BUSINESS AND FINANCIAL EXPERIENCE**

(a)   Please describe in reasonable detail the nature and extent of your business, financial and investment experience which you believe gives you the capacity to evaluate the merits and risks of the proposed investment and the capacity to protect your interests.

_____

_____

(b)   Are you purchasing the securities offered for investment?

Yes _____ No _____     If not, please state reason for investment:_____

_____

(c)   Do you meet one of the categories below; that is, (i), (ii) or (iii)?

☐ Yes              ☐ No

Please check all categories which apply to you:

☐    (i)     You, or your professional advisor, have the capacity to protect your own interests in connection with the transaction.

☐    (ii)    You are able to bear the economic risk of your investment in the transaction.

☐    (iii)    The investment does not exceed 10% of your net worth or joint net worth with your spouse.

9.    **FINANCIAL ADVISORS**

In evaluating this investment, will you use the services of any of the following advisors? (If so, please identify, providing address and telephone number.)

Accountant: _____

_____

Attorney: _____

_____

Others: _____

_____

_____

The above information is true and correct in all material respects and the undersigned recognizes that the Company is relying on the truth and accuracy of such information in reliance on the exemption contained in Subsection 4(2) of the Securities Act of 1933, as amended, and/or Regulation D promulgated by the Securities and Exchange Commission, and similar exemptions under applicable state securities laws. The undersigned agrees to notify the Company promptly of any changes in the foregoing information which may occur prior to the investment.

Executed at _____, on _____, 2007.

_____

[Signature]

_____

[Print Name]

**EXHIBIT 5**

Execution Version

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

**by and among**

**RQ MANUFACTURING, LLC,**
**as Buyer**

**ECOLITE CONCRETE U.S.A.,**

**and**

**ECOWALL, LLC,**
**as Sellers**

**and**

**ECOLITE LAS VEGAS, LLC,**

**July 28, 2008**

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made and effective as of July 28, 2008, by and among RQ Manufacturing, LLC, a California limited liability company ("Buyer"), Ecolite Las Vegas, LLC, a Nevada limited liability company ("Company"), and the shareholders of Company named on the signature pages to this Agreement (each, a "Member," and, collectively, the "Members").

### RECITALS

A.     The Members collectively own, beneficially and of record, all issued and outstanding membership interests of Company;

B.     Each Member owns, beneficially and of record, the number of issued and outstanding membership interests set forth opposite the name of such Member on Schedule A hereto;

C.     Each Member desires to sell to Buyer, and Buyer desires to purchase from each such Member, all issued and outstanding membership interests owned and/or held and/or to be owned and/or held (upon exercise of any option, warrant or other similar or convertible security or interest) by such Member;

D.     The parties hereto are entering into this Agreement to provide for the sale and purchase of all the issued and outstanding membership interests of Company and to make certain representations, warranties and covenants and to prescribe certain conditions as to such transactions.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and the agreements, representations, warranties and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE 1 -
### DEFINITIONS

1.1     Definitions.  Capitalized terms used herein shall have the meanings assigned to such terms herein.  In addition, the following terms shall have the meanings indicated:

1.1.1.  "Business Day" or "Business Days" shall mean a day or days, other than a Saturday or Sunday, on which trading occurs on the New York Stock Exchange.

1.1.2.  "Company Disclosure Schedule" means the disclosure schedule of Company attached hereto which sets forth the exceptions to the representations and warranties contained in Section 3.1 hereof and certain other information called for by this Agreement.

1.1.3.  "<u>Contemplated Transaction</u>" and "<u>Contemplated Transactions</u>" shall mean each and all of the transactions contemplated by this Agreement and the Related Agreements (defined herein), including, without limitation, (a) the sale of the membership interests  by each Member to Buyer and the purchase and acquisition of the membership interests by Buyer from each Member, (b) the execution, delivery and performance of the Related Agreements, (c) the performance by Company and each Member of any and all covenants and obligations of such party under this Agreement, and (d) the acquisition and ownership by Buyer of the membership interests.

1.1.4.  "<u>ECUSA</u>" shall mean Ecolite Concrete U.S.A., Inc., a Nevada corporation.

1.1.5.  "<u>EcoWall</u>" shall mean EcoWall, LLC, a Nevada limited liability company.

1.1.6.  "<u>Environmental Claim</u>" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, directives, claims, Liens, investigations, proceedings or notices of compliance or violation (written or oral) by any Person alleging potential liability (including, without limitation, potential liability for enforcement, investigatory costs, cleanup costs, governmental response costs, removal costs, remedial costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from (i) the presence or Release or threatened Release into the environment, of any Hazardous Material at any location that is or has been owned, operated, leased or managed by Company; or (ii) circumstances reasonably forming the basis of any violation or alleged violation, of any Environmental Law; or (iii) any claim by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence or release of any Hazardous Materials.

1.1.7.  "<u>Environmental Laws</u>" shall mean all federal, state and local laws or orders relating to the regulation or protection of human health, welfare, safety or the environment (including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata), including, without limitation, laws and regulations relating to Releases (as defined below) or threatened Releases of Hazardous Materials (as defined below) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling or handling of Hazardous Materials.

1.1.8.  "<u>Equipment</u>" means that certain personal property securing the performance of the SBA Loan (defined below) listed on Exhibit A to the Assumption Agreement (defined below).

1.1.9.  "<u>Equity Interests</u>" means all types, series or classes of membership interests, options, warrants, rights (preemptive or otherwise), calls, convertible instruments, agreements, arrangements or commitments requiring restrictions or otherwise providing for the issuance, sale, transfer, disposition or acquisition of any securities.

1.1.10. "<u>Family</u>" of an individual shall include, without limitation, (a) the individual, (b) the individual's spouse and former spouses, if any, (c) any other natural person

who is related to the individual or the individual's spouse or former spouses, if any, within the second degree of consanguinity and who resides with such individual.

1.1.11. "GAAP" shall mean those generally accepted accounting principles and practices which are used in the United States and recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board or by the Financial Accounting Standards Board or through other appropriate boards or committees thereof and which are consistently applied for all periods so as to properly reflect the financial position, results of operations and operating cash flow on a consolidated basis of the Person, except that any accounting principle or practice required to be changed by the Accounting Principles Board or Financial Accounting Standards Board (or other appropriate board or committee) in order to continue as a generally accepted accounting principle or practice may be so changed.

1.1.12. "Governmental Body" shall mean any (a) national, federal, state, local, county, municipal, city, town, village, district, foreign or other government or jurisdiction of any kind, character or nature whatsoever, (b) governmental or quasi-governmental authority of any nature (including, without limitation, any court, judge, tribunal, agency, branch, department, commission, board, bureau, official, administrator, regulator, legislator, instrumentality, arbitrator or mediator), (c) multi-national organization or body, or (d) Person or body exercising or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any kind, character or nature whatsoever.

1.1.13. "Hazardous Materials" shall mean (i) any petroleum or petroleum products or natural gas liquids as those terms are defined or used in Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), mold, radioactive materials, asbestos in any form that is or could become friable, polychlorinated biphenyls ("PCBs") in any form or equipment; and (ii) any chemicals, materials or substances which are now defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "pollutants," "contaminants" or words of similar import, under any Environmental Law; and (iii) any other chemical, material, substance or waste, exposure to which is now prohibited, limited or regulated under any Environmental Law.

1.1.14. "Known" shall mean information that is in the knowledge of an individual (and such individual shall be deemed to have "Knowledge" of a particular fact or matter), if such individual is actually aware of such fact or matter; provided, however, that a Person other than an individual shall be deemed to have "Knowledge" of, or to have "Known" of, a particular fact or matter if any individual who is serving as a director, officer, partner, executor, trustee or employee of such Person (or in any similar capacity) is actually aware of such fact or matter.

1.1.15. "Lien" shall mean any mortgage, deed of trust, lien, pledge, adverse claim, security interest or encumbrance of any nature whatsoever.

1.1.16. "Material Adverse Effect". An event, condition, fact, circumstance, violation, inaccuracy or other matter shall be deemed to have a "Material Adverse Effect" on a Person if such event, condition, fact, circumstance, violation, inaccuracy or matter (either individually or considered together with any other event(s), condition(s), fact(s),

597116.1

3

circumstances(s), violation(s), inaccuracy or inaccuracies, and matters) had (and is continuing to have), has or could reasonably be expected to have, a material adverse effect on (i) such Person, (ii) any business, condition (financial or otherwise), security, capitalization, asset, liability, operation or result(s) of operations of such Person taken as a whole, or (iii) the ability of such Person to consummate this Agreement, any Related Agreement or any Contemplated Transaction or to perform any material obligation of such Person under this Agreement or any Related Agreement.  Notwithstanding the foregoing, a "Material Adverse Effect" shall not include: (i) any adverse change, event or effect arising from or relating to general business or economic conditions, (ii) any adverse change, event or effect relating to or affecting Company's industry generally, which does not affect Company in a manner materially disproportionate to other similarly situated companies in Company's industry, or (iii) any adverse change, event or effect arising from or relating to the announcement or pendency of the Contemplated Transactions.

      1.1.17. "Material Interest" shall mean any direct or indirect beneficial ownership (as defined in Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of voting securities or other voting interests representing at least ten percent (10%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least ten percent (10%) of the outstanding equity securities or equity interests in a Person.

      1.1.18. "Ordinary Course of Business" shall mean, with respect to any Person, any action that is consistent with  the past practices of such Person and is taken or occurs in the ordinary course of the normal day-to-day business operations of such Person.

      1.1.19. "Organizational Documents" shall mean that certain Amended and Restated Operating Agreement of Ecolite Las Vegas, LLC, dated as of July 28, 2008 (the "Operating Agreement"), and (ii) those certain Articles of Organization of Company, field with the Secretary of State of Nevada on October 3, 2007 (the "Articles").

      1.1.20. "PEA" shall mean Polito, Eppich Associates, LLP

      1.1.21. "Permitted Lien" or "Permitted Liens" shall mean the following Liens: (a) any Lien for Taxes not yet due and payable or contested in good faith by appropriate Proceedings, (b) any Lien described as a "Permitted Lien" in a disclosure schedule, (c) any Lien of mechanics, materialmen, laborers, warehousemen, carriers and other similar common law or statutory liens which are not yet due and payable or are being contested in good faith, (d) zoning, entitlement, land use, environmental and other regulation by Governmental Bodies, (e) any Liens that may arise or be created after the date of this Agreement that are incidental to the conduct of the business of Company and that are created in the Ordinary Course of Business of Company, (f) any Lien granted to any lenders prior to the date hereof for obligations set forth in the Company Disclosure Schedule, (g) any minor imperfection of title or similar Lien which individually or in the aggregate with other such Liens does not impair the value of the property subject to such Lien or the use of such property in the conduct of the business of Company, and (h) any Lien arising by virtue of this Agreement or any Related Agreement or pursuant to a Permitted Transaction.

1.1.22. "Person" shall mean an individual and any nonnatural entity including, without limitation, a corporation, general or limited partnership, limited liability company, joint venture, estate, trust, association organization, labor union, entity or Governmental Body.

1.1.23. "Proceeding" shall mean any action, arbitration, mediation, dispute resolution, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) in, commenced, brought, conducted or heard by or before or otherwise involving, any judge, court, arbitrator, mediator or Governmental Body of any kind, character or nature.

1.1.24. "Related Agreements" means (i) the Operating Agreement, (ii) that certain Put Option Agreement by and between Ecolite Concrete U.S.A., Inc. and RQ Construction, Inc., dated as of the date hereof (the "Option Agreement"), (iii) that certain Voting Agreement by and among Ecolite Concrete U.S.A., Inc. and certain of its stockholders dated as of the date hereof (the "Voting Agreement"), (iv) that certain Security Agreement by and between the Company and RQ Construction, Inc. dated as of April 4, 2008 (the "Security Agreement" and those certain Promissory Notes of the Company executed in favor of RQ Construction, Inc., dated as of April 4, 2008, May 9, 2008 and July 8, 2008 (the "Promissory Notes"), (v) that certain Memorandum of Terms, dated as of the date hereof, by and among the Company, Buyer and ECUSA (the "Licensing MOU"), and (vi) that certain Assignment and Assumption Agreement by and among the ECUSA, Ecolite Manufacturing, LLC and Company, effective as f July 25, 2008 (the "Assumption Agreement").

1.1.25. "Related Person" shall mean with respect to Company (i) any Person that directly or indirectly controls, is directly or indirectly controlled by or is directly or indirectly under common control with Company, (ii) any Person that holds a Material Interest in Company, (iii) each Person that serves, or at any time since October 3, 2007 served, as a member, executive officer (as defined in Rule 405 promulgated under the Securities Act of 1933, as amended, and Rule 3b-7 promulgated under the Securities Exchange Act of 1934), or a manager of Company, (iv) any Person in which Company holds a Material Interest, and (v) with respect to any individual described in clause (ii) or (iii) (a) each other member of such individual's Family, (b) any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family, (c) any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest, and (d) any Person with respect to which such individual or one or more members of such individual's Family serves as a partner, executive officer, a director, or a nominee for director.

1.1.26. "Releases" shall mean any depositing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment.

1.1.27. "Representative" shall mean with respect to any particular Person, any director, officer, manager, member, employee, agent, consultant, advisor or other representative of such Person, including, without limitation, any legal counsel, accountant or financial advisor.

1.1.28. "SBA Loan" means that certain loan in the original principal amount of $624,000, evidenced by Business Loan Agreement, Note and other SBA Loan Documents.

597116.1

5

4379023v.6

1.1.29. "<u>SBA Loan Documents</u>" means the agreements, documents and instruments entered into and delivered in connection with the SBA Loan including, without limitation, that certain Business Loan Agreement dated as of February 26, 2007 by and among Pacific Coast Business Bank, as lender ("<u>SBA Lender</u>") Ecolite Manufacturing, LLC ("<u>ECM</u>") and ECUSA, that certain Note dated February 26, 2007 in the original principal amount of $624,000 by and among SBA Lender, ECUSA and ECM (the "<u>SBA Note</u>"), that certain Commercial Security Agreement, dated as of February 26, 2007 by and among SBA Lender, ECUSA and ECM (the "<u>SBA Security Agreement</u>") and that certain Deed of Trust dated February 26, 2007 among Brian Smith as Trustor, and SBA Lender as beneficiary and trustee (the "<u>SBA Deed of Trust</u>").

1.1.30. "<u>Subsidiary</u>" means, with respect to any Person (the "<u>Owner</u>"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries.

1.1.31. "<u>Threatened</u>" shall mean, with respect to an event, statement, demand, claim, Proceeding, dispute, circumstance or matter, if (i) the same has been made, asserted, commenced, taken or pursued (orally or in writing), and (ii) any notice of the same has been given (orally or in writing) to the Threatened party.

## ARTICLE 2 -
## SALE AND TRANSFER OF MEMBERSHIP INTERESTS; CLOSING

2.1 <u>Sale and Transfer of Membership Interests</u>. At the Closing and pursuant to and in accordance with the provisions of this Agreement, each Member shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase from the Members, the membership interests set forth opposite such Member's name on <u>Schedule A</u> hereto (collectively, the "<u>Membership Interests</u>").

2.2 <u>Purchase Price</u>. In payment for the sale, assignment, transfer and conveyance of all the Membership Interests, Buyer shall pay an aggregate sum of Ten Dollars ($10.00) (the "<u>Purchase Price</u>"), to be delivered as set forth below.

2.2.1. <u>Purchase Price Delivery</u>. At the Closing (defined below), Buyer shall deliver to each Member such Member's respective portion of the Purchase Price in cash, or in immediately available funds by wire transfer to an account specified in writing by such Member.

2.2.2. <u>Purchase Price Obligation</u>. Notwithstanding anything in this Agreement to the contrary, Buyer's obligation with respect to payment of the Purchase Price shall be satisfied, and the Membership Interests shall be fully paid for, upon delivery of the Purchase Price to the Members.

2.3 <u>Closing</u>. Unless this Agreement is terminated pursuant to <u>Article VII</u> and subject to satisfaction or waiver of the conditions set forth in <u>Article V</u>, the consummation of the Contemplated Transactions (the "<u>Closing</u>") shall take place at the offices of Musick, Peeler &

597116.1

6

4379023v.6

Garrett, LLP, located at 225 Broadway, Suite 1900, San Diego, California, at 10:00 A.M. (Pacific Standard Time) on July 28, 2008 (the "Closing Date") or on such later date and at such other place and time as the parties hereto may agree in writing, but as soon as commercially practicable (and in any event within two (2) Business Days) after the day on which the last of the conditions set forth in Article V are satisfied (other than the deliveries to be made at the Closing); provided, however, that, except for and to the extent of the provisions of Article VII, a failure to consummate the Contemplated Transactions on the date and at the place and time contemplated by this Section 2.3 shall not result in the termination of this Agreement and shall not relieve any party hereto of any obligation of such party under this Agreement.

## ARTICLE 3 -
## REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of Company.  To induce Buyer to enter into this Agreement, the Related Agreements and the other documents and/or instruments delivered pursuant to and in accordance with this Agreement and the Related Agreements, and to consummate the Contemplated Transactions, Company and each of the Members hereby jointly and severally represent and warrant to Buyer, as of the date of this Agreement and as of the Closing Date (except for those representations and warranties which address matters only as of a particular date in which case such representations and warranties shall be true, complete and correct in all material respects on and as of such particular date), and except as set forth in the Company Disclosure Schedule attached hereto (which exceptions shall be deemed to be representations and warranties as if made in this Section 3.1), as follows:

3.1.1.   Corporate Organization, Existence, Qualification and Good Standing. Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Nevada.  Company has all requisite power and authority to own and conduct the business of Company as the business of Company has been and is being owned and conducted.  Company is qualified to conduct the business of Company as a foreign corporation and is in good standing in each state or other jurisdiction listed on Schedule 3.1.1(a) of the Company Disclosure Schedule, which are all of the states or jurisdictions in which the character of any property or asset owned by or leased by or to Company or the nature or conduct of the business of Company makes such qualification necessary, except where the failure to be so qualified would not have a Material Adverse Effect on Company.  Company does not have any Subsidiaries and, except as set forth on Schedule 3.1.1(a) of the Company Disclosure Schedule, does not own, or have any Contract to acquire, any Equity Interests or other securities of any Person or any direct or indirect Equity Interests or other ownership interest in any other business.

3.1.2.   Authority; Authorization and Validity.  Company has full power and authority to (a) consummate, enter into, execute, deliver and perform this Agreement, the Related Agreements to which Company is a party, if any, the Company Certificate and any other document or instrument executed and delivered by Company pursuant to Section 6.1(e) (each, a "Company Document" and, collectively, the "Company Documents") and (b) consummate and perform the Contemplated Transactions and the obligations of Company under this Agreement and the other Company Documents. This Agreement has been duly authorized, executed and delivered by Company and, assuming due execution and delivery by Buyer, constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with the

597116.1

7

4379023v.6

provisions of this Agreement except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of indemnification, specific performance, injunctive relief or other equitable remedies.  When the Company Documents called for by this Agreement to be executed and delivered at the Closing are executed and delivered, such Company Documents shall have been duly authorized, executed and delivered by Company and, assuming due execution and delivery by any other party thereto, shall constitute the legal, valid and binding obligation of Company enforceable against Company in accordance with the provisions of such Company Documents except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of indemnification, specific performance, injunctive relief or other equitable remedies.

 3.1.3. No Conflicts or Violations.  Except as may be contemplated in the Related Agreements and SBA Loan Documents, the execution, delivery and performance of this Agreement and the other Company Documents and the consummation and performance of the Contemplated Transactions by Company shall not, directly or indirectly (with or without notice and/or passage of time) in whole or in part, (a) contravene, conflict with or constitute or result in a default under or breach or violation of any provision of the Organizational Documents, (b) contravene, conflict with or constitute or result in a default under or breach or violation of any provision of or give any Person the right to declare a default or exercise any remedy under or to accelerate the maturity or performance of or to cancel, terminate or modify, any material agreement, contract, lease, Lien, indenture, obligation, promise, instrument, obligation, arrangement or undertaking (whether written or oral and whether express or implied) that is legally binding (collectively, a "Contract") or any national, federal, state, local, municipal, foreign, international, multinational or other administrative statute, law, rule, regulation order ordinance, principle of common law, treaty or constitution (collectively, a "Legal Requirement") by or to which Company or any business of Company is a party or is bound or subject (except where such contravention, conflict, default, breach, violation or right would not reasonably be excepted to have a Material Adverse Effect on Company) or give any person a right to challenge any Contemplated Transaction, (c) result in the creation of any Lien (excluding ordinary utility and other similar easements of record that do not materially interfere with the use of real property) on any of Company's assets or properties other than a Permitted Lien, or (d) give any Governmental Body to the right to revoke, withdraw, suspend, cancel terminate or modify any approval, consent, license, permit, waiver or other authorization granted or otherwise made available under the authority of any Governmental Body or pursuant to any Legal Requirement that is held by the Company or that relates to Company's business or assets.

 3.1.4. No Consents.  Company is not and shall not be required to give any notice to, make any designation, declaration or filing with, or obtain any approval, consent, license, permit, waiver, order or ratification (including, without limitation, any of the foregoing issued, granted, given or otherwise made available by or under the authority of, any Governmental Body or pursuant to any Contract or Legal Requirement) (each, a "Consent"), from any Person prior to, in connection with or as a result of, the execution, delivery or performance by Company of this Agreement or any other Company Document or the consummation and performance by

597116.1

8

4379023v.6

Company of any Contemplated Transaction.  <u>Schedule 3.1.4</u> of the Company Disclosure Schedule sets forth all Consents required in connection with or as a result of, the valid execution, delivery or performance by Company of this Agreement or any other Company Document or the consummation and performance by Company of any Contemplated Transaction (collectively, the "<u>Company Consents</u>").

      3.1.5.  <u>Absence of Certain Liabilities</u>.  Except as set forth in the Related Agreements or as disclosed in the Company Financial Statements, Company does not have any liability or obligation (whether absolute, accrued, contingent, due or to become due) of any kind, character or nature whatsoever, other than such liabilities and obligations incurred by Company since June 30, 2008 in the Ordinary Course of Business or not exceeding $25,000 individually or in the aggregate.

      3.1.6.  <u>Absence of Certain Proceedings</u>.

      (a)  There are no Proceedings pending or, to the Company's Knowledge, Threatened against the Company concerning, affecting or relating to in any manner whatsoever Company or any of Company's business, assets or properties or by or to which Company or any of Company's business, assets or properties are party or are bound or subject, nor is Company aware of any fact that is reasonably likely to give rise to any such Proceeding. There are no Proceedings pending or, to the Company's Knowledge, Threatened against the Company concerning, Company or any of Company's business, assets or properties or by or to which Company or any of Company's business, assets or properties are party or are bound or subject, that (i) challenges or would have the effect of preventing, delaying, making illegal or otherwise interfering with, any Contemplated Transaction, nor is Company aware of any fact that is reasonably likely to give rise to any such Proceeding or that (ii) would reasonably be expected to give rise to any right to indemnification of any Person, including, without limitation, any Person, any or all directors, officers, employees, agents, consultants, advisors or representatives of such Person, including, without limitation, any legal counsel, accountant or financial advisor of Company or any heir, executor, successor or administrator of such Person, as against Company, nor is Company aware of any fact that it believes is reasonably likely to give rise to any such Proceeding.

      (b)  There is no outstanding order, including, without limitation, any permanent or temporary restraining order, award, decision, injunction, writ, judgment, settlement, ruling, subpoena, decree or verdict entered, issued, made or rendered by any Governmental Body (collectively, an "<u>Order</u>") entered, issued, made or rendered by any Governmental Body against the Company or, to Company's Knowledge, otherwise adversely affecting the business of Company or the assets or properties of Company, and Company is not aware of any fact which is reasonably likely to give rise to any such Order.

      3.1.7.  <u>Absence of Changes</u>.  Except as set forth in the Related Agreements and except as reflected in the Company Financial Statements, since March 31, 2008, there has not been:

      (a)  Any event or circumstance that would reasonably be expected to have a Material Adverse Effect on Company.

597116.1

9

4379023v.6

(b)     Any increase in or modification of the base compensation, rate of compensation, commission, payments related to excess billing, salaries or bonuses payable or to become payable by Company to any (i) consultant to the Company receiving compensation from the Company at a rate in excess of $50,000 per year or, (ii) manager, director, officer or employee of Company earning more than $50,000 per annum;

(c)     Any change (including, without limitation, any partial or complete termination) in any existing or adoption of, entering into or becoming bound by any new, written or oral benefit plan or arrangement affecting any manager, director, officer or employee of Company, including, without limitation, any bonus, profit-sharing, pension, deferred compensation, severance or termination pay benefit, option, group life or health insurance or other similar plans, agreements or arrangements;

(d)     Any waiver, compromise or settlement by Company of any right or claim of Company in excess of $25,000 individually or in the aggregate or any institution or settlement of or agreement to settle, any Proceeding involving any Governmental Body and concerning, affecting or relating to Company or any of Company's assets or properties;

(e)     Any creation, renewal, change or termination or any notice of any proposed renewal, change or termination of any Contract involving more than $50,000 in the aggregate or extending beyond three (3) months from the date of this Agreement, by or to which Company or any business of Company is a party or is bound or subject, other than in the Ordinary Course of Business of Company;

(f)     Any sale, assignment or transfer of any Contract or Company's assets or properties, except the Permitted Transactions or in the Ordinary Course of Business of Company;

(g)     Any lapse of any insurance policy or coverage of Company, except for normal renewals and/or replacements;

(h)     Any damage, destruction or loss to any of Company's assets or properties, whether or not covered by insurance, which would reasonably be expected to have a Material Adverse Effect on Company including, without limitation, any damage, destruction or loss as a result of fire, explosion, accident, earthquake, lightning, aircraft, vehicle, smoke, hail, flood, drought, storm, strike, work stoppage, lockout, sabotage, embargo, condemnation, riot, civil disturbance, vandalism, terrorism or act of God or public enemy;

(i)     Any other action(s) taken or transaction(s) entered into by Company other than in the Ordinary Course of Business of Company, except as expressly contemplated by this Agreement.

3.1.8.   Compliance with Laws.  Company is in compliance with all applicable Legal Requirements except where the failure to comply, in each instance and in the aggregate, would not result in a Material Adverse Effect on Company, and Company has not received any written notice of any claimed violation of any such Legal Requirements.  Company has filed all returns, reports and other documents and furnished all information required or requested by any

597116.1

10

4379023v.6

Governmental Body except where the failure to file, in each instance and in the aggregate, would not result in a Material Adverse Effect on Company, and all such returns, reports, documents and information are true, accurate and complete in all material respects. All permits, licenses orders, franchises and approvals of all Governmental Bodies required of Company for any business of Company have been obtained except where the failure to obtain such permits, licenses orders, franchises and approvals in each instance and in the aggregate would not result in a Material Adverse Effect on Company, no violations are or have been recorded in respect of any such permits, licenses orders, franchises and approvals except where such violations in each instance and in the aggregate would not result in a Material Adverse Effect on Company, and there is no pending, or to Company's Knowledge, Threatened Proceeding which would revoke, limit or question the validity, sufficiency or continuance of any permit, license order, franchise or approval of Company necessary for the conduct of Company's business as presently conducted. Such permits, licenses orders, franchises and approvals are valid and sufficient for the Company to conduct its business as presently conducted. Neither Company or any Representative of Company has made any offer, payment, promise to pay or authorization of the payment of any money, offer, gift, promise to give or authorization of anything of value to any Person for any unlawful purpose described in Section 30A of the Exchange Act.

      3.1.9. <u>Capitalization</u>. Except for the membership interests set forth on Schedule A of the Operating Agreement, no membership interests of other equity interests of Company are issued and outstanding. Company does not own, control or have voting rights with respect to, directly or indirectly, any interest in any other corporation, partnership, association or other business entity, and Company is not a party to any agreement relating to the acquisition of such an interest. All issued and outstanding Membership Interests are owned and held, beneficially and of record, by and in the name of the Members free and clear of any Lien. All issued and outstanding Membership Interests have been or will be as of the Closing Date, duly authorized and validly issued in accordance and compliance with all applicable laws, rules and regulations and are and will be fully paid and nonassessable. Other than as contemplated by this Agreement or set forth on <u>Schedule 3.1.9</u> of the Company Disclosure Schedule, there are no securities, options, warrants, subscriptions, rights, calls, commitments, plans, contracts or other agreements of any kind, character or nature granted or issued by Company that (i) provide for the purchase, issuance or transfer of any membership interests of Company or (ii) are convertible into or exchangeable or exercisable for any membership interests of Company (each, a "<u>Company Right</u>" and, collectively, the "<u>Company Rights</u>") and no Company Rights are authorized except as contemplated by this Agreement. Company is not obligated or committed to purchase, redeem, acquire or otherwise effect any transfer of any membership interests of Company. All voting rights as to Company are vested exclusively in the issued and outstanding Membership Interests and each issued and outstanding Membership Interest is entitled to vote on matters to come before the members of Company as set forth in the Operating Agreement. There are no voting trusts or other voting agreements, proxies or other arrangements with respect to any membership interests of Company except as contemplated by this Agreement and the Operating Agreement.

      3.1.10. <u>Financial Statements and Forecasts</u>. The unaudited balance sheet of Company and the related statement of profit and loss for the fiscal year ended December 31, 2007 and the unaudited balance sheet and the related statement of profit and loss for the

597116.1

11

4379023v.6

Company for the period between January 1, 2008 and March 31, 2008 (the "Company Financial Statements") provided by Company to Buyer, are true, accurate and complete in all material respects. The Company Financial Statements present fairly in all material respects the financial position of Company as of the date(s) thereof and the results of the operations and cash flows of Company for the period(s) then ended, in accordance with GAAP, except, with respect only to any non-year end Company Financial Statements, for any applicable recurring year end adjustments, if any, that are normal in nature and amount, and the lack of notes and other presentation items.

3.1.11. Indebtedness and Guaranties. Schedule 3.1.11 of the Company Disclosure Schedule sets forth a true, accurate and complete list of all promissory notes, loan agreements, security agreements and guarantees relating to indebtedness for borrowed money or money loaned to others (each, a "Financing Agreement," and, collectively, the "Financing Agreements") to which Company is a party or obligor, except for promissory notes, loan agreements, security agreements and guarantees relating to indebtedness for borrowed money or money loaned to others that constitute Related Agreements. Company has not guaranteed any dividend, obligation or indebtedness of any Person (except for the endorsement of negotiable instruments in the Ordinary Course of Business). The Company is not in material breach or default under, and Company has no Knowledge of the occurrence of any event which with notice and/or lapse of time would constitute a material breach or default under, any of the Financing Agreements.

3.1.12. Debts to and from Related Parties. Except for indebtedness owing under the applicable Related Agreements, there presently is no indebtedness owing to Company by or any Contracts between Company and any Related Person or any Affiliate or Associate of such Related Person. Other than the Equipment, no Related Person or any Affiliate or Associate of such Related Person owns any property or rights, tangible or intangible (other than an equitable interest), used in the business of Company as presently conducted. Except as set forth in the Company Financial Statements and the Related Agreements, Company is not indebted to any Related Person or any Affiliate or Associate of any Related Person, in any amount whatsoever, other than for payment of salaries, normal Fringe Benefits (as defined below) and compensation for bona fide services actually rendered to Company in the Ordinary Course of Business of Company.

3.1.13. Banking Arrangements and Powers of Attorney. Schedule 3.1.13 of the Company Disclosure Schedule sets forth a true, accurate and complete list of the name of each bank in or with which Company has an account, credit line or safety deposit box, and a brief description of each such account, credit line or safety deposit box, including the names of all Persons authorized to draw thereon or having access thereto and the names of all Persons, if any, now holding powers of attorney from Company and a summary statement of the terms thereof.

3.1.14. Title to Properties. Except as provided pursuant to the Related Agreements and SBA Loan Documents and as set forth on Schedule 3.1.14 of the Company Disclosure Schedule, Company is in possession of and has good and marketable title to, or has valid leasehold interests in or valid rights under written agreements to use, all tangible personal property, equipment, plants, buildings, structures, facilities and all other Company assets and properties used in and reasonably necessary for the conduct of Company's business as presently conducted, including the tangible personal property reflected on the Company Financial
597116.1

12

4379023v.6

Statements other than property disposed of since March 31, 2008 in the Ordinary Course of Business (the "Personal Property"). Except as provided pursuant to the Related Agreements and SBA Loan Documents and as set forth on Schedule 3.1.14 of the Company Disclosure Schedule, all such Personal Property is free and clear of all Liens, other than Permitted Liens.

3.1.15. Real Property and Real Property Leases. Schedule 3.1.15 of the Company Disclosure Schedule contains a true, accurate and complete list of (a) all real estate leases to which Company is a party, and (b) all other interests, if any, in real property owned or claimed by Company. Company does not own, nor has ever owned, any real property. Company has all easements and rights, including, without limitation, parking rights and easements for power lines, water lines, roadways and other access, necessary to conduct the business now conducted by Company and enjoys peaceful and undisturbed possession of all properties occupied by Company, in each case except where failure to maintain such easements or rights or failure to enjoy peaceful and undisturbed possession would not result have a Material Adverse Effect on Company. All leases of real property to which Company is a party are valid, binding on Company and, to Company's Knowledge, are in full force and effect, and Company is not in default of any material provision of any such real property lease, nor has any event occurred which (with or without notice and/or passage of time) would constitute a default by Company of any material provision thereunder. Company has delivered to Buyer true, accurate and complete copies of all real estate leases listed on Schedule 3.1.14 of the Company Disclosure Schedule, including, without limitation, all amendments, modifications, letter agreements and assignments relating thereto.

3.1.16. Intellectual Property.

(a)     Company owns or has been granted a valid right to use all Intellectual Property used in the conduct of the business of Company as presently conducted (the "Company IP Rights"); for purposes of this Agreement;

"Intellectual Property" shall mean, collectively, all worldwide industrial and intellectual property rights, including patents, patent applications, patent rights, trademarks, trademark registrations and applications therefore, trade dress rights, trade names, service marks, service mark registrations and applications therefor, Internet domain names, Internet and World Wide Web URLs or addresses, copyrights, copyright registrations and applications therefore, franchises, licenses, inventions, trade secrets, know how, customer lists, supplier lists, customer or user information or data, whether or not personally identifiable, proprietary processes and formulae, methodologies, software source code and object code, algorithms, net lists, architectures, structures, screen displays, photographs, images, layouts, inventions, development tools, designs, blueprints, specifications, technical drawings (or similar information in electronic format) and all documentation and media constituting, describing or relating to the foregoing, including manuals, programmers' notes, memoranda and records;

(b)     Schedule 3.1.16(b) of the Company Disclosure Schedule contains a true, accurate and complete list of all registrations and applications made by or on behalf of Company of any patents, copyrights, trademarks, service marks, Internet domain names or Internet or World Wide Web URLs or addresses or other Intellectual Property with any Governmental Body;

597116.1

13

4379023v.6

(c)     Except as set forth in or contemplated by the Related Agreements, there are no royalties, honoraria, fees or other payments payable by Company to any third Person (other than salaries payable to employees and independent contractors not contingent on or related to use of their work product and license payments for "off the shelf" software products) as a result of the ownership, use, possession, license, sale, marketing, advertising or disposition of Company IP Rights by Company and none shall become due and payable as a result of the consummation of the Contemplated Transactions; and

(d)     (i) Neither the operation of Company's business, nor the sale or other exploitation of the products or services of Company has resulted in the infringement or misappropriation of any Intellectual Property right of any Person, and (ii) there is no pending, or to Company's Knowledge, Threatened Proceeding alleging that the operation of Company's business or the sale or other exploitation of the products or services of Company conflicts or shall conflict with the rights of any other Person, nor is Company aware of any legitimate basis for any such Proceeding.

3.1.17. <u>Receivables</u>.  Excluding the Related Agreements, all notes and accounts receivable of Company reflected in the Company Financial Statements and all those arising since March 31, 2008 have arisen in the Ordinary Course of Business and to the Company's Knowledge are fully collectible.

3.1.18. <u>Taxes</u>.

(a)     Company has duly and timely filed all required federal, state, local, foreign and other tax returns, information returns, notices, reports, declarations, statements, forms, estimates or other information or documents required to be supplied to a taxing authority in connection with any Tax(es) (including, without limitation, income, property, sales, use, franchise, capital stock, excise, value added, employees' income withholding, social security and unemployment tax returns, notices and reports) (each, a "<u>Company Tax Return</u>" and, collectively, the "<u>Company Tax Returns</u>") related to Company heretofore due except where failure to duly and timely file such Tax Return(s) would not, individually or in the aggregate, reasonably be expected to result in an Material Adverse Effect on Company, and all such Company Tax Returns are true, accurate and complete in all respects.

"<u>Tax</u>" or "<u>Taxes</u>" shall mean all federal, state, local, foreign and other governmental or quasi-governmental net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, excise, severance, stamp, occupation, premium, property, windfall profits, customs, duties or other taxes, fees and assessments or charges of any kind whatever in the nature of taxes, together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

(b)     Any and all deposits and estimated tax payments required to be made by Company with respect to any Tax (including, without limitation, estimated income, franchise and employee withholding Taxes) have been duly and timely made, except to the extent failure to duly and timely make such payments would not, individually or in the aggregate, reasonably be expected to result in an Material Adverse Effect on Company;

597116.1

14

4379023v.6

(c)     There has not been since inception of the Company any audits or examinations of Company Tax Returns, no audits or examinations of Company Tax Returns are in progress, and Company has not been notified by any tax authority that any such audit or examination is contemplated or pending;

(d)     All Taxes with respect to Company that are due and payable or shall be due and payable on or before the Closing Date have been or shall be timely paid in full or adequately reserved against on the Company Financial Statements.  There are no Liens on any of the assets of Company that arose in connection with any failure (or alleged failure) to pay any Tax, except for Permitted Liens and those Liens that are not yet due and payable or are being contested in good faith by appropriate proceedings;

(e)     All Taxes with respect to Company that are due and payable after the Closing Date, but that relate to the taxable periods beginning before the Closing Date and ending after the Closing Date, are adequately reserved against on the Company Financial, Statements;

(f)     There are no agreements, waivers or other arrangements providing for an extension of time with respect to the assessment or collection of any Tax against Company, nor are there any Proceedings now pending against Company in respect of any Tax or any matters under discussion with any federal, state, local or foreign authority or any claims for refund by Company for overpaid Taxes or any claims for additional Taxes asserted by any such authority, and to the Company's Knowledge there is no basis for the assertion of any additional Taxes against Company;

(g)     Company has not made any payments, is obligated to make any payments or is a party to any agreement that under certain circumstances could obligate it to make any payments that may not be deductible under Section 280G of the Code;

(h)     Company has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, independent contractor or other third party;

3.1.19. ERISA.  With the exception of vacation pay, holiday pay and other standard payroll practices, neither the Company nor any Subsidiary maintains, contributes to or sponsors any "employee benefit plans" as defined by Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or any specified fringe benefit plans as defined in Section 6039D of the Code, or any other bonus, incentive compensation, deferred compensation, profit sharing, option, appreciation right, equity bonus, equity purchase, employee equity ownership, savings, severance, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, dental, disability, accident, group insurance, fringe benefit or welfare plan and any other employee compensation or benefit plan, agreement, policy, practice, commitment or contract (whether qualified or nonqualified, currently effective or terminated, written or unwritten), or any trust, escrow or other agreement related thereto (collectively referred to hereinafter as "Employee Benefit Plans").  Except as set forth on Schedule 3.1.19 of the Company Disclosure Schedule, the Company has not made any commitments or promises to establish any Employee Benefit Plans.

597116.1

15

### 3.1.20. Employees.

(a)     Schedule 3.1.20 of the Company Disclosure Schedule sets forth a true, accurate and complete list of (i) all collective bargaining agreements to which Company is a party, (ii) all employment, profit-sharing, deferred compensation, bonus, membership interest option, membership interest purchase, pension, retainer, consultant, retirement, welfare and incentive plans, agreements or contracts, written or, to the Knowledge of Company oral, with employees or consultants of the Company to which Company is a party, (iii) all written and, to the Knowledge of Company oral agreements, plans and programs to which Company is a party and which require payments and/or reimbursements to any employee or salesperson of Company, including, without limitation, any life or health insurance, vacation, sick leave, termination or severance pay agreements, plans or programs or employee discounts (collectively, "Fringe Benefits"), and (iv) the name and current annual compensation of each current director and officer of Company, and of each current employee, consultant and independent contractor of Company, together with such person's job title and amounts and forms of compensation and Fringe Benefits.

(b)     All of the aforesaid contracts, agreements, plans and programs are in full compliance with all applicable federal, state and local laws, and Company is in full compliance with all federal, state and local laws respecting employment, wages and hours in each case. Company is in full compliance with all applicable federal and state laws and regulations respecting occupational safety and health standards and Company has received no written complaints from any Governmental Body alleging outstanding violations of any such laws and regulations. No employee of Company is represented by any labor organization, no labor organization or group of employees of Company has made a pending demand for recognition or request for certification of representation to Company, and, to the Knowledge of Company, there are no representation or certification proceedings or petitions seeking a representation election presently pending or Threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal in connection with any employee of Company. To the Knowledge of Company, with respect to the business of Company, there are no strikes, lockouts, work stoppages or slowdowns pending or Threatened against or involving Company. To the Knowledge of Company, there are no unfair labor practice charges, arbitrations, grievances or complaints pending or Threatened against Company relating to the employment or termination of employment by Company of any employee of Company.

(c)     Company is in compliance with the terms of all employment related contracts, agreements, plans and programs described above. To the Knowledge of Company, and except as provided for in an employment contract, agreement, plan or program which has been provided to Buyer, the employment of all persons and officers employed by Company is terminable at will, without any penalty or severance obligation of any kind on the part of the employer, and the consummation of the Contemplated Transactions shall not by themselves trigger any payments to any officers, directors or employees of Company. All sums due for employee compensation and benefits and all vacation time, sick leave and/or personal time off owing to any employees have been duly and adequately accrued on the books of Company pursuant to past practice. To the Knowledge of Company (relying solely only on completed I-9s of Company's employees), all employees of Company located in the United

597116.1

16

4379023v.6

States are either United States citizens or are authorized to be employed in the United States in accordance with all applicable laws. To the Knowledge of Company, Company has not been informed that any key employee or consultant, distributor, representative, advisor, salesman, agent, customer or supplier of Company intends to terminate his, her or its employment or cease to do business with Company after the Closing Date.

3.1.21. <u>Insurance</u>.  Company has provided Buyer a true and complete list of all insurance policies (including the policy number, the name of the insurer, the amounts of coverage, the premium rate, the cash value, if any, the expiration date and the risks and losses insured against) maintained by Company on its properties, assets, products, services, businesses and personnel and Company has delivered true, accurate and complete copies of all such policies, agreements, studies and analyses to Buyer. All of the foregoing insurance policies are in full force and effect and are fully paid as to all premiums heretofore due. Company has not failed to give any notice or present any claim under such insurance policies in timely fashion where such failure would materially and adversely affect Company's rights under any such policy, nor has Company received any written notification of the cancellation of any of such policies or that any of them shall not be renewed.

3.1.22. <u>Environmental Matters</u>.

(a)    Company is in compliance with all applicable Environmental Laws except where such failure to comply would not reasonably be expected to have a Material Adverse Effect on Company, and Company has not received from any person or sent (nor has Company been required to send or provide) any written communication, that alleges that Company is not in compliance with applicable Environmental Laws. Company has not given, nor, to Company's Knowledge, has Company been required by any Environmental Laws to give or provide, notice under any Environmental Laws to any Governmental Body.

(b)    There is no Environmental Claim pending, nor to the Company's Knowledge, Threatened, to which Company is subject, and Company is not aware of any basis for any such claim against Company.

(c)    To the Knowledge of Company, there are no environmental reports, audits, investigations or assessments of Company.

(d)    To the Knowledge of Company, no underground storage tanks are located on or under any real property operated or leased by Company and none are used by Company in connection with the operation of its business.

3.1.23. <u>Agreements</u>.  All Contracts and licenses (i) the breach of which would result in a Material Adverse Effect on Company and (ii) to which Company is a party or by which Company or the properties or assets of Company are bound and which involve obligations by any party thereto in excess of $25,000 in each case, other than those Contracts which are terminable by Company upon less than thirty-one (31) days notice or which have been terminated or which have expired (collectively, the "<u>Company Contracts</u>"), are valid, binding and, to Company's Knowledge, in full force and effect against the Company and, to Company's Knowledge, the other parties thereto  Company is not in breach of or default under any Company

597116.1

17

4379023v.6

Contract, nor is there any event which, with notice and/or lapse of time, would constitute a breach of, or default under, a Company Contract. Company has delivered to Buyer true, accurate and complete copies, including, without limitation, any and all amendments, modifications, letter agreements and assignments relating thereto, of all of the Company Contracts and true and correct summaries of all oral Company Contracts.

3.1.24. <u>Organizational Documents</u>. Company has delivered to Buyer true, accurate and complete copies of the Organizational Documents of Company. All such Organizational Documents were duly adopted and are in full force and effect, and there are no amendments or modifications thereto except as included in said Organizational Documents.

3.1.25. <u>Books and Records</u>. The minute books of Company contain true accurate and complete records of all actions taken by the members and manager(s) of Company. All books, records and accounts of Company have been made available to Buyer. The membership certificate books and transfer ledgers of Company are true, accurate and complete and accurately reflect the membership interests owned and/or held by the members of Company

3.1.26. <u>No Brokers' or Finders' Fees</u>. Neither Company nor any Representative or Affiliate of Company has incurred or shall incur any obligation or liability, contingent or otherwise, for any brokerage or agents' or finders' fees or commissions or other similar payment in connection with or as a result of this Agreement.

3.1.27. <u>No Conflicts of Interest</u>. Except for Related Agreements, <u>Schedule 3.1.27</u> of the Company Disclosure Schedule sets forth a list of all agreements which Company has with the Representatives, consultants, distributors and salesmen of Company that prohibit or restrain such individuals from competing with Company in the business(es) of Company. Company does not own, directly or indirectly, a controlling interest in any Person which is a customer, supplier, competitor or potential competitor of Company; neither does Company or any of its Representatives control the management or policies of any Person which is a customer, supplier, competitor or potential competitor of Company by means of a management contract or otherwise.

3.1.28. <u>No Solicitation or Negotiation</u>. Company has not made any agreement to sell the equity, business or any asset of Company to another Person or to merge, consolidate, exchange equity interests or combine the assets or the business of Company with another Person (except for the Contemplated Transactions) and Company is not currently engaged in negotiations or discussions concerning any other sale of the Membership Interests or the sale, merger, consolidation, share exchange or combination of any asset or business of Company to or with another Person (except for the Contemplated Transactions).

3.1.29. <u>Disclosure</u>. No representation or warranty of Company in this Agreement or Company Document contains any untrue statement or omits to state a material fact necessary in order to make a statement made herein or therein, in light of the circumstances under which such statement was made, not misleading. No notice given by Company pursuant to <u>Section 4.1.1</u> shall contain any untrue statement or omit to state a material fact necessary to make a statement therein or herein, in light of the circumstances in which such statement was made, not misleading.

597116.1

18

4379023v.6

3.1.30. <u>Disclosure Schedule</u>.  The disclosure of any fact(s) or item(s) in the Company Disclosure Schedule relevant to any Section of this <u>Section 3.1</u> shall, should the existence of such fact or item or its contents be relevant to any other Section(s) of this <u>Section 3.1</u>, be deemed to be disclosed with respect to such other Section(s) whether or not the Company Disclosure Schedule includes an explicit cross reference to such other Section(s) and whether or not such other Section(s) contemplate the Company Disclosure Schedule.  The disclosure of any fact or item in the Company Disclosure Schedule shall not be deemed an admission as to whether such fact or item is "material" or may constitute, produce or result in a Material Adverse Effect on any party.

3.2     <u>Representations and Warranties of the Members</u>.  To induce Buyer to enter into this Agreement and the Related Agreements to which Buyer is a party and to consummate the Contemplated Transactions, each Member hereby severally and not jointly represents and warrants to Buyer as of the date of this Agreement and as of the Closing Date (except for those representations and warranties which address matters only as of a particular date in which case such representations and warranties shall be true, complete and correct in all material respects on and as of such particular date) as set forth below (subject, as specified, to the disclosure schedule of the Members (the "<u>Member Disclosure Schedule</u>"), which exceptions shall be deemed to be representations and warranties as if made in this Section 3.2):

3.2.1. <u>Authority; Authorization and Validity</u>.  Such Member has full power and capacity to (a) consummate, enter into, execute, deliver and perform this Agreement, the Related Agreements to which such Member is a party, if any, the Member Certificate and any other document or instrument executed and delivered by such Member pursuant to <u>Section 6.2(e)</u> (each, a "<u>Member Document</u>" and, collectively, the "<u>Member Documents</u>") and (b) consummate and perform the Contemplated Transactions and the obligations of such Member under this Agreement and the other Member Documents.  This Agreement has been duly authorized, executed and delivered by such Member and, assuming due execution and delivery by, and enforceability against, Buyer and the other Member, constitutes the legal, valid and binding obligation of such Member enforceable against such Member in accordance with the provisions of this Agreement.  When the Member Documents called for by this Agreement to be executed and delivered at the Closing are executed and delivered, such Member Documents shall have been duly authorized, executed and delivered by such Member and, assuming due execution and delivery by, and enforceability against, any other party thereto, constitute the legal, valid and binding obligation of such Member enforceable against such Member in accordance with the provisions of such Member Documents, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of indemnification, and specific performance, injunctive relief or other equitable remedies.

3.2.2. <u>No Conflicts or Violations</u>.  Except as contemplated by the SBA Loan Documents, the execution, delivery and performance of this Agreement and the other Member Documents and the consummation and performance of the Contemplated Transactions by such Member shall not, directly or indirectly (with or without notice and/or passage of time) in whole or in part, (a) contravene, conflict with or constitute or result in a default under or breach or violation of any provision of or give any Person the right to declare a default or exercise any

remedy under or to accelerate the maturity or performance of or to cancel, terminate or modify, any Contract or Legal Requirement by or to which such Member or any business of such Member is a party or is bound or subject (except where such contravention, conflict, default, breach, violation or right would not reasonably be expected to adversely affect the Contemplated Transactions) or give any Person a right to challenge any Contemplated Transaction, or (b) result in the creation of any Lien on any business of any Member other than a Permitted Lien.

3.2.3.  No Consents.  Except as contemplated by the SBA Loan Documents, such Member is not and shall not be required to give any notice to, make any designation, declaration or filing with or obtain any Consent from any Person prior to, in connection with or as a result of, the execution, delivery or performance by such Member of this Agreement or any other Member Document or the consummation and performance by such Member of any Contemplated Transaction.  Except for Consents required by the SBA Loan Documents, Schedule 3.2.3 of the Member Disclosure Schedule sets forth all Consents required in connection with or as a result of, the valid execution, delivery or performance by such Member of this Agreement or any other Member Document or the consummation and performance by such Member of any Contemplated Transaction (collectively, the "Member Consents").

3.2.4.  Absence of Certain Proceedings.  There are no Proceedings pending, or to such Member's Knowledge, Threatened against such Member or by or to which such Member or any property, asset, security or business of such Member are party or are bound or subject, that challenges or would reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with, any Contemplated Transaction and no fact(s) are Known to such Member that is/are reasonably likely to give rise to any such Proceeding.  Such Member is not subject to any Order that relates to any business of or property or asset owned or used by, Company that is necessary for the conduct of Company's business as presently conducted.

3.2.5.  No Brokers' or Finders' Fees.  Neither such Member nor any Representative or Affiliate of such Member has incurred or shall incur any obligation or liability, contingent or otherwise, for any brokerage or agents' or finders' fees or commissions or other similar payment in connection with or as a result of this Agreement.

3.2.6.  No Contracts.  Except for the Related Agreements and the SBA Loan Documents, and except for Contracts between Company and/or ECUSA on one hand and Buyer (and/or any Person that constitutes a Related Person of Buyer) on the other hand, no Member nor any Related Person, Affiliate or Associate of such Member has any right, obligation or liability under any Contract that relates to any business of or property or asset owned or used by, Company.

3.2.7.  Ownership of the Membership Interests.  Such Member is, and shall be at the Closing Date, the lawful, record and beneficial owner (as defined in Rule 13d-3 promulgated under the Exchange Act) and holder of that portion of the Membership Interests set forth across from such Member's name on Schedule A to the Operating Agreement, free and clear of any claim, community property interest, condition, equitable interest, Lien, encumbrance, option, pledge, security interest, right of first refusal, preemptive right or similar right or restriction of any kind, character or nature, including, without limitation, any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, but excluding any
597116.1

20

4379023v.6

restrictions on transfer imposed by applicable federal or state securities laws (collectively, "Encumbrances"), and the delivery of the Membership Interests to Buyer pursuant to this Agreement shall transfer to Buyer valid title thereto, free and clear of all Encumbrances. No legend or other reference to any purported Encumbrance (other than restrictions on transfer under applicable federal and state securities laws) shall appear upon any certificate representing the Membership Interests.

      3.2.8.  No Solicitation or Negotiation.  Except pursuant to the Contemplated Transactions, such Member has not made any agreement to sell its Membership Interest, or the Company business or any asset of Company to another Person or to merge, consolidate, exchange equity interests or combine the assets or the business of Company with another Person, and such Member is not currently engaged in negotiations or discussions concerning any other sale of its Membership Interest or the sale, merger, consolidation, exchange of equity interests or combination of any asset or business of Company to or with another Person.

      3.2.9.  Disclosure.  No representation or warranty of such Member in this Agreement or any Member Document contains any untrue statement or omits to state a material fact necessary in order to make a statement made herein or therein, in light of the circumstances under which such statement was made, not misleading.  No notice given by such Member pursuant to Section 4.2.1 shall contain any untrue statement or omit to state a material fact necessary to make a statement therein or herein, in light of the circumstances in which such statement was made, not misleading.

      3.2.10. Disclosure Schedule.  The disclosure of any fact(s) or item(s) in the Member Disclosure Schedule relevant to any Section of this Section 3.2 shall, should the existence of such fact or item or its contents be relevant to any other Section(s) of this Section 3.2, be deemed to be disclosed with respect to such other Section(s) whether or not the Member Disclosure Schedule includes an explicit cross reference to such other Section(s) and whether or not such other Section(s) contemplate the Member Disclosure Schedule.  The disclosure of any fact or item in the Member Disclosure Schedule shall not be deemed an admission as to whether such fact or item is "material" or may constitute, produce or result in a Material Adverse Effect on any party.

      3.3  Representations and Warranties of Buyer.  To induce Company and each Member to enter into this Agreement and the Related Agreements to which Company or such Member is a party, if any, and consummate the Contemplated Transactions, Buyer hereby represents and warrants to Company and each Member as of the date of this Agreement and as of the Closing Date (except for those representations and warranties which address matters only as of a particular date in which case such representations and warranties shall be true, complete and correct in all material respects on and as of such particular date) as set forth below (subject, as specified, to the disclosure schedule of Buyer (the "Buyer Disclosure Schedule") which exceptions shall be deemed to be representations and warranties as if made in this Section 3.3):

      3.3.1.  Corporate Organization, Existence and Good Standing.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California.

597116.1

4379023v.6

3.3.2.  <u>Authority; Authorization and Validity</u>.  Buyer has full power and authority to (a) consummate, enter into, execute, deliver and perform this Agreement, the Related Agreements to which Buyer is a party, if any, Buyer Certificate and any other document or instrument executed and delivered by Buyer pursuant to <u>Section 6.3(e)</u> (each, a "<u>Buyer Document</u>" and, collectively, the "<u>Buyer Documents</u>") and (b) consummate and perform the Contemplated Transactions and the obligations of Buyer under this Agreement and the other Buyer Documents.  This Agreement has been duly authorized, executed and delivered by Buyer and, assuming due execution and delivery by, and enforceability against, Company and each Member, constitutes the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with the provisions of this Agreement.  When Buyer Documents called for by this Agreement to be executed and delivered at the Closing are executed and delivered, such Buyer Documents shall have been duly authorized, executed and delivered by Buyer and, assuming due execution and delivery by, and enforceability against, any other party thereto, constitute the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with the provisions of such Buyer Documents.

3.3.3.  <u>No Conflicts or Violations</u>.  The execution, delivery and performance of this Agreement and the other Buyer Documents and the consummation and performance of the Contemplated Transactions by Buyer shall not, directly or indirectly (with or without notice and/or passage of time) in whole or in part, (a) contravene, conflict with or constitute or result in a default under or breach or violation of any provision of or give any Person the right to declare a default or exercise any remedy under or to accelerate the maturity or performance of or to cancel, terminate or modify, any Contract or Legal Requirement by or to which Buyer or any business of Buyer is a party or may be bound or subject or give any Person a right to challenge any Contemplated Transaction, (b) result in the creation of any Lien on any business of Buyer, or (c) permit any Governmental Body to impose any restriction or limitation of any kind, character or nature whatsoever on Buyer or any business of Buyer.

3.3.4.  <u>No Consents</u>.  The Buyer is not and shall not be required to give any notice to, make any designation, declaration or filing with or obtain any Consent from any Person prior to, in connection with or as a result of, the execution, delivery and/or performance by Buyer of this Agreement and/or the other Buyer Documents or the consummation and performance by Buyer of the Contemplated Transactions.  <u>Schedule 3.3.4</u> of Buyer Disclosure Schedule sets forth all Consents of third Persons required in connection with or as a result of, the valid execution, delivery or performance by Buyer of this Agreement and the other Buyer Documents or the consummation and performance by Buyer of the Contemplated Transactions (collectively, the "<u>Buyer Consents</u>").

3.3.5.  <u>Absence of Certain Proceedings</u>.  There is no proposed, pending, Threatened or contemplated Proceeding by or against Buyer or by or to which Buyer or any property, asset, security or business of Buyer is a party or may be bound, subject or affected, that challenges or may have the effect of preventing, delaying, making illegal or otherwise interfering with, any Contemplated Transaction and no fact(s) are Known to Buyer which is/are reasonably likely to give rise to any such Proceeding.

3.3.6.  <u>No Brokers' or Finders' Fees</u>.  Except as set forth on <u>Schedule 3.3.6</u> of the Buyer Disclosure Schedule, neither Buyer nor any Representative or Affiliate of Buyer has

incurred or shall incur any obligation or liability, contingent or otherwise, for any brokerage or agents' or finders' fees or commissions or other similar payment in connection with or as a result of this Agreement.

3.3.7.   Disclosure.  No representation or warranty of Buyer in this Agreement or any Buyer Document contains any untrue statement or omits to state a material fact necessary in order to make a statement made herein or therein, in light of the circumstances under which such statement was made, not misleading.  No notice given by Buyer pursuant to Section 4.3.1 shall contain any untrue statement or omit to state a material fact necessary to make a statement therein or herein, in light of the circumstances in which such statement was made, not misleading.

3.3.8.   Investment Intent.  Buyer is acquiring the Membership Interests for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act of 1933, as amended.

3.3.9.   Disclosure Schedule.  The disclosure of any fact(s) or item(s) in Buyer Disclosure Schedule relevant to any Section of this Section 3.3 shall, should the existence of such fact or item or its contents be relevant to any other Section(s) of this Section 3.3, be deemed to be disclosed with respect to such other Section(s) whether or not Buyer Disclosure Schedule includes an explicit cross reference to such other Section(s) and whether or not such other Section(s) contemplate Buyer Disclosure Schedule.  The disclosure of any fact or item in Buyer Disclosure Schedule shall not be deemed an admission as to whether such fact or item is "material" or may constitute, produce or result in a Material Adverse Effect on any party.

## ARTICLE 4 - 
## COVENANTS

4.1     Covenants of Company.  To induce Buyer to enter into this Agreement and the Related Agreements and to consummate the Contemplated Transactions, and without limiting any agreement, representation, warranty or covenant made elsewhere in this Agreement, Company covenants as follows between the date of this Agreement and the earlier of the Closing or the termination of this Agreement pursuant to Article VII:

4.1.1.   Notification.  Company shall promptly notify Buyer in writing if Company becomes aware of any fact or condition that causes or constitutes a material Breach of any representation and warranty of Company as of the date of this Agreement or if Company becomes aware of the occurrence, after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a material Breach of any representation or warranty of Company had such representation or warranty been made as of the time of occurrence or awareness of such fact or condition.  Company shall promptly notify Buyer of the occurrence of any material Breach of any covenant of Company in this Section 4.1 or of the occurrence of any event that may make the satisfaction of any condition in Section 5.1 impossible or unlikely.

"Breach" of a representation, warranty, covenant, obligation or other provision of this Agreement or any document or instrument delivered pursuant to this Agreement shall be

597116.1

· 23

4379023v.6

deemed to have occurred if there is or has been any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation or other provision.

     4.1.2.   <u>Access and Information</u>.  Except as may be necessary for Company to protect its attorney-client privilege, Company shall provide Buyer and the Representatives of Buyer, during normal business hours or otherwise if and as reasonably requested by Buyer or any Representative of Buyer, and upon reasonable advance notice, with (a) access to any and all properties, assets, agreements, books, records, accounts, Company Tax Return, correspondence and document of Company and permit Buyer and the Representatives of Buyer to make copies thereof solely for purposes evaluating Company in connection with the Contemplated Transactions, (b) all information concerning the properties, assets, securities, business and affairs of Company, (c) all financial information relating to Company, including, without limitation, all working papers pertaining to audits and reviews made by auditors of Company, (d) materially true, accurate and complete copies of all financial and operating statements of Company, and (e) access to the Representatives, customers and suppliers of Company for consultation or verification of any information.  Company shall use commercially reasonable efforts to cause Company Representatives, including, without limitation, any accountant and auditor of Company, to cooperate fully with any audit, review, investigation or examination made by Buyer and the Representatives of Buyer, including, without limitation, with respect to the books and records of Company, the reports of state and federal regulatory examinations, Contracts between Company and any other Person(s), physical examination of any real property used by or leased to or by Company, and physical examination of any furniture, fixtures, equipment or other personal property owned or used by or leased to or by Company.

     4.1.3.   <u>Notices and Consents</u>.  Company shall give any notice(s) to any Person(s) that may be necessary in connection with this Agreement, the Related Agreements or the Contemplated Transactions and use commercially reasonable efforts to obtain all Consents necessary for the consummation by Company of this Agreement, the Related Agreements and the Contemplated Transactions.

     4.1.4.   <u>Conduct of Business</u>.  Unless otherwise expressly contemplated hereby (including, without limitation, the Contemplated Transactions) or approved in writing by Buyer, Company shall conduct the business of Company only in, and Company shall not take (and shall cause any and all Subsidiaries not to take) any action except in, the Ordinary Course of Business of Company.  Without Buyer's prior written approval, Company shall not take (and shall cause any and all Subsidiaries not to take), nor enter into any agreements to take, any of the following actions except in each such case in connection with this Agreement and the Contemplated Transactions, or, in the case of actions described in clauses (a) - (d) of this <u>Section 4.1.4</u>, in the Ordinary Course of Business of Company:

     (a)    dispose of or acquire, any assets;

     (b)    incur any indebtedness for borrowed money;

     (c)    pay any discretionary bonuses (other than bonuses already accrued on the date hereof) to or alter the compensation or benefit of, any director, officer or employee;

    (d)    enter into any transaction or agreement with any Affiliate or Associate of Company;

    (e)    institute any reduction in force;

    (f)    close any office;

    (g)    take any action not in the Ordinary Course of Business that shall knowingly cause any representation or warranty of Company to be untrue, inaccurate or incomplete in any material respect;

    (h)    omit to take any commercially reasonable action that Company would take in the Ordinary Course of Business, which omission shall knowingly cause any representation or warranty of Company to be untrue, inaccurate or incomplete in any material respect;

    (i)    declare or pay any dividends on or make any distribution or payment with respect to or redeem or repurchase, any membership interests of Company or take any other action which would have a similar effect, except for cash distributions expressly permitted by the terms of this Agreement or which would not reduce working capital below $1,000,000.00; or

    (j)    issue any equity interest in Company or in any subsidiary of Company or any securities, options, warrants, rights, calls, commitments, plans, contracts or other agreements of any kind, character or nature whatsoever which provide for the purchase, issuance or transfer of any equity interest or any securities that are convertible into or exchangeable for any equity interest or increase or decrease, change into or exchange any such equity interest for a different number or kind of equity interest through a reorganization, recapitalization, reclassification, distribution, split, reverse split or other similar change in capitalization.

    4.1.5.  <u>Proceedings</u>.  Company shall promptly notify Buyer of any Proceeding that is Threatened or commenced against Company or, as applicable, any Representative of Company that relate to or affect, the Contemplated Transactions or, in the case of Company, the business, or material assets or properties of Company.  Company shall not knowingly fail to comply in any material respect with any Legal Requirement applicable to Company or the business, assets or properties of Company.

    4.1.6.  <u>Insurance</u>.  Except for worker's compensation insurance (which shall terminate at the Closing), Company shall continue in full force and effect all insurance carried by Company as of the date of this Agreement for a period ending not sooner than thirty (30) days following the Closing Date

    4.1.7.  <u>Financing Agreements</u>.  Company shall reasonably cooperate in connection with any Financing Agreement(s) between Buyer and any lender of or to Company concerning any desired amendment(s) and/or waiver(s) of any Financing Agreement(s) of Company that shall be subject to, and take effect upon, Closing, in order to ensure there is no

597116.1

25

4379023v.6

termination, cancellation, modification or acceleration of any such Financing Agreement(s) or indebtedness thereunder.

### 4.1.8.   No Solicitation or Negotiation.

(a)     Except for the Contemplated Transactions, Company shall not directly or indirectly, solicit, discuss, negotiate, initiate, agree to the sale, transfer, pledge, hypothecation or disposition of any membership interests or other equity interest in Company, except to Buyer or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to or consider the merits of any unsolicited inquiries or proposals from, any Person relating to any transaction involving the sale of the business or assets (other than in the Ordinary Course of Business) of Company or any equity interest of Company, any merger, consolidation, combination, exchange of equity interests or similar transaction involving Company, except to Buyer or any sale or disposition of any of the business or operating assets of Company.

(b)     Company shall give prompt notice to Buyer if Company receives any communication from any Person not a party to this Agreement that proposes any discussion, negotiation or agreement prohibited by Section 4.1.7(a).  This notice shall include the identity of the Person making any such inquiry or proposal and, if in writing, Company shall promptly deliver or cause to be delivered to Buyer a copy of such inquiry or proposal, along with all other documentation and related correspondence.  Moreover, Company shall keep Buyer informed, on a current basis, of the nature of any such inquiries and the status of any such proposal including amendments thereto.

(c)     Except for Contemplated Transactions, Company shall not agree to any acquisition of any equity interest in any business entity or any operating segment of any business entity.

4.2     Covenants of the Members.  To induce Buyer to enter into this Agreement and the Related Agreements and consummate the Contemplated Transactions, and without limiting any agreement, representation, warranty or covenant made elsewhere in this Agreement, each Member agrees, severally and not jointly, that between the date of this Agreement and the earlier of the Closing or the termination of this Agreement pursuant to Article VII, except as otherwise consented to by Buyer or as otherwise contemplated by this Agreement, including, without limitation, by the Contemplated Transactions as follows:

4.2.1.  Notification.  Such Member shall promptly notify Buyer in writing if such Member becomes aware of any fact or condition that causes or constitutes a material Breach of any representation and warranty of such Member as of the date of this Agreement or if such Member becomes aware of the occurrence, after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a material Breach of any representation or warranty of such Member had such representation or warranty been made as of the time of occurrence or awareness of such fact or condition.  Such Member shall promptly notify Buyer of the occurrence of any material Breach of any covenant of such Member in this Section 4.2 or of the occurrence of any event that may make the satisfaction of any condition in Section 5.1 impossible or unlikely.

597116.1

4379023v.6

4.2.2.  Commercially Reasonable Efforts.  Such Member shall use commercially reasonable efforts to cause, as promptly as practicable, this Agreement and the Related Agreements and the Contemplated Transactions to which such Member is a party to be consummated and effective and the conditions in Section 5.1 to be satisfied.

4.2.3.  Notices and Consents.  Such Member shall give any notice(s) to any Person(s) that may be necessary or appropriate in connection with this Agreement, the Related Agreements and/or the Contemplated Transactions and use commercially reasonable efforts to obtain all Consents necessary or appropriate for the consummation by such Member of this Agreement, the Related Agreements and the Contemplated Transactions.

4.2.4.  Proceedings.  Such Member shall promptly notify Buyer of any Proceeding that is Threatened or commenced against such Member or, as applicable, any employee, consultant, officer or director of such Member that relate to or affect, the Contemplated Transactions.  Such Member shall not knowingly fail to comply in any material respect with any Legal Requirements applicable to such Member or the Membership Interests.

4.2.5.  Financing Agreements.  Such Member shall reasonably cooperate in connection with any Financing Agreement(s) between Buyer and any lender of or to Company concerning any desired amendment(s) and/or waiver(s) of any Financing Agreement(s) of Company that shall be subject to, and take effect upon, Closing, in order to ensure there is no termination, cancellation, modification or acceleration of any such Financing Agreement(s) or indebtedness thereunder.

4.2.6.  Management of Company.  Such Member shall take such steps as are necessary to cause the management of Company to be constituted as contemplated by Section 5.1.9 subject to and effective upon the Closing and to cause all such nominees or designees to have been duly elected or appointed and qualified in accordance with Section 5.1.9 upon the Closing..

4.2.7.  No Solicitation or Negotiation.

(a)     Except for the Permitted Transactions, such Member shall not directly or indirectly, solicit, discuss, negotiate, initiate, agree to the sale, transfer, pledge, hypothecation or disposition of any Membership Interests or other equity interest in Company, except to Buyer or encourage any inquiries or proposals from, discuss or negotiate with, provide any non-public information to or consider the merits of any unsolicited inquiries or proposals from, any Person (other than Buyer) relating to any transaction involving the sale of the business or assets (other than in the Ordinary Course of Business) of Company or any equity interests or right to purchase any equity interests of Company, any merger, consolidation, combination, exchange of equity interests or similar transaction involving Company, except to Buyer or any sale or disposition of any of the business or operating assets of Company.

(b)     Such Member shall give prompt notice to Buyer if such Member receives any communication from any Person not a party to this Agreement that proposes any discussion, negotiation or agreement prohibited by Section 4.2.8(a).  This notice shall include the identity of the Person making any such inquiry or proposal and, if in writing, such Member shall

597116.1

27

4379023v.6

promptly deliver or cause to be delivered to Buyer a copy of such inquiry or proposal, along with all other documentation and related correspondence. Moreover, such Member shall keep Buyer informed, on a current basis, of the nature of any such inquiries and the status of any such proposal including amendments thereto.

(c)     Nothing in this <u>Section 4.2.7</u> shall permit such Member to terminate this Agreement (except as specifically provided in <u>Article VII</u>) or affect any other obligation of such Member under this Agreement.

4.2.8.   <u>Payment of Indebtedness</u>.  Except as expressly provided in this Agreement, such Member shall cause all indebtedness owed to Company by such Member or any Related Person of such Member to be paid in full at or prior to the Closing.

4.2.9.   <u>Confidentiality</u>.  Except as required by applicable law, each Member (a) shall keep any and all Confidential Information (as defined below) of the other parties hereto (and their respective Affiliates) strictly confidential, (b) shall not disclose or use any Confidential Information of Company, Buyer or any Affiliate of Buyer to the detriment of the business of Company, Buyer or any Affiliate of Buyer, and (c) shall not disclose or use any Confidential Information (other than such Member's Confidential Information) for the benefit of such Member or any other Person or for any other purpose or in connection with any business, transaction, or matter other than for the benefit of, for the purposes of, and in connection with the evaluation and consummation of the Contemplated Transactions.

For the purposes of this Agreement, "<u>Confidential Information</u>" means (i) this Agreement, (ii) any exhibit, schedule or other document to be provided by the disclosing party, its Affiliates or Representatives at Closing, and (iii) the following items, whether in writing, electronically, orally or otherwise, relating to Buyer, Company, a Member, or their respective Affiliates or their respective businesses: trade secrets, proprietary information, business plans, marketing plans, computer data and programs, methodologies, operations manuals, reports, records, financial information, sales information, capital expenditure information, compensation and benefit information, cost and pricing information, potential industry partners and contacts with such partners, customer and potential customer lists and contact information, supplier lists and contact information, vendor lists and contact information, and the names and backgrounds of key personnel and personnel training techniques and materials, however documented. Notwithstanding the foregoing, "Confidential Information" shall not include any information that (I) is or becomes publicly available other than as a result of the acts of the receiving party, its Affiliates or their respective Representatives in violation of this Agreement or (II) is or becomes available to the receiving party, its Affiliates or their respective Representatives from a source that, to the knowledge of such party, its Affiliates or their respective Representatives, is not bound by a confidentiality agreement with the disclosing party prohibiting such disclosure.

4.3     <u>Covenants of Buyer</u>.  To induce Company and each Member to enter into this Agreement and the Related Agreements and consummate the Contemplated Transactions, and without limiting any agreement, representation, warranty or covenant made elsewhere in this Agreement, Buyer agrees that between the date of this Agreement and the earlier of the Closing or the termination of this Agreement pursuant to <u>Article VII</u>, except as otherwise consented to by Company and the Member(s) holding a majority of the voting power of the Membership Interests

597116.1

28

held by all Members or as otherwise contemplated by this Agreement, including, without limitation, by the Contemplated Transactions, as follows:

4.3.1. <u>Notification</u> The Buyer shall promptly notify Company and each Member in writing if Buyer becomes aware of any fact or condition that causes or constitutes a material Breach of any representation and warranty of Buyer as of the date of this Agreement or if Buyer becomes aware of the occurrence, after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a material Breach of any representation or warranty of Buyer had such representation or warranty been made as of the time of occurrence or awareness of such fact or condition. The Buyer shall promptly notify Company and each Member of the occurrence of any material Breach of any covenant of Buyer in this <u>Section 4.3</u> or of the occurrence of any event that may make the satisfaction of any condition in <u>Section 5.1</u>, as applicable to Buyer, or <u>5.2</u> impossible or unlikely.

4.3.2. <u>Notices and Consents</u> The Buyer shall give any notice(s) to any Person(s) that may be necessary or appropriate in connection with this Agreement, the Related Agreements or the Contemplated Transactions and use commercially reasonable efforts to obtain all Consents necessary or appropriate for the consummation by Buyer of this Agreement, the Related Agreements and the Contemplated Transactions.

4.3.3. <u>Confidentiality</u>. Except as required by applicable law, Buyer (a) shall keep any and all Confidential Information (as defined below) of the other parties hereto (and their respective Affiliates) strictly confidential, (b) shall not disclose or use any Confidential Information of Company or the Members, or any Affiliate of Company or the Members, to the detriment of the business of Company, any Member, or their respective Affiliates, and (c) shall not disclose or use any Confidential Information (other than such Member's Confidential Information) for the benefit of such Member or any other Person or for any other purpose or in connection with any business, transaction, or matter other than for the benefit of, for the purposes of, and in connection with the evaluation and consummation of the Contemplated Transactions.

4.3.4. <u>Proceedings</u> The Buyer shall promptly notify Company and each Member of any Proceeding that is commenced, pending or Threatened against Buyer or, as applicable, any Representative of Buyer that relates to or affects, the Contemplated Transactions. The Buyer shall not knowingly fail to comply in any material respect with any Legal Requirements applicable to Buyer.

4.4 <u>Mutual Covenants.</u> The parties mutually covenant and agree as follows:

4.4.1. <u>Commercially Reasonable Efforts</u>. The parties to this Agreement mutually covenant and agree to use commercially reasonable efforts to cause, as promptly as practicable, this Agreement and the Related Agreements and the Contemplated Transactions to which Buyer is a party to be consummated and effective and, in the case of Members and Company, the conditions in <u>Sections 5.1</u> (except for the conditions set forth in <u>Section 5.1.1</u>) and, in the case of Buyer, <u>5.2</u> to be satisfied.

4.4.2. <u>Purchase Price Allocation</u>. The parties agree that the Purchase Price and the liabilities of Company (plus other relevant items) will be allocated to the assets of Company

597116.1

4379023v.6

for all purposes (including Tax and financial accounting) in a manner mutually agreed upon by Buyer and each Member. Buyer, Company, and Members shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocations.

    4.5    <u>Tax Matters</u>. The following provisions shall govern the allocation of responsibility as between Buyer and Members for certain tax matters following the Closing Date:

    4.5.1.  <u>Determination of Asset Value</u>. PEA shall make a final determination of the fair market value of the assets of the Company Business conveyed and transferred to Buyer upon consummation of the transactions contemplated herein. The parties shall fully cooperate with PEA. PEA shall make its final determination and deliver its valuation of such assets (the "<u>Transaction Asset Valuation</u>") to Buyer and the Members in a commercially reasonable time after the Closing, but in no event, later than sixty (60) days following the Closing. The Transaction Asset Valuation shall be binding on all parties (unless Members holding at least a majority of the Membership Interests object within three business days of receipt of such Transaction Asset Valuation, in which case the parties shall promptly convene with PEA to expeditiously resolve such dispute) and shall be used by Buyer and the Members in the calculation and filing of each of their tax returns for 2008 (including amended returns and claims for refund) and information returns, as applicable.

    4.5.2.  <u>Reports and Returns</u>. Company shall duly and timely file all reports and returns required to be filed with any Governmental Body prior to the Closing, including, without limitation, all Company Tax Returns (except for this reports and returns for which extensions have been appropriately granted), which reports and returns shall be prepared in accordance with all Legal Requirements in all respects. Company shall timely pay all Taxes and other quasi-governmental charges levied or assessed upon Company or any of Company's assets or properties prior to the date on which penalties attach thereto and all lawful claims which, if unpaid when due and payable, would reasonably be expected to become a Lien upon any of Company's assets or properties necessary for the conduct of the Company's business, except Permitted Liens. Company shall duly and timely make all deposits and estimated tax payments required of Company, with respect to any Taxes (including, without limitation, employee withholding Taxes).

    4.5.3.  <u>Straddle Period</u>. In the case of any taxable period that includes (but does not end on) the Closing Date (a "<u>Straddle Period</u>"), the amount of any Income Taxes for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date.

    4.5.4.  <u>Refunds; Tax Benefits</u>. Any Income Tax refunds that are received by Buyer or Company, and any amounts credited against Income Tax to which Buyer or Company become entitled, that relate to Income Tax periods or portions thereof ending on or before the Closing Date shall be for the account of Members, and Buyer shall pay over to the Members their respective amounts of any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto. In addition, to the extent that a claim for refund or a proceeding results in a payment or credit against Income Tax by a taxing authority to Buyer or

Company of any amount accrued on the Company's Financial Statements, Buyer shall pay such amount pro rata to the Members within fifteen (15) days after receipt or entitlement thereto.

4.5.5.  <u>Tax Periods Ending on or before Closing Date</u>. Members shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for Company for all periods ending on or prior to the Closing Date that are filed after the Closing Date. Members shall permit Buyer to review and comment on each such Tax Return described in the preceding sentence prior to filing. To the extent permitted by applicable law, Members shall include any income, gain, loss, deduction or other tax items for such periods on their Tax Returns in a manner consistent with the Schedule K-1s prepared by Members for such periods.

4.5.6.  <u>Cooperation on Tax Matters</u>.

(a)  Buyer, Company, and Members shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information reasonably relevant to any such audit, litigation, or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Company, Members, and Buyer agree (A) to retain all books and records with respect to Tax matters pertinent to Company relating to any taxable period beginning before the Closing Date until expiration of the statute of limitations (and, to the extent notified by Buyer or Members, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, Company or Members, as the case may be, shall allow the other party to take possession of such books and records.

(b)  Buyer and Members further agree, upon request, to use their best efforts to obtain any certificate or other document from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).]

## ARTICLE 5 -
## CONDITIONS PRECEDENT TO CLOSING

5.1  <u>Conditions Precedent to the Obligations of Buyer</u>. The obligations of Buyer under this Agreement shall be subject to the fulfillment and satisfaction of each and all of the following conditions at or prior to Closing (unless an earlier or later date and/or time is specified in this Agreement, in which case on or before such earlier or later date and/or time), each of which is individually hereby deemed material, and any one or more of which may be waived in writing by Buyer:

5.1.1.  <u>Representations and Warranties of Company and the Members</u>. All (considered collectively) and each (considered severally and not jointly) of the representations and warranties set forth in <u>Section 3.1</u> and <u>Section 3.2</u> above shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and

597116.1

31

warranties are qualified by the term "material," or contain the term "Material Adverse Effect," in which case such representations and warranties (as so written, including the term "material" or "Material Adverse Effect") shall be true and correct in all respects at and as of the Closing Date.

5.1.2. <u>Performance by Company and the Members</u>. Company and each Member shall have fully performed and complied with and satisfied all (considered collectively) and each (considered severally and not jointly) agreements, covenants and conditions required by this Agreement to be performed or complied with or satisfied by Company and such Member on or before the Closing (unless an earlier and/or later date and/or time is specified in this Agreement, in which case on or before such earlier and/or later date and/or time) in all respects, including, without limitation, the execution and delivery by Company and such Member of all items required by <u>Article VI</u>.

5.1.3. <u>All Consents</u>. There shall have been duly and validly obtained all Consents, including, without limitation, the Company Consents, the Member Consents and Buyer Consents, required in connection with this Agreement, the Related Agreements and the Contemplated Transactions, and all such Consents shall be in full force and effect as of the Closing.

5.1.4. <u>No Orders</u>. On the Closing Date, there shall be no effective Order of any kind, character or nature whatsoever entered, issued, made or rendered by any Governmental Body directing that any Contemplated Transaction not be consummated as herein provided or awarding damages or any other remedy to any Person with respect to any of the Contemplated Transactions.

5.1.5. <u>No Proceedings</u>. Since the date of this Agreement, there shall not have been commenced or Threatened against Company or any Member or against any Person affiliated with Company or any Member, any Proceeding (a) involving any challenge to or seeking damages or other relief in connection with, any of the Contemplated Transactions or (b) that could reasonably be expected to have the effect of preventing, delaying, making illegal or otherwise interfering with any Contemplated Transaction.

5.1.6. <u>Certificates of Company and the Members</u>. Company and each Member shall have provided to Buyer a certificate, dated the Closing Date, executed by Company and each Member, respectively, certifying that the conditions in <u>Section 5.1.1</u> and <u>5.1.2</u> as to Company and such Member have been fully fulfilled and satisfied.

5.1.7. <u>Good Standing</u>. Company shall have furnished to Buyer at or prior to the Closing a certificate of the appropriate Governmental Bodies, dated within thirty (30) days of the Closing Date, certifying that Company is in good standing and is duly qualified to conduct business in the applicable state of incorporation and in each applicable jurisdiction set forth in <u>Schedule 3.1.1</u> of the Company Disclosure Schedule.

5.1.8. <u>Related Agreements</u>. All parties to the Related Agreements (other than Buyer) shall have executed and delivered the Related Agreements to Buyer.

597116.1

4379023v.6

5.1.9.   Management of the Post-Closing Company.   On or prior to the Closing, each of the managers of Company shall deliver his/her resignation to Company effective immediately prior to the Closing.  Company and the Members shall take the requisite actions immediately prior to the Closing to elect the following person (such election to be subject to and conditioned upon consummation of the Closing) to be the Manager of the Company: George H. Rogers III.

5.1.10.  No Claim Regarding Ownership of the Membership Interests or Sale Proceeds.  There shall not have been any claim pending or Threatened by any Person claiming that such Person (a) is the holder or the beneficial owner of or has the right to acquire or to obtain beneficial ownership of, any equity interest of or any other voting, equity or ownership interest in, Company or (b) is entitled to all or any portion of the Purchase Price payable by Buyer to any Member for any of the Membership Interests.

5.1.11.  No Prohibition.  Neither the consummation nor the performance of any of the Contemplated Transactions shall, directly or indirectly (with or without notice or lapse of time), contravene or conflict with or result in a violation of or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order or (b) any Legal Requirement or Order that has been published, introduced or otherwise proposed by or before any Governmental Body.

5.1.12.  No Material Adverse Effect.  Between the date of this Agreement and the Closing Date, there shall not have occurred any Material Adverse Effect with respect to Company.

5.1.13.  Additional Documents.  Each of such documents as Buyer may reasonably request to carry out the intents and purposes of this Agreement shall have been delivered to Buyer, including, without limitation, documents (a) evidencing the accuracy of any representation and warranty of Company or any Member, (b) evidencing the performance by Company and each Member of or the compliance by Company and each Member with, any covenant or obligation required to be performed or complied with by Company or such Member, (c) evidencing the satisfaction of any condition referred to in this Section 5.1, or (d) otherwise facilitating the consummation or performance of the Contemplated Transactions

5.2     Conditions Precedent to the Obligations of Company and the Members.  The obligations of Company and each Member under this Agreement shall be subject to the fulfillment and satisfaction of each and all of the following conditions at or prior to Closing (unless an earlier or later date and/or time is specified in this Agreement, in which case on or before such earlier or later date and/or time), each of which is individually hereby deemed material, and any one or more of which may be waived in writing by Company and the Member(s) holding a majority of the voting power of the Membership Interests held by all Members:

5.2.1.   Representations and Warranties.  All (considered collectively) and each (considered severally and not jointly) of the representations and warranties set forth in Section 3.3 above shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or

597116.1

33

4379023v.6

contain the term "Material Adverse Effect," in which case such representations and warranties (as so written, including the term "material" or "Material Adverse Effect") shall be true and correct in all respects at and as of the Closing Date.

5.2.2. <u>Performance by Buyer</u>. The Buyer shall have fully performed and complied with and satisfied all (considered collectively) and each (considered severally and not jointly) agreements, covenants and conditions required by this Agreement to be performed or complied with or satisfied by Buyer on or before the Closing (unless an earlier and/or later date and/or time is specified in this Agreement, in which case on or before such earlier and/or later date and/or time) in all respects, including, without limitation, the execution and delivery by Buyer of all items required by <u>Article VI</u>.

5.2.3. <u>All Consents</u>. There shall have been duly and validly obtained all Consents, including, without limitation, the Company Consents, the Member Consents and Buyer Consents, required in connection with this Agreement, the Related Agreements and the Contemplated Transactions, and all such Consents shall be in full force and effect as of the Closing.

5.2.4. <u>No Orders</u>. On the Closing Date, there shall be no effective Order of any kind, character or nature whatsoever entered, issued, made or rendered by any Governmental Body directing that any Contemplated Transaction not be consummated as herein provided or awarding damages or any other remedy to any Person with respect to any Contemplated Transaction.

5.2.5. <u>Certificate of Buyer</u>. The Buyer shall have provided to Company and each Member a certificate, dated the Closing Date, executed by Buyer certifying that the conditions in <u>Section 5.2.1</u> and <u>5.2.2</u> as to Buyer have been fully fulfilled and satisfied.

5.2.6. <u>Good Standing</u>. Buyer shall have furnished to Company and each Member at or prior to the Closing a certificate of the appropriate Governmental Bodies, dated within thirty (30) days of the Closing Date, certifying that Buyer is in good standing in the State of California.

5.2.7. <u>Related Agreements</u>. Buyer shall have executed and delivered the Related Agreements to Company and such Member.

5.2.8. <u>Other Agreements</u>. ECUSA (i) and the Company shall enter into the License MOU concurrently with the Closing, (ii) and RQ Construction, Inc shall have entered into the Option Agreement, and (iii) shall have entered into the Voting Agreement with certain stockholders of ECUSA. In addition, the Distribution Agreement shall have been terminated (it being understood that the parties to the Distribution Agreement will abide by the terms and provisions of the Licensing MOU until a replacement distribution agreement has been executed).

5.2.9. <u>Assumption of Indebtedness</u>. In the following order, (i) ECUSA and Ecolite Manufacturing, LLC, a Nevada limited liability company, shall have (a) transferred the Equipment to the Company pursuant to the terms of the Assumption Agreement, and (ii) the

597116.1

34

4379023v.6

Company shall have assumed all payment obligations of ECUSA and Ecolite Manufacturing, LLC under and pursuant to the SBA Loan Documents.

5.2.10. <u>No Material Adverse Effect</u>.  Between the date of this Agreement and the Closing Date, there shall not have occurred any Material Adverse Effect with respect to Buyer.

5.2.11. <u>No Prohibition</u>.  Neither the consummation nor the performance of any of the Contemplated Transactions shall, directly or indirectly (with or without notice or lapse of time), contravene or conflict with or result in a violation of or cause Company or such Member or any Person affiliated with Company or such Member to suffer any adverse consequence under, (a) any applicable Legal Requirement or Order or (b) any Legal Requirement or Order that has been published, introduced or otherwise proposed by or before any Governmental Body.

5.2.12. <u>Additional Documents</u>.  Each of such documents as Company or such Member may reasonably request to carry out the intents and purposes of this Agreement shall have been delivered to Company or such Member, including, without limitation, documents (a) evidencing the accuracy of any representation and warranty of Buyer, (b) evidencing the performance by Buyer of or the compliance by Buyer with, any covenant or obligation required to be performed or complied with by Buyer, (c) evidencing the satisfaction of any condition referred to in this <u>Section 5.2</u>, or (d) otherwise facilitating the consummation or performance of the Contemplated Transactions.

## ARTICLE 6 -
## CLOSING DELIVERIES

At the Closing, the following shall occur as a single integrated transaction:

6.1    <u>Deliveries by Company</u>.  At the Closing, Company shall deliver or cause to be delivered to Buyer the following duly executed and/or certified, as appropriate, and otherwise effective items:

(a)    The documents required to be executed and/or delivered by Company pursuant to Section 5.1;

(b)    Company shall have delivered to Buyer (i) a copy of its Articles (and any amendments thereto) as in effect as of the Closing Date, certified by the Secretary of State of the State of California as of a date not earlier than thirty (30) days prior to the Closing Date, and (ii) its Operating Agreement;

(c)    the resignations of each of the managers of Company and evidence of the election of the new manager, as set forth and required by <u>Section 5.1.9</u>;

(d)    a certificate in a form reasonably acceptable by Buyer and its counsel (the "<u>Company Certificate</u>") duly executed by Company representing, warranting and certifying to Buyer that, except as otherwise stated in the Company Certificate, each representation and warranty of Company in this Agreement was true, accurate and complete on and as of the date of this Agreement and is true, accurate and complete on and as of the Closing

597116.1

4379023v.6

Date to the same extent and with the same effect as if made on and as of the Closing Date (except for changes contemplated by this Agreement and except to the extent any such representation and warranty speaks of an earlier and/or later date and/or time, in which case such representation or warranty shall have been true, accurate and complete as of such earlier and/or later date and/or time);

(e)     copies, certified or otherwise identified to the reasonable satisfaction of Buyer, of all documents and items that Buyer shall reasonably request, if any, to carry out the intents and purposes of this Agreement, including, without limitation, a unanimous written consent of the board of directors (including, without limitation, the disinterested directors) of Company, dated on or before the date hereof approving, authorizing and adopting this Agreement, the Related Agreements and the Contemplated Transactions; and

(f)     Company shall have delivered to Buyer a Manager's certificate certifying a true and complete copy of resolutions duly and validly adopted by the manager and members of Company evidencing its authorization of (i) the execution and delivery of this Agreement, the Related Agreements and any other agreements, documents or instruments to be executed and delivered by Company in connection with the Contemplated Transactions and (ii) the consummation of the Transaction (the "Company Manager's Certificate")

6.2     Deliveries by the Members.  At the Closing, each Member shall deliver or cause to be delivered to Buyer the following duly executed and/or certified, as appropriate, and otherwise effective items:

(a)     The documents required to be executed and/or delivered by Members pursuant to Section 5.1;

(b)     any and all certificate(s), if any, representing and evidencing the Membership Interests owned and/or held by such Member as described in Column II of Schedule A hereto (each, a "Membership Certificate," and, collectively, the "Membership Certificates")) duly endorsed or accompanied by a duly executed assignment (each, a "Power," and, collectively, the "Powers") as necessary in the judgment of Buyer to effectuate the transfer of such Membership Interests to Buyer; provided, however, that, if any Membership Certificate(s) shall have been lost or destroyed, the owner and holder of such Membership Certificate(s) shall be entitled to receive the Purchase Price for the percentage of Membership Interest represented by such lost or destroyed Membership Certificate(s) if such holder provides Buyer with a lost certificate affidavit and indemnification acceptable to Buyer in its sole discretion at or before the Closing;

(c)     a certificate in a form reasonably acceptable to Buyer and its counsel (the "Member Certificate") duly executed by such Member representing, warranting and certifying to Buyer that, except as otherwise stated in the Member Certificate, each representation and warranty of such Member in this Agreement was true, accurate and complete on and as of the date of this Agreement and is true, accurate and complete on and as of the Closing Date to the same extent and with the same effect as if made on and as of the Closing Date (except for changes contemplated by this Agreement and except to the extent any such representation and warranty speaks of an earlier and/or later date and/or time, in which case such

597116.1

36

4379023v.6

representation or warranty shall have been true, accurate and complete as of such earlier and/or later date and/or time); and

   (d) copies, certified or otherwise identified to the reasonable satisfaction of Buyer, of all documents and items that Buyer shall reasonably request, if any, to carry out the intents and purposes of this Agreement, including, without limitation, a unanimous written consent of the Members of Company, dated on or before the date hereof approving, authorizing and adopting this Agreement, the Related Agreements and the Contemplated Transactions.

  6.3 <u>Deliveries by Buyer</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Company and each Member, as appropriate, the following duly executed and/or certified, as appropriate, and otherwise effective items:

   (a) The documents required to be executed and/or delivered by Buyer pursuant to Section 5.2;

   (b) the Purchase Price pursuant to and in accordance with the provisions of <u>Section 2.2</u> and as set forth in <u>Schedule A</u>;

   (c) a certificate in a form reasonably acceptable to Company (the "<u>Buyer Certificate</u>") duly executed by Buyer representing, warranting and certifying to Company and each Member that, except as otherwise stated in Buyer Certificate, each representation and warranty of Buyer in this Agreement was true, accurate and complete on and as of the date of this Agreement and is true, accurate and complete on and as of the Closing Date to the same extent and with the same effect as if made on and as of the Closing Date (except for changes contemplated by this Agreement and except to the extent any such representation and warranty speaks of an earlier and/or later date and/or time, in which case such representation or warranty shall have been true, accurate and complete as of such earlier and/or later date and/or time);

   (d) copies, certified or otherwise identified to the reasonable satisfaction of Company and each Member, of all documents and items that Company and such Member shall reasonably request, if any, to carry out the intents and purposes of this Agreement, including, without limitation, a written consent of the Manager of Buyer, dated on or before the date hereof approving, authorizing and adopting this Agreement, the Related Agreements and the Contemplated Transactions, if any; and

   (e) Buyer shall have delivered to Company a Secretary's certificate certifying (i) a true and complete copy of resolutions duly and validly adopted by the Manager of Buyer evidencing its authorization of (x) the execution and delivery of t his Agreement, the Related Agreements and any other agreements, documents or instruments to be executed and delivered by Buyer in connection with the Contemplated Transactions and (y) the consummation of the Transaction, and (ii) the names and signatures of the officers of Buyer authorized to sign this Agreement, the Related Agreements and any other agreements, documents or instruments to be executed and delivered by Buyer in connection with the Contemplated Transactions, (the "<u>Buyer Officer's Certificate</u>").

597116.1

4379023v.6

## ARTICLE 7 -
## TERMINATION

7.1    Termination Events.  This Agreement may, by written notice given prior to or at the Closing, be terminated:

(a)    by any party hereto if a material Breach of any provision of this Agreement has been committed by any other party or parties and such material Breach has not been waived or cured before the Closing by the appropriate party or parties (provided, however, that neither the Company or any Member may give notice of termination for the foregoing reason if the party in material Breach is any other Member or the Company);

(b)    by Buyer if any condition in Section 5.1 is or becomes impossible to fulfill or satisfy (other than through or as a result of any failure of Buyer to comply with the obligations of Buyer under this Agreement) and Buyer has not waived any such condition on or before the Closing Date, or by Company or ECUSA, if any condition in Section 5.2 is or becomes impossible to fulfill or satisfy (other than through or as a result of any failure of Company or ECUSA to comply with the obligations of Company or ECUSA under this Agreement) and Company and ECUSA have not waived any such condition on or before the Closing Date;

(c)    by any party hereto if any other party (i) becomes insolvent, or generally does not pay its debts as they become due, or admits in writing its inability to pay its debts, or makes an assignment for the benefit of creditors, or (ii) insolvency, receivership, reorganization, or bankruptcy proceedings are commenced by or against such other party (provided, however, that neither the Company or any Member may give notice of termination for the foregoing reason if the party described in clause (i) or (ii) of this Section 7.1(c) is any other Member or the Company);

(d)    by mutual consent of Buyer and Members holding more than 50% of the Membership Interests; or

(e)    by any party hereto if the Closing has not occurred (other than through or as a result of any failure of any party seeking to terminate this Agreement to comply with the obligations of such party under this Agreement) within ninety (90) days from the date hereof.

7.2    Effect of Termination.  Each party's right of termination under Section 7.1 is in addition to any other rights such party may have under this Agreement or otherwise, and the exercise of a right of termination shall not be an election of remedies.  If this Agreement is terminated pursuant to Section 7.1, (i) each party (in this context, the "receiving party") will return or destroy as much of the Confidential Information of the other party (in this context, the "disclosing party") as the disclosing party may request and shall certify to such destruction, and (ii) all further obligations of the parties under this Agreement shall terminate, except for the obligations in Article VIII which shall survive; provided, however, each party's right to pursue all legal remedies because of a Breach of this Agreement by any other party or parties shall survive such termination unimpaired.

597116.1

38

4379023v.6

## ARTICLE 8 -
## INDEMNIFICATION AND REMEDIES

8.1     <u>Survival; Right to Indemnification Not Affected by Knowledge</u>.  All representations and warranties in this Agreement, the Related Agreements, the Company Certificate, the Member Certificate and Buyer Certificate shall survive the Closing until eighteen (18) months after the Closing Date (the "<u>Survival Date</u>"); provided, however, that, notwithstanding anything in this Agreement or elsewhere to the contrary, the representations and warranties of Company, each Member and Buyer in (a) Sections <u>3.1.1</u>, <u>3.1.2</u>, <u>3.1.9</u>, <u>3.2.1</u>, <u>3.2.7</u>, <u>3.3.1</u> and <u>3.3.2</u> of this Agreement (the "<u>Extended Representations and Warranties</u>") shall survive forever (subject to any applicable statutes of limitations), (b) Section <u>3.1.18</u> of this Agreement (the "<u>Tax Representations and Warranties</u>") shall survive until all applicable statutes of limitations, including, without limitation, any tolling agreements or periods, have expired, and (c) the representations, warranties, agreements, covenants, obligations and other provisions in this Agreement that by their terms apply or are to be performed in whole or in part prior to or after the Survival Date (the "<u>Date Specific Provisions</u>") shall be governed by the terms of survival set forth in the Date Specific Provisions with respect only to such Date Specific Provisions.  From and after the Survival Date, no party to this Agreement shall have any indemnification obligation pursuant to this <u>Article VIII</u> with respect to any representation, warranty, agreement, covenant or obligation contained in this Agreement, the Related Agreements, the Company Certificate, the Member Certificate or Buyer Certificate, except with respect to the Extended Representations and Warranties, the Tax Representations and Warranties, the Date Specific Provisions and any matter(s) as to which notice has been received prior to the Survival Date in accordance with <u>Section 8.4</u> or <u>8.5</u>.  Notwithstanding anything to the contrary in this <u>Section 8.1</u>, the indemnification obligations pursuant to this <u>Article VIII</u> shall not terminate with respect to (i) any indemnification claim made by Buyer, Company or the Members prior to the Survival Date or (with respect to a claim against the Extended Representations and Warranties, the Tax Representations and Warranties or the Date Specific Provisions, as applicable) the termination date of the Extended Representations and Warranties, the Tax Representations and Warranties or the Date Specific Provisions, as applicable, until such claim is resolved or (ii) a Potential Loss (as defined below) until the date on which such Potential Loss is determined to have resulted in any loss, liability, claim, damage (excluding incidental or consequential damages except as expressly permitted pursuant to Section 8.6(d) below) or expense (including, without limitation, costs of investigation and defense and reasonable attorneys' fees) (collectively, a "<u>Loss</u>") to the potential indemnified party and such party has made a related claim for indemnification with respect to such Loss pursuant to this <u>Article VIII</u> (provided, that such claim must be made, if at all, within ninety (90) days following the date on which such Potential Loss is determined to have resulted in a Loss).  Except as set forth herein, the right to indemnification, reimbursement for or payment of Buyer Damages or Company Damages, as applicable or other remedy based on any such representation, warranty, agreement, covenant or obligation shall not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or obligation.  Except as set forth herein, the waiver of any condition based on the accuracy of any representation or warranty or on the performance of or compliance with any agreement, covenant

or obligation, shall not affect the right to indemnification, reimbursement for or payment of damages or any other remedy based on such representation, warranty, agreement, covenant and obligation.

"Potential Loss" shall mean the discovery by a party that a representation or warranty of another party under this Agreement was not true in all respects, except where such representation or warranty is qualified by "Knowledge" or "materiality" or "Material Adverse Effect," in which case such representation or warranty shall have been true as so qualified, when made and that such inaccuracy may result in a Loss to such first party.

8.2    Indemnification and Payment of Damages by Company and the Members. Subject to the provisions and limitations of this Article VIII, ECUSA (and prior to the Closing only, EcoWall) and the Company (provided, that with respect to Company, the indemnification obligations of this Section 8.2 shall apply only with respect to Losses occurring prior to Closing) (the "Seller Indemnifying Parties"), jointly and severally, shall indemnify, defend and hold harmless Buyer and any Representative and Affiliate (including, without limitation, after the Closing, Company) of Buyer (each, a "Buyer Indemnified Person," and, collectively, the "Buyer Indemnified Persons") from and against the amount of any Loss, whether or not involving any third-party claim, actually suffered, incurred or realized by such Buyer Indemnified Person (collectively, "Buyer Damages"), arising, directly from or in connection with:

(a)    any Breach of any representation or warranty made by Company or ECUSA in this Agreement, the Company Certificate, the Member Certificate or any other certificate or document delivered by Company or ECUSA pursuant to this Agreement;

(b)    any Breach of any representation or warranty made by Company or ECUSA in this Agreement as if such representation or warranty were made on and as of the Closing Date (except for changes contemplated by this Agreement and except to the extent any such representation and warranty speaks of an earlier and/or later date and/or time, in which case such representation or warranty shall have been true, accurate and complete in all material respects as of such earlier and/or later date and/or time), other than any such Breach that is expressly identified in the Company Certificate or the Member Certificate Schedule as having caused the conditions specified in Sections 5.1.1 or 5.1.2, as applicable, not to be fulfilled and satisfied;

(c)    any Breach by Company or ECUSA of any agreement, covenant or obligation of Company or ECUSA in this Agreement;

(d)    any Proceeding relating to any event, condition, circumstance, activity, practice, incident, action, omission, negligence, fault or plan initially existing or occurring (or alleged to have occurred) prior to the Closing relating to or involving in any way Company (whether or not any such event, condition, circumstance, act, practice, incident, action, omission, negligence, fault, plan or Proceeding has been disclosed on any disclosure schedule or otherwise to Buyer); or

(e)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have

597116.1

40

4379023v.6

been made by such Person with either Company or ECUSA or any Person acting on behalf of Company or ECUSA in connection with any of the Contemplated Transactions.

Subject to Article VII of this Agreement, the indemnification provided in this Article VIII shall be the sole and exclusive remedy available to Buyer or any other Buyer Indemnified Person for any Breach of any representation, warranty, covenant, agreement or obligation in this Agreement, the Company Certificate or any Member Certificate by Company or a Member, except for any Breach resulting from fraud or that constitutes an intentional Breach by Company or a Member. Notwithstanding anything in this Agreement to the contrary, (i) no Buyer Indemnified Person shall bring any claim for Losses subject to the indemnity provisions set forth in this Agreement against Company or ECUSA to the extent such Buyer Damages arise soley out of the acts or omissions of EcoWall or its Representatives; and (ii) as appropriate, ECUSA shall be entitled to seek indemnity, contractual or equitable, and contribution against EcoWall related to or arising from Losses subject to the indemnity provisions set forth in this Agreement only to the extent such Losses are the result solely of the acts or omissions of EcoWall or its Representatives.

8.3     Indemnification and Payment of Damages by Buyer. Subject to the provisions and limitations of this Article VIII, Buyer shall indemnify, hold harmless and promptly reimburse ECUSA and any Representative and Affiliate of ECUSA (each, a "Member Indemnified Person," and, collectively, the "Member Indemnified Persons") for, and shall pay to the Member Indemnified Persons the amount of, any Loss or Potential Loss, whether or not involving any third-party claim, actually suffered, incurred or realized by such Member Indemnified Person (collectively, "Member Damages"), arising, directly or indirectly, from or in connection with:

(a)     any Breach of any representation or warranty made by Buyer in this Agreement, or Buyer Certificate or any other certificate or document delivered by Buyer pursuant to this Agreement;

(b)     any Breach of any representation or warranty made by Buyer in this Agreement as if such representation or warranty were made on and as of the Closing Date (except for changes contemplated by this Agreement and except to the extent any such representation and warranty speaks of an earlier and/or later date and/or time, in which case such representation or warranty shall have been true, accurate and complete as of such earlier and/or later date and/or time), other than any such Breach that is expressly identified in Buyer Certificate as having caused the conditions specified in Sections 5.2.1 and 5.2.2 not to be fulfilled and satisfied;

(c)     any Breach by Buyer of any agreement, covenant or obligation of Buyer in this Agreement;

(d)     any Proceeding (other than a Proceeding instituted by Buyer) relating to any event, condition, circumstance, activity, practice, incident, action, omission, negligence, fault or plan initially existing or occurring (or alleged to have occurred) after the Closing relating to or involving in any way Company or Buyer (whether or not any such event,

597116.1

41

4379023v.6

condition, circumstance, act, practice, incident, action, omission, negligence, fault, plan or Proceeding has been disclosed on any disclosure schedule or otherwise to the Members);

(e)     any sales, gross receipts or other transfer taxes arising out of or related to the transfer of the Equipment to Company; or

(f)     any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer or any Person acting on behalf of Buyer in connection with any of the Contemplated Transactions.

Subject to Article VII of this Agreement, the indemnification provided in this Article VIII shall be the sole and exclusive remedy available to Company, the Members and any other Company Indemnified Person for any Breach of any representation, warranty, covenant, agreement or obligation in this Agreement or Buyer Certificate by Buyer, except for any Breach resulting from fraud or that constitutes an intentional Breach by Buyer or its Representatives.

8.4     Procedure for Indemnification of Third Party Claims.

(a)     Promptly after receipt by an indemnified party under Section 8.2 or 8.3 of notice of the commencement of any Proceeding against such indemnified party, such indemnified party shall, if such party intends to exercise its right to indemnification from an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim; provided, however, that the failure to notify the indemnifying party shall not relieve the indemnifying party of any liability that such indemnifying party may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is materially prejudiced by the indemnified party's failure to give such notice.

(b)     If any Proceeding referred to in Section 8.4(a) is brought against an indemnified party and such indemnified party gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party shall be entitled to participate in such Proceeding and, to the extent that such indemnifying party wishes (unless (i) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to competently defend such Proceeding and provide indemnification with respect to such Proceeding) to assume the defense of such Proceeding with counsel satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party shall not, as long as such indemnifying party diligently conducts such defense, be liable to the indemnified party under this Article VIII for any fees of counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (i) no compromise or settlement of the claims under such Proceeding may be effected by the indemnifying party without the consent of the indemnified party unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of

597116.1

42

4379023v.6

the rights of any Person and no adverse effect on any other claims that may be made against the indemnified party and (B) the sole relief provided is a monetary settlement to be paid in full by the indemnifying party, (ii) the indemnified party shall have no liability with respect to any compromise or settlement of such claims effected without the consent of such indemnified party, and (iii) the indemnified party shall provide its reasonable cooperation to the indemnifying party in connection with the defense of such Proceeding. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten (10) days after the such notice is given, give notice to the indemnified party of the election of the indemnifying party to assume the defense of such Proceeding, the indemnified party shall be entitled to employ counsel to represent or defend the indemnified party in such Proceeding and the indemnifying party shall pay the reasonable fees and expenses of such counsel as incurred; provided, however, that the indemnifying party shall not be required to pay the fees and expenses of more than one (1) counsel for all indemnified parties in any jurisdiction in any single Proceeding. In any Proceeding with respect to which indemnification is sought hereunder, the indemnified party or the indemnifying party, whichever is not assuming the defense of such Proceeding, shall have the right to participate therein and to retain its own counsel at such party's own expense; provided, that such participation by the party not assuming the defense of such Proceeding, including without limitation the actions of such Party's counsel, shall not adversely effect the control of the defense of such Proceeding by the party that has assumed such defense of such Proceeding. The indemnified party and the indemnifying party, as the case may be, shall at all times use commercially reasonable efforts to keep the other party reasonably apprised of the status of the defense of any Proceeding, the defense of which such party is maintaining, and to cooperate in good faith with each other with respect to the defense of any such Proceeding.

      (c)    Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that such party or an Affiliate of such party would be subject to, or entitled to receive, an Order in equity, including without limitation an injunction or restraining order, in a Proceeding, including in connection with the Intellectual Property of Company, and that monetary damages (for which such party or an Affiliate of such party would be entitled to indemnification under this Agreement) would not be sufficient, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise or settle such Proceeding; provided, however, that the indemnifying party (i) shall have the right to participate in such Proceeding and (ii) shall not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without the consent of the indemnifying party (which may not be unreasonably withheld).

      (d)    Each of the parties hereto hereby consents to the non-exclusive jurisdiction of any court in which a Proceeding is brought against any indemnified party for purposes of any claim that any indemnified party may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on parties hereto with respect to such a claim anywhere in the world.

     8.5    <u>Procedure for Indemnification of Other Claims</u>. A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

     8.6    <u>Indemnification Limits</u>.

597116.1

43

4379023v.6

(a)      No party to this Agreement shall be liable for or obligated to pay, any Buyer Damages arising under Section 8.2(a) or (b) or Member Damages arising under Section 8.3(a) or (b), to the extent such Buyer Damages or Member Damages are less than or equal to $5,000 (the "De Minimis Basket"); provided, that for the purposes of this Section 8.6(a), all such Buyer Damages or Member Damages arising out of, or in connection with, a series of related events or circumstances shall be aggregated; provided further, however, that, notwithstanding anything to the contrary in this Section 8.6(a) or elsewhere in this Agreement, the De Minimis Basket shall not apply to any Buyer Damages arising out of or relating to any claim(s) under or in connection with (i) the Extended Representations and Warranties, (ii) the Tax Representations and Warranties, (iii) Section 8.2(d), or (iv) the fraud or willful misconduct of Company or any Member; provided further, however, that, notwithstanding anything to the contrary in this Section 8.6(a) or elsewhere in this Agreement, the De Minimis Basket shall not apply to any Member Damages arising out of or relating to any claim(s) under or in connection with (i) the Extended Representations and Warranties of Buyer, (ii) Sections 8.3(d) or (e) or Section 9.1, or (iii) the fraud or willful misconduct of Buyer.

(b)      No party to this Agreement shall be liable for or obligated to pay any Buyer Damages arising under Section 8.2(a) or (b) or Member Damages arising under Section 8.3(a) or (b), unless and until any party or parties to be indemnified has or have incurred aggregate Buyer Damages arising under Section 8.2(a) or (b) or Member Damages arising under Section 8.3(a) or (b), respectively, in excess of $25,000 (the "Basket"); provided, however, that, notwithstanding anything to the contrary in this Section 8.6(b) or elsewhere in this Agreement, the Basket shall not apply to (i) any Buyer Damages arising out of or relating to any claim(s) under or in connection with (a) the Extended Representations and Warranties, (b) the Tax Representations and Warranties, (c) Section 8.2(d) or (iv) the fraud or willful misconduct of Company or any Member, and (ii) any Member Damages arising out of or relating to any claim(s) under or in connection with (x) the Extended Representations and Warranties of Buyer, (y) Sections 8.3(d) or (e) or Section 9.1, or (z) the fraud or willful misconduct of Buyer or any Buyer Representative.  At such time as the aggregate Buyer Damages or Member Damages incurred by the party or parties to be indemnified shall exceed the Basket, any party or parties to be indemnified shall only be entitled to the amount of such Buyer Damages or Member Damages in excess of the Basket, subject to the other provisions of this Section 8.6.

(c)      No party to this Agreement shall be liable for or obligated to pay, for any reason, in connection with Buyer Damages arising under Section 8.2(a) or (b) and the Member Damages arising under Section 8.3(a) or (b), any amount in excess of the Purchase Price (hereinafter, the "Cap"); provided, however, that, notwithstanding anything to the contrary in this Section 8.6(c) or elsewhere in this Agreement, (i)(A) the Cap shall not apply to any Buyer Damages arising out of or relating to any claim(s) under or in connection with (1) the Extended Representations and Warranties, (2) the Tax Representations and Warranties, (3) Section 8.2(d) or (iv) the fraud or willful misconduct of Company or any Member, and (B) the amount of any Buyer Damages arising out of or relating to any claim(s) under or in connection with (1) the Extended Representations and Warranties, (2) the Tax Representations and Warranties, (3) Section 8.2(d) or (4) the fraud or willful misconduct of Company or any Member shall not be included in or counted toward any determination of the Cap, and (ii)(A) the Cap shall not apply to any Member Damages arising out of or relating to any claim(s) under or in connection with

(1) the Extended Representations and Warranties of Buyer, (2) <u>Sections 8.3(d) or (e)</u> or <u>Section 9.1</u>, or (3) the fraud, or willful misconduct of Buyer or any Buyer Representative, and (B) the amount of any Member Damages arising out of or relating to any claim(s) under or in connection with (1) the Extended Representations and Warranties of Buyer, (2) <u>Sections 8.3(d) or (e)</u> or <u>Section 9.1</u>, or (3) the fraud or willful misconduct of Buyer or any Buyer Representative shall not be included in or counted toward any determination of the Cap. Notwithstanding anything herein to the contrary, no Member shall be liable for or obligated to pay, for any reason, in connection with Buyer Damages arising under Section 8.2(a) or (b), any amount in excess of such Member's pro rata share thereof except with respect to Buyer Damages arising out of or related to the fraud or willful misconduct of such Member. For purposes of this Agreement, a Member's "pro rata share" shall mean the percentage equal to the percentage of the Purchase Price received by such Member.

(d)  Nothing contained in this <u>Section 8.6</u> shall be construed to limit the rights and obligations of the parties hereto under any other agreement. The indemnification obligations of the parties hereto pursuant to this <u>Article VIII</u> shall be limited to actual damages and shall not, except in the case of fraud or willful misconduct, include incidental, consequential, indirect, punitive or exemplary damages, except that any incidental, consequential, indirect, punitive or exemplary damages recovered by any third party against any party indemnified pursuant to this <u>Article VIII</u> shall be included in damages recoverable under such indemnity.

(e)  In recovering any payment due pursuant to this <u>Article VIII</u> by Buyer for any Buyer Damages, subject to the limitations set forth in this <u>Section 8.6</u>, Buyer shall collect such payments due (i) from any insurance policies or arrangements that insure against such Losses, and (ii) to the extent that the resources in clause (i) of this <u>Section 8.6(e)</u> are not available to fully insure against such Losses, from the Members, severally, in accordance with the "pro rata share" (as defined in Section 8.6(c) above; <u>provided,</u> that any time spent collecting, or attempting to collect, such payments from the resources set forth in clauses (i) and (ii) shall not count towards the time period for collecting from the Members, including without limitation any applicable statute of limitations, and such time period shall be tolled from the earlier of (x) the day that Buyer first notifies Company the Members of its intention to exercise its rights to indemnification under this <u>Article VIII</u> or (y) the day that Buyer first attempts to collect such payment pursuant to this <u>Section 8.6(e)</u>.

8.7  <u>Purchase Price Adjustment.</u> All indemnification payments under this Article VIII shall be deemed adjustments to the Purchase Price.

## ARTICLE 9 -
## POST-CLOSING COVENANTS

9.1  <u>SBA Loan</u>. Buyer shall as promptly as reasonably practicably following the Closing, but not later than ninety (90) days after the Closing, cause the SBA Note to be paid and discharged in full, the SBA Security Agreement and related UCC-1 filings to be terminated, and the SBA Deed of Trust to be reconveyed. Within three (3) business days following the closing, Buyer will enter into that certain Bill of Sale, Assignment and Assumption and Indemnity, effective as of July 25, 2008, by and between Company, ECUSA and ECM (the "*Assignment Agreement*") for the limited purposes of, along with Company, jointly and severally

597116.1

45

4379023v.6

indemnifying ECUSA and ECM pursuant to the provisions of Section 3(b) thereof. At all times following the Closing and prior to the satisfaction of the covenants contained in first sentence of this Section 9.1, Buyer will timely satisfy (or cause to be timely satisfied) all payment obligations of ECUSA and ECM to the SBA Lender as they arise under the SBA Loan, and ECUSA shall reasonably cooperate with Buyer at Buyer's expense to effect the timely satisfaction of such payment obligations. Without limitation of the other provisions of Article VIII of this Agreement, in the event of a Breach by Buyer of the foregoing covenants of this Section 9.1 and the acceleration by the SBA Lender of the SBA Note and the initiation by SBA Lender of enforcement of the Unconditional Guarantee of Brian D. Smith in favor of the SBA Lender, dated as of February 26, 2007, and of the SBA Deed of Trust, Brian D. Smith shall be deemed a Member Indemnified Person pursuant to Section 8.3.  Notwithstanding anything to the contrary contained in Article VIII, any Member Damages arising out of or related to a Breach of the covenants contained in this Section 9.1 shall be subject to the indemnification provisions of Article VIII and shall be excluded from the Cap. The indemnification obligations of Buyer contemplated by this Section 9.1 shall be superseded at such time that Buyer enters into the Assignment Agreement (and becomes bound by the indemnification obligations contained therein), whereupon the indemnification provisions of the Assignment Agreement shall govern.

     9.2    <u>Distribution Agreement</u>. Following the Closing, Buyer and ECUSA shall use their best efforts to negotiate, sign and deliver a distribution agreement consistent with the terms and conditions of the Licensing MOU.

<div align="center">

**ARTICLE 10 -**
**MISCELLANEOUS**

</div>

     10.1    <u>Fees and Expenses</u>.  Except as otherwise expressly provided in this Agreement, each party to this Agreement shall bear the expenses of such party incurred in connection with the preparation, execution and performance of this Agreement, the Related Agreements and the Contemplated Transactions, including, without limitation, any and all fees and expenses of any agents, Representatives, counsel and accountants of such party.  In the event of termination of this Agreement, the obligation of each party to pay the expenses of such party shall be subject to any rights of such party arising from a Breach of this Agreement by another party.

     10.2    <u>Public Announcements</u>.  No public announcement or similar publicity with respect to this Agreement, the Related Agreements or the Contemplated Transactions shall be issued or made by any party without the prior written consent of Buyer (which consent shall not be unreasonably withheld) and ECUSA.

     10.3    <u>Notices</u>.  All notices, consents, waivers and other communications under this Agreement shall be in writing and shall be deemed to have been duly given and received when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile or electronic mail (receipt of transmission confirmed), or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (return receipt requested), in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a party may designate by notice to another party):

     If to Company (prior to Closing):

597116.1

<div align="center">46</div>

4379023v.6

Ecolite Las Vegas, LLC
2091 Las Palmas, Suite E
Carlsbad, CA  92011
Attn: CEO
Fax: (760) 804-9038
Email: james@ecoliteconcrete.com

If to Buyer:

RQ Manufacturing, LLC
3194 Lionshead Avenue
Carlsbad, California 92010
Attn: Gerard Smolin, Jr., Esq.
Fax: (760) 631-7739
Email: rsmolin@rqconstruction.com

with a copy to:

Musick Peeler & Garrett LLP
225 Broadway, Suite 1900
San Diego, California 92101
Attn: Gary L. Wollberg, Esq.
Fax: (619) 231-1234

If to any Member:

To the address(es) or facsimile number set forth below the name of such Member on the applicable signature page(s) hereto.

with a copy to:

Mintz Levin
3580 Carmel Mountain Road, Suite 300
San Diego, California 92130
Attn: Jeremy B. Hayden, Esq.
Fax: (858) 314-1501

10.4    Jurisdiction; Service of Process.  Any action or other Proceeding seeking to enforce any provision of or based on any right arising out of, this Agreement may be brought against any of the parties only in the courts of the State of California, County of Los Angeles, or, if such party has or can acquire jurisdiction, in the United States District Court for the Central District of California, and each of the parties consents to the jurisdiction of such court(s) (and of the appropriate appellate courts) in any such action or other Proceeding and waives any objection to venue laid therein and agrees that such jurisdiction shall be exclusive.  Process in any action or other Proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

597116.1

47

4379023v.6

10.5    Further Assurances. The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other parties may reasonably request for the purpose of carrying out the intent and purpose of this Agreement, the Related Agreements, the Contemplated Transactions and any other documents contemplated by this Agreement.  In addition to the foregoing, from time to time after the Closing and without further consideration, Company and the Members, upon the reasonable request of Buyer, shall execute and deliver such documents and instruments of conveyance and transfer as Buyer may reasonably request in order to consummate more effectively the Contemplated Transactions.

10.6    Waiver. Neither the failure to exercise, nor any delay by any party in exercising, any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one (1) party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other parties, (b) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given, and (c) no notice to or demand on one (1) party shall be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement, the Related Agreements or any other documents contemplated by this Agreement.

10.7    Entire Agreement: Modification. This Agreement supersedes all prior agreements between the parties with respect to its subject matter (provided, however, that, notwithstanding anything to the contrary in this Agreement, this Agreement shall not impair or diminish any of the rights or obligations of any of the parties hereto pursuant to, supersede or otherwise affect in any manner, the Related Agreements) and constitutes (along with the agreements and documents contemplated this Agreement) a complete and exclusive statement of the terms of the agreement by and among the parties hereto with respect to the subject matter of this Agreement.  This Agreement may not be amended except by a written agreement executed by any and all parties to be charged with or otherwise affected by any such amendment.

10.8    Assignments, Successors and No Third-Party Rights. No party may assign any of the rights or obligations of such party under this Agreement without the prior consent of the other parties, which shall not be unreasonably withheld.  Subject to the preceding sentence, this Agreement shall apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties.  Nothing expressed or referred to in this Agreement shall be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and the successors and permitted assigns of the parties hereto.

10.9    Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full

597116.1

48

force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

10.10   Article and Section Headings; Construction.  The headings of Articles and Sections in this Agreement are provided for convenience only and shall not affect the construction or interpretation of this Agreement.  All references to "Article," "Articles," "Section," or "Sections" refer to the corresponding Article, Articles, Section or Sections of this Agreement.  All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

10.11   Time of the Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.12   Governing Law.  This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of California without regard to conflict of laws principles.

10.13   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one (1) and the same agreement.

*[Remainder of Page Intentionally Left Blank.*
*Signature Page(s) To Follow.]*

597116.1

4379023v.6

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement effective as of the date first written above.

**BUYER:**

RQ MANUFACTURING, LLC,
A CALIFORNIA LIMITED LIABILITY COMPANY

By: _____
Name: George H. Rogers III
Title:   Manager and Chief Executive Officer

By: _____
Name: Gerard Shublin, Jr.
Title:   Secretary

**COMPANY:**

ECOLITE LAS VEGAS, LLC,
A NEVADA LIMITED LIABILITY COMPANY

By:     Ecolite Concrete U.S.A., Inc., its Manager

        By: _____
              James Lawrence, CEO

*[Signatures of Members follow.]*

**MEMBERS:**

ECOLITE CONCRETE, U.S.A., INC.,
A NEVADA CORPORATION

By: _____
James Lawrence, Chief Executive Officer

Address: 2091 Las Palmas, Suite E
Carlsbad, CA  92011
Fax: (760) 804-9038
Email: james@ecoliteconcrete.com


ECOWALL, LLC,
A NEVADA LIMITED LIABILITY COMPANY
BY THE AVANZI GROUP, A NEVADA LIMITED LIABILITY COMPAN
MANAGER

By: _____
Name: _____
Title:  Manager

Address: _____
_____

Fax: (____) ____-____
Email: _____


*[End of Signatures of Members]*

597116.1

4379023v.6

## SCHEDULE A

## Membership Interests

**As of the Closing Date:**

### Membership Interests

| Column I<br>Member | Column II<br>% Membership Interests Owned<br>and/or Held (%) | Column III<br>Aggregate Proceeds ($) |
| --- | --- | --- |
| Ecolite Concrete U.S.A., Inc. | 80% | $8.00 |
| EcoWall, LLC | 20% | $2.00 |
| Total: | 100% | $10.00 |



JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| RQ Construction, Inc. | Ecolite Concrete U.S.A., Inc., Ecolite International, Inc., Brian Smith, and DOES 1 through 90 |

**(b)** County of Residence of First Listed Plaintiff   San Diego, California
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   San Diego, California
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Marks, Golia & Finch, LLP, 8620 Spectrum Center Blvd., Suite 900, San Diego, California 92123, (858) 737-3100

Attorneys (If Known)

FILED
09 DEC -4 PM 4: 26
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY:                    DEPUTY

**09 CV 2728 BEN   WVG**

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **PRISONER PETITIONS** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 510 Motions to Vacate Sentence | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | **Habeas Corpus:** | **IMMIGRATION** | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 530 General | ☐ 462 Naturalization Application | |
| | ☐ 440 Other Civil Rights | ☐ 535 Death Penalty | ☐ 463 Habeas Corpus - Alien Detainee | |
| | | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | |
| | | ☐ 550 Civil Rights | | |
| | | ☐ 555 Prison Condition | | |

*(Note: PERSONAL INJURY second column items: ☐ 362 Personal Injury - Med. Malpractice; ☐ 365 Personal Injury - Product Liability; ☐ 368 Asbestos Personal Injury Product Liability; **PERSONAL PROPERTY**: ☐ 370 Other Fraud; ☐ 371 Truth in Lending; ☐ 380 Other Personal Property Damage; ☐ 385 Property Damage Product Liability)*

## V. ORIGIN   (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
United States Code sections 77a et seq., 78a et seq., and 1367

Brief description of cause:
Securities Fraud/Fraudulent Misrepresentations

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   12/4/09

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 7984   AMOUNT 350.00   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

WS  12/4/09

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS007984
Cashier ID: msweaney
Transaction Date: 12/04/2009
Payer Name: MARKS, GOLIA AND FINCH LLP
---------------------------------
CIVIL FILING FEE
 For: RQ CONSTRUCTIONS V ECOLITE
 Case/Party: D-CAS-3-09-CV-002728-001
 Amount:        $350.00
---------------------------------
CHECK
 Check/Money Order Num: 37742
 Amt Tendered:  $350.00
---------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```